THE KING LAW GROUP
DAVID A. KING, ESQ. (SBN212439)
dking@thekinglawgroup.com
707 Broadway, Suite 1240
San Diego, CA  92101
Telephone:     619-702-2008
Facsimile:      619-702-2009

Attorneys for Defendant Tampa Investment Group, LLC

**FILED**

MAR 6 2012

RICHARD W. WIENING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PSG

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

EVAN WEAVER,

          Plaintiff,

    vs.

TAMPA INVESTMENT GROUP, LLC; and
DOES 1 – 50, inclusive,

          Defendants.

Case No. **CV12 – 01117**

**NOTICE OF REMOVAL OF ACTION**
**(28 U.S.C. § § 1332, 1441(b) (diversity))**

**TO PLAINTIFF, HIS ATTORNEYS, AND THE ABOVE-CAPTIONED COURT:**

PLEASE TAKE NOTICE that Defendant Tampa Investment Group, LLC ("TIG") removes the above-captioned action from the Superior Court of the State of California, County of Santa Clara, where the action is now pending, to the United States District Court for the Northern District of California.  This civil action is removed on the basis of diversity jurisdiction pursuant to 28 U.S.C. § § 1332 and1441.

## PROCEDURAL HISTORY AND TIMELINESS OF REMOVAL

1.    On or about February 2, 2012, Plaintiff Evan Weaver ("Plaintiff") commenced a civil action in the Superior Court of the State of California, County of Santa Clara, entitled *Evan Weaver v. Tampa Investment Group, LLC; and Does 1 – 50, inclusive,* Case No. 112CV217949, by filing a Complaint.

2.     The Complaint asserts three causes of action:  (1) breach of written agreement; (2) breach of the covenant of good faith and fair dealing; and (3) fraud.  (Complaint at ¶ ¶ 18 – 34.) Plaintiff's Complaint arises following TIG's purported breach of an agreement to purchase 1,348,259 shares of Plaintiff's Twitter stock.  (Complaint at ¶ ¶ 6 – 16.)  The operative facts are disputed, but taken as Plaintiff has alleged for purposes of this Notice of Removal.

3.     On February 6, 2012, TIG was served with the Summons and Complaint, along with a Civil Lawsuit Notice, and an Alternative Dispute Resolution Information Sheet.  A true and correct copy of the Summons, indicating it was served on February 6, 2012, is attached as Exhibit A.  A true and correct copy of the Complaint is attached as Exhibit B.  A true and correct copy of the Civil Lawsuit Notice is attached as Exhibit C.  A true and correct copy of the Alternative Dispute Resolution Information Sheet is attached as Exhibit D.  (Declaration of Robert Forlizzo Decl. at ¶ 2.)

4.     This Notice of Removal is timely because TIG filed it within thirty days of when Plaintiff served TIG with the Summons and Complaint.  (28 U.S.C. § 1446(b).)

5.     TIG will give Plaintiff written notice as required by 28 U.S.C. § 1446(d) by served Plaintiff, through his counsel of record, via personal delivery with this Notice of Removal and all documents filed in support thereof and concurrently herewith on the date of filing of this Notice of Removal.

## SUBJECT MATTER JURISDICTION

### The Parties Are Citizens of Different States

6.     This is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this Court by TIG pursuant to the provisions of 28 U.S.C. § 1441(b) in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. The operative facts are disputed, but taken as Plaintiff has alleged for purposes of this Notice of Removal.

7.     Plaintiff is and at all relevant times was a citizen of California.  (*See* Complaint, Exhibit

1   B, at ¶ 1.)

2       8.    TIG is a citizen of Delaware because it is a Delaware limited liability company.

3   (Forlizzo Decl. at ¶ 3; Complaint, Exhibit B, at ¶ 2.)  TIG has its principal place of business in

4   Florida.  (Forlizzo Decl. at ¶ 3.)  TIG's headquarters and executive offices are located in Tampa,

5   Florida.  (Forlizzo Decl. at ¶ 3.)  No member of TIG is a citizen of California.  (Forlizzo Decl. at ¶

6   3.)

7       9.    The citizenship of unnamed "Doe" defendants sued under fictitious names is disregarded

8   for purposes of removal.  (28 U.S.C. § 1441(a).)

9       10.   Complete diversity existed at the time the action in the Santa Clara Superior Court was

10  commenced and as of the date of the filing this Notice of Removal.

11                    **The Amount in Controversy Exceeds $75,000.00**

12      11.   In his Complaint, Plaintiff seeks compensatory damages in an amount to be proven at

13  trial; reliance, lost opportunity, out of pocket, and other damages as is appropriate; and punitive

14  damages. (Complaint, Exhibit B, at 7:13-22.) The operative facts are disputed, but taken as Plaintiff

15  has alleged for purposes of this Notice of Removal.

16      12.   As alleged, it is apparent that the amount Plaintiff claims exceeds $75.000.00:

17          A.    According to the Complaint, TIG allegedly agreed to purchase 1,348,259 shares of

18  stock for $20.85.  (Complaint, Exhibit B, at ¶ 8.)  According to the Complaint, Plaintiff claims he

19  was entitled to receive $28,111,200.15 as a result of the sale of his Twitter stock to TIG ($20.85 x

20  1,348,259).  According to the Complaint, as a result of TIG's alleged breach of contract, Plaintiff

21  resold all of his 1,348,259 shares to third parties and the sum total which Plaintiff received was

22  "substantially less than he was entitled to receive from" TIG.  (Complaint, Exhibit B, at ¶ 14.)  If

23  Plaintiff received merely 1.0% less as a result of the sale to third parties, his alleged damages would

24  be $281,112.00.

25          B.    According to the Complaint, Plaintiff allegedly quit his employment with Twitter

26  in reliance on TIG's promises to purchase the 1,348,259 shares of Twitter stock.  (Complaint,

27  Exhibit B, at ¶ 9.)  Plaintiff claims he earned $12,916.67 per month in salary and benefits.

28

1  (Complaint, Exhibit B, at ¶ 9.)  Plaintiff appears to have quit his employment with Twitter on

2  August 15, 2011.  (Declaration of David A. King at ¶ 2.)  As alleged, Plaintiff has lost more than six

3  (6) months salary between August 18, 2011, and March 6, 2012.  By Plaintiff's allegations, it is

4  apparent that Plaintiff would have lost at least $77,500.02 in salary and benefits ($12,916.67 x 6 =

5  $77,500.02).

6          C.  According to the Complaint, Plaintiff allegedly lost 45,000.00 shares per month as

7  a result of TIG's alleged breach of the promise to purchase the Twitter stock.  (Complaint, Exhibit

8  B, at ¶ 9.)  If valued at $20.85 per month (as set forth in the Complaint at ¶ 8), 45,000.00 shares of

9  Twitter stock are worth $938,250.00.  Plaintiff appears to have quit his employment more than six

10  (6) months ago.  (King Decl. at ¶ 2.)  Thus, as alleged, the value of the stock Plaintiff claims to have

11  lost as a result of TIG's breach of contract exceeds $5,629,500.00 ($938,250.00 x 6 =

12  $5,629,500.00).

13                                        **VENUE IS PROPER**

14      13.  Removal to this judicial district and division is proper under 28 U.S.C. § § 1441(a),

15  1446(a) because the state court action was originally pending in this judicial district – namely, the

16  Superior Court of the State of California, County of Santa Clara.

17          **NOTICE TO THE SANTA CLARA COUNTY SUPERIOR COURT**

18      14.  Pursuant to 28 U.S.C. § 1446(d), contemporaneously with the filing of this Notice of

19  Removal, TIG is filing a true and correct copy of this Notice of Removal and all documents filed in

20  support thereof with the clerk of the Superior Court of the State of California, Santa Clara County.

21

22  Dated:     March ⎰⎱, 2012            The King Law Group

23

24                       By:

25                            David A. King

26                            Attorney for Defendant Tampa
                                Investment Group, LLC

27

28

EXHIBIT A

**SUMMONS**
*(CITACION JUDICIAL)*

SUM-100

**NOTICE TO DEFENDANT:** TAMPA INVESTMENT GROUP, LLC.;
*(AVISO AL DEMANDADO):* DOES 1-50, inclusive

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**FILED**

2012 FEB -2 A 10: 55

David H. Yamasaki Clerk of the Superior Court
County of Santa Clara, California
By _____ Deputy Clerk

**YOU ARE BEING SUED BY PLAINTIFF:** EVAN WEAVER
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California
County of Santa Clara
191 North First Street
San Jose, CA  95113-1090

CASE NUMBER:
*(Número del Caso):*
**112CV217949**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Thomas H. Carlson - (SBN 121367)          T:415.956.2828   F:415.956.6457
Rogers Joseph O'Donnell
311 California Street, 10th Floor
San Francisco, CA 94104

DATE:                                Clerk, by _____, Deputy
*(Fecha)* FEB -2 2012                *(Secretario)*                *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Tampa Investment Group, LLC
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☒ other *(specify):* Limited Liability Company
4. ☒ by personal delivery on *(date):* 2/6/12

**SUMMONS**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

Code of Civil Procedure §§ 412.20, 465

Page 1 of 1

Legal
Solutions
by Fios

DateServed: 2/6/12
TimeServed

RT

EXHIBIT B

1   ROGERS JOSEPH O'DONNELL
2   THOMAS H. CARLSON (State Bar No. 121367)
    311 California Street
3   San Francisco, California 94104
    Telephone: 415.956.2828
4   Facsimile: 415.956.6457

    Attorneys for Plaintiff
5   EVAN WEAVER

6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                           COUNTY OF SANTA CLARA

10  EVAN WEAVER,

11                Plaintiff,                Case No.    1 1 2 C V 2 1 7 9 4 9

12        vs.                               COMPLAINT FOR DAMAGES

13  TAMPA INVESTMENT GROUP, LLC;            Unlimited
    and DOES 1-50, inclusive,                        (S4)
14

15                Defendants.

16                                                BY FAX

17                    THE PARTIES

18        1.    Plaintiff Evan Weaver ("Weaver") is an individual who is a resident of
19  the State of California.

20        2.    Weaver is informed and believes and alleges thereon that defendant
21  Tampa Investment Group, LLC ("Tampa") is a Delaware limited liability company which
22  does business in California.  Tampa has contractually submitted to jurisdiction in California,
23  to venue in this Court, and such jurisdiction and venue are also independently proper.

24        3.    Plaintiff Weaver is presently unaware of the true names and capacities
25  of defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these
26  defendants (the "Doe Defendants") by such fictitious names.  Weaver is informed and
27  believes and alleges thereon that each Doe Defendant is responsible in some fashion for the
28  wrongful conduct complained of herein and/or are the alter egos of defendant Tampa.

COMPLAINT FOR DAMAGES                                                    Page 1

307767.2

# FACTUAL BACKGROUND

4.     Weaver was an early employee of Twitter, Inc. ("Twitter") who received significant options to purchase Twitter's common stock and, through the exercise of those options and otherwise, held shares of Twitter's common stock.

5.     Weaver understands that defendant Tampa has long been interested in acquiring shares in Twitter, as have many other investors. Weaver further understands that Tampa had entered into share purchase agreements with other Twitter share or option holders, and knew of other investors who had done so, only to have Twitter or its assigns prevent the consummation of such share purchase agreements by exercising a contractual right of first refusal with respect to such shares.

6.     In early 2011 Paul McCabe, a stock broker with Halcyon Cabot Partners, Ltd., "cold called" Weaver and, Weaver understands, a number of other (early) Twitter employees in order to solicit purchases of their Twitter stock holdings. Weaver advised McCabe that he was not then interested but that McCabe could call back in about six months. McCabe did so. In the context of those discussions Weaver was advised that the prospective purchaser had been trying to buy Twitter shares but had been frustrated by the fact that Twitter or its assigns had blocked the deals by exercising its right of first refusal. Weaver was eventually advised that defendant Tampa (or an entity related to Tampa) was willing to set the price at $20.85 to help ensure that the right of first refusal would not be exercised by Twitter and that Tampa would thus in fact be able to acquire the shares.

7.     Various communications then followed, many of which centered around the fact that Weaver would not be able to convey the shares to defendant Tampa if the right of first refusal were exercised. Those discussions formed part of basis of the language contained in the two agreements described hereafter.

8.     The parties reached agreement on all material terms for the share purchase, including the price to be paid per share ($20.85) and the total number of shares to be purchased (1,348,259). Two agreements were then executed to memorialize the deal. Specifically, one of these was a written agreement with a date of August 16, 2011 which was

1   executed by plaintiff Weaver and defendant Tampa (the "Letter Agreement"). (A true and

2   correct copy of the Letter Agreement is attached hereto as Exhibit A and is incorporated

3   herein by this reference as though fully set forth.) Another agreement describing the material

4   terms (the exact number of shares to be sold, and the exact price to be paid) was also

5   executed. This agreement had an issue date of August 16, 2011 as well, and was executed by

6   Weaver, Tampa and the stock broker Halcyon Cabot Partners, Ltd. (the "Term Sheet"). (A

7   true and correct copy of the Term Sheet is attached hereto as Exhibit B and is incorporated by

8   this reference as though fully set forth.) The Term Sheet, which plaintiff Weaver signed after

9   he signed the Letter Agreement, provided that Tampa was "to work in good faith and use best

10  efforts to finalize and execute definitive documentation."

11          9.     In reliance on defendant Tampa's promises, plaintiff Weaver left his job

12  at Twitter for the sole reason that current employees of Twitter were prohibited from selling

13  stock holdings of this size. In leaving Twitter, plaintiff Weaver gave up significant additional

14  stock option vesting of 45,000 shares per month, and ceased receiving his monthly salary of

15  $12,916.67 and other benefits. Plaintiff Weaver would not have left Twitter when he did

16  absent defendant Tampa's promises and commitments to buy his shares.

17          10.    Plaintiff Weaver proceeded to perform under the written agreements.

18  Specifically, but without limitation, plaintiff Weaver provided notice of the Tampa deal terms

19  to Twitter as Twitter had a contractual right of first refusal. (Weaver was contractually

20  obligated to provide this notice to Twitter under the Letter Agreement, and he had otherwise

21  been instructed by Tampa to provide this notice.) Twitter ultimately notified plaintiff Weaver

22  that the right of first refusal would not be exercised, thus clearing the way for defendant

23  Tampa to proceed with the promised acquisition at the promised price. Plaintiff Weaver duly

24  advised defendant Tampa of this fact.

25          11.    In breach of the agreements defendant Tampa failed and refused to

26  purchase plaintiff Weaver's Twitter stock at the contracted price. Defendant Tampa also took

27  no steps, and exerted no efforts, to finalize and execute definitive documentation, to work in

28  good faith, or to expedite the closing once the right of first refusal process expired without

COMPLAINT FOR DAMAGES                                                              Page 3

307767.2

1    exercise. Defendant Tampa also took no steps with respect to Twitter's stock transfer

2    agreement.

3        12.    When plaintiff Weaver was advised of Tampa's breach he was first told

4    that Tampa had found a different seller of Twitter stock who was willing to sell at a lower

5    price. Plaintiff was simultaneously advised that "another" group "within" Tampa "might" be

6    "willing" to buy Weaver's stock at the contracted price. Eventually, on September 30, 2011,

7    plaintiff Weaver was apologetically advised as follows:

8            "Sorry we will not be able to raise the funds for the deal. We

9            have been unsuccessful with regard to our investors."

10        13.    While this repudiation of Tampa's obligations was clear, in an excess of

11    caution plaintiff Weaver sent defendant Tampa a formal demand for an adequate assurance of

12    performance pursuant to Commercial Code §2609, the common law, and as was otherwise his

13    right. Defendant did not provide any such assurance, let alone an adequate one, within the

14    time period specified in the notice, which time period was reasonable under the

15    circumstances. In fact, defendant specifically confirmed that it would not perform.

16        14.    Plaintiff then exercised his right (and arguably his duty) to mitigate his

17    damages by reselling all of his 1,348,259 shares to third parties. These resales were

18    commercially reasonable in light of all the circumstances, and the sum total which was

19    received by plaintiff Weaver was substantially less than he was entitled to receive from

20    defendant Tampa. The net difference in proceeds to plaintiff Weaver between the actual sales

21    and Tampa's contracted price is an exact sum which will be disclosed upon request during

22    discovery but is not disclosed here for privacy reasons, and this amount constitutes just one

23    portion of the damages plaintiff suffered at defendant's hands.

24        15.    Plaintiff suffered other damages as a result of defendant Tampa's

25    breach as well. Specifically, but without limitation, plaintiff suffered reliance and lost

26    opportunity damages as he did not seek other opportunities to sell his shares during the time

27    between the execution of the agreements and the time he was notified of defendant's breach.

28    The market for Twitter shares decreased during that time period. He also would not have

---

COMPLAINT FOR DAMAGES                        Page 4

1   terminated his employment at Twitter, and would have received additional stock option

2   vesting, wages and other benefits had he remained.

3           16.     At the time the written agreements were entered into, defendant Tampa

4   represented to plaintiff that it had the requisite funds available.  Plaintiff Weaver was later

5   advised that Tampa did not in fact have the requisite funds available then, and plaintiff

6   Weaver believes that Tampa also had no reasonable basis to believe that the funds would later

7   become available when the time for performance came.  Defendant fraudulently entered into

8   the agreements without an intent to perform and/or without a reasonable basis to believe that

9   they could perform.

10          17.     Weaver reserves the right to amend this complaint to name additional

11  individuals and entities as defendants, such as the members and/or owners of Tampa,

12  depending on what is revealed in discovery and otherwise.

13                          **FIRST CAUSE OF ACTION**
14                          (Breach of Written Agreements)

15          18.     Plaintiff Weaver hereby incorporates by reference paragraphs 1 through

16  17, inclusive, as though fully set forth herein.

17          19.     As set forth above, defendant has breached the written agreements.

18          20.     As a direct and proximate result of defendant's breach of the

19  agreements, Weaver has suffered compensatory damages in a sum which equals the

20  difference between the sums defendant promised to pay for the stock less the amount plaintiff

21  actually received in mitigation.  Plaintiff suffered additional reliance damages in the form of

22  the wages and benefits he lost, and the additional stock option vesting which did not accrue,

23  all in amounts to be proven at trial.  Plaintiff suffered other out of pocket and lost opportunity

24  costs in an amount to be proven at trial as well.  Pursuant to Civil Code §§ 3287 and 3289,

25  plaintiff is entitled to prejudgment interest at ten percent (10%) per annum on some or all of

26  these sums.

27          21.     Weaver has fully performed or offered to perform all his obligations

28  under the agreements, except such obligations as were excused, waived, modified or

307767.2

1  prevented by defendant's conduct or by the mutual agreement of the parties.

2  WHEREFORE, Weaver prays for relief as set forth below.

3  ### SECOND CAUSE OF ACTION
4  **(Breach of the Covenant of Good Faith and Fair Dealing)**

5  22.    Plaintiff Weaver hereby incorporates by reference paragraphs 1 through

6  21, inclusive, as though fully set forth herein.

7  23.    Inherent and implied by law and fact in the agreements is the implied

8  covenant of good faith and fair dealing. Defendant has breached the implied covenant by

9  acting and failing to act as described herein.

10  24.    As a direct and proximate result of defendant's breach of the

11  agreements, Weaver has suffered compensatory damages in a sum which equals the

12  difference between the sums defendant promised to pay for the stock less the amount plaintiff

13  actually received in mitigation. Plaintiff suffered additional reliance damages in the form of

14  the wages and benefits he lost, and the additional stock option vesting which did not accrue,

15  all in amounts to be proven at trial. Plaintiff suffered other out of pocket and lost opportunity

16  costs in an amount to be proven at trial as well. Pursuant to Civil Code §§ 3287 and 3289,

17  plaintiff is entitled to prejudgment interest at ten percent (10%) per annum on some or all of

18  these sums.

19  25.    Weaver has fully performed or offered to perform all of his obligations

20  under the agreements, except such obligations as were excused, waived, modified or

21  prevented by defendant's conduct or by mutual agreement of the parties.

22  WHEREFORE, Weaver prays for relief as set forth below.

23  ### THIRD CAUSE OF ACTION
    **(Fraud)**

24  26.    Plaintiff Weaver hereby incorporates by reference paragraphs 1 through

25  25, inclusive, as though fully set forth herein.

26  27.    Defendant represented to Weaver that Tampa was financially ready,

27  willing and able to perform under the agreements.

28  28.    Defendant knew that this material representation was false when it was

---

COMPLAINT FOR DAMAGES

307767.2

1   made and/or that it had no reasonable basis to believe that Tampa would be ready to perform.

2   This representation was made with the intent to defraud.

3       29.    Plaintiff Weaver did not know the representation was false and believed

4   it to be true, and he detrimentally relied upon this false representation.  Had plaintiff Weaver

5   known the representation was false he would have sold to others in a more favorable market

6   environment, or would not have terminated his employment when he did.

7       30.    As a proximate result of this misrepresentation, plaintiff Weaver has

8   been damaged in an amount to be proven at trial, and as otherwise set forth above.

9       34.    In committing the acts alleged above, defendant has acted with malice,

10  oppression and fraud, and in conscious disregard of Weaver's rights.  Plaintiff Weaver is thus

11  entitled to punitive damages in a sum according to proof.

12      WHEREFORE, Weaver prays for relief as set forth below.

13

14                          **PRAYER FOR RELIEF**

15  1.    For compensatory damages in an amount to be proven at trial;

16  2.    For such other and further reliance, lost opportunity, out of pocket and
        other damages as is appropriate;

17  3.    For interest and prejudgment interest thereon at the rate of ten percent
18        (10%) per annum pursuant to Civil Code §§ 3287 and 3289;

19  4.    For punitive damages;

20  5.    For appropriate prejudgment remedies such as a writ of attachment, a
        right to attach order, and otherwise;

21  6.    For costs and expenses;

22  7.    For such other and further relief as is necessary and appropriate.

23
    Dated: February _____, 2012

24                          ROGERS JOSEPH O'DONNELL

25

26                          By: _____

27                              THOMAS H. CARLSON

28                              Attorneys for Plaintiff
                                EVAN WEAVER

COMPLAINT FOR DAMAGES                                           Page 7

                                                                3077767.2

# EXHIBIT A

Tampa Investment Group, LLC
2903 Rigsby Lane
Safety Harbor, FL 34695

August 16, 2011

Evan Weaver

Dear Evan:

We at Tampa Investment Group, LLC (the "Purchaser") are excited to proceed with the proposed purchase from you (the "Seller") of 1,348,259 shares of common stock (after giving effect to the 2-for-1 stock split which occurred on May 3, 2011) (the "Shares") of Twitter, Inc. (the "Company") for consideration of $20.85 per share, or aggregate consideration of $28,111,200.15 as further described below. The purpose of this letter (this "Letter") is to set forth certain understandings between Seller and Purchaser with respect to this proposed transaction.

COMMON STOCK PURCHASE

Shares:                          1,348,259 shares common stock of the Company (after giving effect to the 2-for-1 stock split which occurred on May 3, 2011)

Purchase Price:                  $28,111,200.15 of aggregate cash compensation ($20.85 per share)

Close:                           Purchaser and Seller will use their reasonable commercial efforts to expedite the closing of the purchase and sale of the Shares as soon as practical once the right of first refusal process expires without exercise.

                                 The parties will enter into and comply with the Company's standard stock transfer agreement or amend it in a manner that is mutually satisfactory and approved by the Company. Definitive agreements will contain provisions usual and customary for similar transactions, including appropriate representations and warranties and covenants. The parties will take reasonable steps to comply with any other Company requirements in respect of the purchase and sale of the Shares.

Definitive Documentation:        Seller will provide to Purchaser, within seven (7) business days of the date of this Letter, all relevant documentation in connection with the Seller's acquisition of the Shares, including without limitation, any agreements or constituting documents of the Company containing restrictions on the resale or other transfer of the Shares, rights of first refusal or similar provisions (the "Shareholder Agreements").

| | |
|---|---|
| Notice to the Company: | Seller shall provide a notice for this offer to the Company immediately following the execution and delivery hereof (and not any sooner). |
| Expenses: | Purchaser and Seller shall be responsible for their own legal fees and expenses. |
| Confidentiality: | Purchaser and Seller will keep confidential and not disclose to any person the terms of this letter (with the exception of legal and financial advisors and the Company) without the express prior consent of the other party. |
| Expiration: | This agreement if not executed by both parties expires on August 18, 2011. |

Notwithstanding any terms herein to the contrary, no term or provision of this Letter (and no negotiations or oral representations made in connection with this transaction) shall constitute a commitment, agreement or binding agreement on the part of the Seller or Purchaser except for the provisions entitled "Expenses" and "Confidentiality" which shall be binding and survive the termination of this Letter, except to the extent agreed to in definitive and final documentation relating to the share purchase. For the avoidance of doubt, if the right of first refusal is exercised by the Company or its assigns, this Letter shall terminate and be rendered null and void.

[Remainder of page intentionally left blank]

{00070521.DOCX }                                   2

Agreed and Accepted:

SELLER

By: _____
Name: Evan Weaver, an individual
Date:   8/16/2011
Address:  943 Lombard St
          San Francisco, CA 94133

BUYER

Tampa Investment Group, LLC

By: _____
Name: Robert Forlizzo

Title: Managing Member

{00070521.DOC:1}                    3

# EXHIBIT B



# Halcyon Cabot Partners, Ltd.

*Strictly Confidential — Not to be Disclosed or Distributed to Third Parties*

## Summary of the Transaction

Date Issued:

Issuer Name: Twitter                                  Security Type: common

Purchaser name: Tampa Investment Group, LLC

Amount / Number of Shares: 1,348,259 (after May 3, 2011 2:1 split)
Price per Share: $20.85

### GROSS AMOUNT BUYER CONTRIBUTES

Less: HCP Fee: $1,011,194.25 ($0.75 per share)

### NET PROCEEDS TO SELLER

Fee is to be paid to Halcyon Cabot Partners upon completion of the transaction described above. Seller pays fee to Halcyon Cabot Partners should the company exercise its right of first refusal or assign that right and the seller receives his funds on completion of such exercised right of first refusal transaction. Wire instructions to follow.

By Executing below, Buyer affirms their intent to work in good faith and use best efforts to finalize and execute definitive documentation.

Halcyon Cabot Partners shall (a) use its best efforts to facilitate the transaction and closing thereof, including, without limitation, timely delivery to the Issuer of the legal opinion, transfer fee and parties' signature pages and exhibits, (b) arrange for and pay directly the costs for the legal opinion and any other securities laws compliance, (c) interface with the Issuer on any outstanding items and issues, and (d) keep Seller informed of status.

Halcyon Cabot Partners represents and warrants that it is a registered broker-dealer under Section 15 of the Securities Exchange Act of 1934, as amended, and has appropriate state licenses to provide the services and receive the fees hereunder.

This Agreement shall be governed by the laws of the State of California, without giving effect to its choice of law rules. The

{00070516.DOC;} }

exclusive venue for disputes arising out of or relating to this agreement shall be the state and federal courts in Santa Clara County, California, and the parties waive all defenses of inconvenient forum and submit to personal jurisdiction in California.

[Signature page follows]

{00070516.DOC;1 }

In witness whereof, the parties have executed this fee agreement.

FOR SELLER                                                          FOR HCP

Name:        Evan Weaver                         Signed By:   Paul McCabe

Title:                                           Title:       SVP

Signed:                                          Signed:

Date:        8 / 16 / 2011                       Date:        8-15-11


FOR BUYER,

Name of Buyer: Tampa Investment Group, LLC

Signed By:

Title:

Signed:       Roease A Foelito

Date:         8 / 15 / 11

{00070518.DOCX }

EXHIBIT C

**CIVIL LAWSUIT NOTICE**                                    ATTACHMENT CV-5012

Superior Court of California, County of Santa Clara
191 N. First St., San Jose, CA 95113          CASE NUMBER: _____ 112CV217949

┌─────────────────────────────────────────┐
│     **PLEASE READ THIS ENTIRE FORM**      │
└─────────────────────────────────────────┘

PLAINTIFF (the person suing): Within 60 days after filing the lawsuit, you must serve each Defendant with the Complaint, Summons, an Alternative Dispute Resolution (ADR) Information Sheet, and a copy of this Civil Lawsuit Notice, and you must file written proof of such service.

┌─────────────────────────────────────────────────────────────────────────────┐
│ DEFENDANT (The person sued): You must do each of the following to protect your rights: │
│                                                                               │
│ 1.  You must file a written response to the Complaint, using the proper legal form or format, in the Clerk's Office of the │
│     Court, within 30 days of the date you were served with the Summons and Complaint; │
│ 2.  You must serve by mail a copy of your written response on the Plaintiff's attorney or on the Plaintiff if Plaintiff has no │
│     attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and │
│ 3.  You must attend the first Case Management Conference. │
│                                                                               │
│            Warning: If you, as the Defendant, do not follow these instructions, │
│                   you may automatically lose this case. │
└─────────────────────────────────────────────────────────────────────────────┘

RULES AND FORMS: You must follow the California Rules of Court and the Superior Court of California, County of Santa Clara Local Civil Rules and use proper forms. You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 99 Notre Dame Avenue, San Jose (408-882-2900 x-2926), www.scselfservice.org (Select "Civil") or from:

  »  State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
  »  Local Rules and Forms: http://www.sccsuperiorcourt.org/civil/rule1toc.htm

CASE MANAGEMENT CONFERENCE (CMC): You must meet with the other parties and discuss the case, in person or by telephone, at least 30 calendar days before the CMC. You must also fill out, file and serve a Case Management Statement (Judicial Council form CM-110) at least 15 calendar days before the CMC.

        You or your attorney must appear at the CMC. You may ask to appear by telephone – see Local Civil Rule 8.

┌─────────────────────────────────────────────────────────────────────────────┐
│ Your Case Management Judge is: Honorable Mark Pierce          Department:   9  │
│                                                                               │
│ The 1st CMC is scheduled for: (Completed by Clerk of Court)                    │
│        Date: _____ JUN 1 9 2012 Time: 1:30 pm  in Department:   9             │
│ The next CMC is scheduled for: (Completed by party if the 1st CMC was continued or has passed) │
│        Date: _____  Time: _____  In Department: _____    │
└─────────────────────────────────────────────────────────────────────────────┘

ALTERNATIVE DISPUTE RESOLUTION (ADR): If all parties have appeared and filed a completed ADR Stipulation Form (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

WARNING: Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

Form CV-5012 REV 7/01/08                   CIVIL LAWSUIT NOTICE                        Page 1 of 1

EXHIBIT D

# SANTA CLARA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION
### INFORMATION SHEET

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

*What is ADR?*

ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

*What are the advantages of choosing ADR instead of litigation?*

ADR can have a number of advantages over litigation:

- ADR can save time. A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

- ADR can save money. Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

- ADR provides more participation. Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

- ADR provides more control and flexibility. Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

- ADR can reduce stress. ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

*What are the main forms of ADR offered by the Court?*

Mediation is an informal, confidential, flexible and non-binding process in the mediator helps the parties to understand the interests of everyone involved, and their practical and legal choices. The mediator helps the parties to communicate better, explore legal and practical settlement options, and reach an acceptable solution of the problem. The mediator does not decide the solution to the dispute; the parties do.

Mediation may be appropriate when:
- The parties want a non-adversary procedure
- The parties have a continuing business or personal relationship
- Communication problems are interfering with a resolution
- There is an emotional element involved
- The parties are interested in an injunction, consent decree, or other form of equitable relief

Neutral evaluation, sometimes called "Early Neutral Evaluation" or "ENE", is an informal process in which the evaluator, an experienced neutral lawyer, hears a compact presentation of both sides of the case, gives a non-binding assessment of the strengths and weaknesses on each side, and predicts the likely outcome. The evaluator can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:
- The parties are far apart in their view of the law or value of the case
- The case involves a technical issue in which the evaluator has expertise
- Case planning assistance would be helpful and would save legal fees and costs
- The parties are interested in an injunction, consent decree, or other form of equitable relief

-over-

EXHIBIT E

BLOG          TNW CONFERENCE - GET YOUR DISCOUNTED TICKETS TODAY          Login / register

# Twitter
PART OF THE NEXT WEB FAMILY

HOME    ABOUT US    TEAM    CONTACT    ADVERTISE

**Obama Touts Twitter Following**

**Microsoft to fix Windows Phone dev in Windows 8**

**Google Gets a New Unified Local Search for Desktop and Mobile**

Share    14

Channels
Apple
Apps
Daily Dose
Design & Dev
Entrepreneur
Events
Facebook
Gadgets
Google
Insider
LifeHacks
Media
Microsoft
Mobile
Sessions
Shareables
Social Media
Twitter
Video

Editions
Africa
Asia
Australia
Canada
Europe
India
Latin America
Middle East
UK
United States

Languages
France
Nederland
Polska
Portugal
Romania
Russia

## Evan Weaver, the man who helped save Twitter from its Fail Whale, has resigned.

18TH AUGUST 2011 *by* ZEE



Remember when the Fail Whale was so common place that "Fail Whale" would find a home on Twitter's trending topics?

At one point it really was that bad folks; and there were endless repetitive questions about whether Twitter would manage to resolve its uptime issues and, more importantly, whether it would be too late by the time it did.

Fortunately we now know the answer to the first question is 'yes' and the second 'no'.

One Twitter engineer is credited with being instrumental in helping Twitter leave its Fail Whale behind, his name is Evan Weaver, Twitter's "Other Evan".

Joining in May 2008, Twitter's co-founder Biz Stone introduced him to the world in a blog post in December of that year.

His words; full of acclaim for Weaver's involvement in working to resolve Twitter's performance problems:

> *"Evan [Weaver] very quickly became a leader on our infrastructure and performance initiatives. Thanks to his contributions, technical vision, systems experience, and pragmatic optimization strategies Twitter's Engineering and Operations team has made significant progress moving away from early scaling problems."*

Biz continued:

> *"Evan represents the unique brand of talent we hope to continue to attract at Twitter. None of the founders of Twitter have college degrees but Evan's Master's degree and combined study of philosophy, computer science, jazz, piano, poetry, and bioinformatics more than makes up for that fact. Plus, his strangely offbeat sense of humor regularly cracks everyone up. Please join us in belatedly welcoming Evan and thanking him for his enormous contributions to Twitter's recent and continued success."*

Today however, over three years on, Weaver officially announces his resignation from (and on) Twitter.

POPULAR    COMMENTED    LATEST

TODAY    WEEK    MONTH

China Mobile Passes 15 Million iPhone Users

Android Now the Most Popular Mobile Browser

Spotify, We Need A Break. I'm Falling for Songza

Greek Artist Uses Path to Remember

Mopapp Raises €1.5m for Mobile Analytics Solution

Why Samsung Uses Twitter to Launch New Devices, Services

Singapore's Singtel buys Mobile Ad Firm Amobee

The Most Popular Sources of Content on Pinterest

**The Next Web** on Facebook

Like

73,223 people like **The Next Web**.

    

Zil    Conrad    Gardening    Ekaard    Dana

Email address here for news in your in



Steven
Evan

Resigned; last day was Monday. Will be missing my Twitter people.

8 hours ago via web · Favorite · Retweet · Reply



Breaking Stories    Daily
as they happen       Top stories

Weekly
Top stories

We've contacted him for comment to hopefully learn more about his motivations for leaving the company. It's not often you hear someone state so boldly that they've resigned, let alone on the product they helped build.

With competition for engineers as competitive as its ever been, Weaver is bound to have a promising venture or company to move on to, the big question is what, and whether this says anything about the current internal operations at Twitter. In a year that's seen two co-founders leave the and one return to support a new CEO, the dynamics within the company will inevitably have changed...but for the better? We hope so.

GET OUR LATEST NEWS ON TWITTER.  →  Follow @TheNextWeb

JOIN TNW TWITTER ON:    Like  1k    |    Follow    OR

TWITTERCOUNTER.COM

Track your brand, website
or any #tag on Twitter



Get trackin'

ABOUT THE AUTHOR

Zee is a technology fiend, entrepreneur and CEO of The Next Web. Follow him on Twitter, Google+ Facebook or visit his own site at Zee.me

Follow @zee

DISCUSSION

7 COMMENTS & PINGBACKS

Comments are closed.

1.    leih79r said on August 18, 2011:                    Reply

      http://www.supershops.org

      ,m,m,m

TRACKBACKS

1. Twitter VP of Engineering Mike Abbott leaves the company | Pro Blog Project
   says:
   October 14, 2011 at 3:42 am
   [...] was given credit for the lack of Fail Whales we've been seeing as of [...]

2. Twitter VP of Engineering Mike Abbott leaves the company | says:
   October 14, 2011 at 5:03 am
   [...] was given credit for the lack of Fail Whales we've been seeing as of [...]

3. Twitter VP of Engineering Mike Abbott leaves the company | Freedom
   Developers says:
   October 14, 2011 at 5:45 am
   [...] was given credit for the lack of Fail Whales we've been seeing as of [...]

4. Twitter hires on Oracle VP of Development as VP of Infrastructure Engineering |
   Tech News Aggregator says:
   November 8, 2011 at 2:07 am
   [...] an effort to improve its stability over the past two years. after continuous
   downtime made the 'fail whale' graphic a common sight. It looks like it is continuing
   on that track with this hire. Late last [...]

3/5/2012 4:11 PM