**ROGERS JOSEPH O'DONNELL**
**THOMAS H. CARLSON** (State Bar No. 121367)
311 California Street, 10th Floor
San Francisco, California 94104
Telephone:  415.956.2828
Facsimile:  415.956.6457

**COTCHETT PITRE & McCARTHY, LLP**
**MARK C. MOLUMPHY** (State Bar No. 168009)
**BRYAN M. PAYNE** (State Bar No. 272971)
830 Malcolm, Suite 200
Burlingame, California 94133
Telephone: 650.697.6000
Fax: 650.697.0577

*Attorneys for Plaintiff Evan Weaver*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| EVAN WEAVER,<br><br>Plaintiff,<br><br>vs.<br><br>TAMPA INVESTMENT GROUP, LLC, HALCYON CABOT PARTNERS LTD., FELIX INVESTMENTS, LLC., and JOHN BIVONA,<br><br>Defendants. | Case No. CV-12-01117 EJD (PSG)<br><br>**FIRST AMENDED COMPLAINT** |

I.   **THE PARTIES**

   A.   **Plaintiff**

   1.   Plaintiff Evan Weaver ("Weaver") is an individual and a resident of the State of California.  Weaver was an early employee of Twitter, Inc. ("Twitter") who, through his employment, received significant options to purchase Twitter's common stock and, through the exercise of those options and otherwise, held shares of Twitter's common stock.

   B.   **Defendants**

   2.   Defendant **Tampa Investment Group, LLC** ("Tampa") is a Delaware limited

liability company with its principal place of business in Florida.  Tampa was formed on May 31, 2011 by the execution of an "Operating Agreement."  Robert Forlizzo ("Forlizzo") and his secretary are the two member-owners named in the Operating Agreement, with Forlizzo holding 99.99% membership interest.  Tampa's stated purpose was to engage in the purchase and sale of pre-IPO technology securities, but, in reality and unbeknownst to Weaver, it had no experience in this.  As described more fully hereafter, Forlizzo was not involved in negotiating the purchase price of Weaver's Twitter shares, even though he owned the company that was supposedly purchasing the shares.  In addition, Forlizzo was not involved in any discussions over the Twitter stock transfer agreement which was sent to finalize the purchase of Weaver's shares after Twitter cleared the shares for sale.

3.     Defendant **Halcyon Cabot Partners Ltd.** ("Halcyon") is headquartered in New York City and is a boutique investment firm that provides, among other things, brokerage services in connection with the purchase and sale of securities in the secondary market. Halcyon's portfolio and activities are primarily focused on small and emerging growth public and private companies.  Halcyon is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC") and is a member of the Financial Industry Regulatory Authority ("FINRA"), Securities Insurance Protection Corporation ("SIPC") and Municipal Securities Rulemaking Board ("MSRB").  Halcyon Partners Group, LLC, a Delaware limited liability company, owns 75% of Halcyon.  Tampa and Felix Investments, LLC (described below) engaged Halcyon and Halcyon's registered representatives to purchase pre-IPO technology stocks, including those of Twitter, and to generate commissions.

4.     Defendant **Felix Investments, LLC** ("Felix") is headquartered in New York City. Felix is registered as a broker-dealer with the SEC and is a member of FINRA.  Felix's owners include Defendant John Bivona and his nephew, Frank Mazzola ("Mazzola").  Felix served as the placement agent for several funds investing in pre-IPO technology stocks.  For example, as of January 2011, Felix had raised at least $56 million for a variety of funds that each separately held stock in Facebook, Twitter, LinkedIn Corp. and Chegg, Inc.  Felix solicited investors for the funds through its registered representatives, provided the funds' offering materials to potential

investors, and effected investors' purchases of interests in the funds.  As discussed further below, Felix is currently the defendant in an SEC action alleging, *inter alia*, that Felix did not disclose the true relationship between it and the broker soliciting interest in pre-IPO shares and that it misstated material facts about Felix-affiliated funds investing in pre-IPO stock in violation of the Securities Act, the Exchange Act and the Advisers Act.

5.      Defendant **John Bivona** ("Bivona") is the founder and 70% majority-owner of Felix.  Bivona is also the control person of Felix Advisors, LLC, a SEC registered investment advisor under Felix's common control.  During the relevant period, Bivona ostensibly served as Tampa's "lawyer" and "authorized representative."  As Tampa's "authorized representative," Bivona regularly communicated with Weaver, directly and indirectly, regarding the purchase of Weaver's Twitter shares, including discussions about the purchase price and buyers for the shares.

**C.      The Defendants' Undisclosed Relationships**

6.      At all relevant times, Defendants were the agents of each of the remaining Defendants, and in doing the acts alleged herein, were acting within the course and scope of such agency.  Defendants ratified and/or authorized the wrongful acts of each of the other Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

7.      At all relevant times, Defendants, and each of them, pursued a conspiracy, common enterprise, and common course of conduct to accomplish the wrongs complained of herein. The purpose and effect of the conspiracy, common enterprise, and common course of conduct complained of was, *inter alia*, to financially benefit Defendants, and each of them, at the expense of Weaver by engaging in illegal, fraudulent, and wrongful activities.  Each Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein, and was aware of his/its overall contribution to, and furtherance of, the conspiracy, common enterprise and common course of conduct. Defendants' acts of conspiracy include, *inter alia*, all of the acts that Defendants, and each of them, are alleged to have committed in furtherance of the wrongful conduct complained of

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

herein.

8.      At all relevant times, there was a unity of interest and control of Tampa by Felix. This control was exercised in such a manner as to eliminate the corporate identity of Tampa, making Felix the alter ego of Tampa.  Tampa was formed with only $100 in capital, had little or no assets during the relevant period and, on information and belief, is no active.  On information and belief, Tampa was a shell company formed by Felix and Bivona, and Tampa was essentially a front for Felix's activities.  On information and belief, Forlizzo and Bivona knew each other from high school and law school, and Paul McCabe ("McCabe") – the broker who initially solicited Weaver to sell his Twitter shares – was introduced to Forlizzo through Bivona.  On information and belief, Felix and Bivona formed Tampa, and other shell-corporations because, beginning in 2010, Felix experienced difficulty purchasing pre-IPO shares from companies like Twitter and Facebook.  On information and belief, Felix and Bivona formed Tampa for the sole purpose of effectuating Felix's business plan to fraudulently solicit purchases and sales of pre-IPO stock and generate commissions, which is the subject of the wrongful conduct alleged herein.

9.      During the relevant period Bivona sent numerous emails to Weaver purportedly on behalf of Tampa.  Significantly, these e-mails were sent from Bivona's law firm address (johnv@bivonalaw.com) rather than from his Felix account.

10.     McCabe is a stockbroker licensed with both Defendant Halcyon and Defendant Felix.  Beginning in late 2010, McCabe "cold-called" Weaver asking if he was interested in selling his Twitter holdings.  Throughout the relevant period, McCabe represented that he was a broker for Halcyon, and Weaver reasonably believed he was acting for and on behalf of Halcyon. The e-mails McCabe sent to Weaver were from his Halcyon account (McCabe@halcyoncabot.com).  On information and belief, Bivona directed McCabe to seek potential sellers of Twitter stock through Halcyon, rather than Felix, because beginning in 2010, Twitter and other pre-IPO companies refused to authorize sales of shares to Felix.  During the relevant period, McCabe sent Weaver numerous emails, and also communicated with Weaver by phone, purportedly on behalf of Halcyon.

///

### III.   JURISDICTION AND VENUE

11.   On February 2, 2012, Weaver commenced a civil action in the Superior Court of the State of California, County of Santa Clara, titled *Evan Weaver v. Tampa Investment Group, LLC; and Does 1-50, inclusive,* Case No. 112CV217949.

12.   Thereafter, on or about March 6, 2012, Tampa removed this action to the Northern District of California pursuant to 28 U.S.C. § 1441(b).  This Court has original jurisdiction on the basis of diversity pursuant to 28 U.S.C. § 1332(a).  The amount in controversy exceeds $75,000, exclusive of interests and costs.

### IV.   THE RELATED SEC ACTION

13.   On March 14, 2012, the SEC initiated an action against Felix, Mazzola, and the investment advisor for two Felix-affiliated funds that were organized to invest in pre-IPO technology stocks, including Twitter.  In addition to the SEC action, Felix settled a related action with FINRA on March 14, 2012.  Under that settlement, Felix will pay a fine of $250,000 and hire an independent consultant to review the firm's policies.

14.   The SEC alleged that Felix created, marketed, managed, and raised money for investment funds designed to invest in pre-IPO companies.  According to the SEC complaint, Felix "created other investment funds to invest in the pre-IPO securities of Twitter" and made "false and misleading statements in marketing those funds."

15.   On information and belief, Tampa is one of the funds mentioned in the SEC's complaint that Felix used or created to invest in Twitter securities.

16.   The SEC alleged that, from approximately mid-2010 to mid-2011, Felix was unsuccessful in purchasing shares from pre-IPO companies because the companies exercised or assigned the right of first refusal to third parties who thereafter purchased the shares.  As a result, the SEC alleged that Felix began to increase the price offered to purchase the shares with the hope that the pre-IPO company would be unsuccessful in assigning the right of first refusal to another party.  Similarly, and as alleged further below, Defendants Tampa, Bivona and Halcyon represented that the proposed purchase price for Weaver's shares took into account the possibility of Twitter exercising its right of first refusal.

307767.10

17.     Additionally, the SEC alleged that, in late 2010, Felix entered into a written referral fee agreement with "another broker-dealer to share in the commissions generated" whenever a pre-IPO shareholder sold stock to a Felix-affiliated fund.  As a result of this undisclosed fee agreement, "Felix realized substantial compensation beyond the five percent placement fee that Defendants disclosed in the Offering Materials."

18.     In order to facilitate these highly profitable transactions, the SEC alleged that Felix employed a "registered representative of the other broker-dealer" who worked to locate the pre-IPO stock for the Felix-affiliated funds to purchase and that:

> Although purportedly supervised by the other broker-dealer, this representative was physically located in Felix's offices, was paid a salary by Felix, was given job responsibilities by Felix, and used a Felix e-mail address.  Accordingly, this arrangement was nothing more than a secret way to route the commissions back to Felix, but make it appear as though an independent entity was brokering the sales transactions.

Under the terms of the referral fee agreement, the SEC alleged that the broker-dealer earned "over $1.1 million" and of this amount "the broker-dealer would return to Felix 87.5%."

19.     On information and belief, Halcyon is the "broker-dealer" and McCabe is the "registered representative" that are mentioned in the SEC's complaint.  This allegation is supported by the fact that McCabe's emails to Weaver indicated that the emails originated from Felix's email system and made reference to "your [*i.e.* Weaver's] Felix Investment LLC account."

20.     The SEC alleged that, in December 2010, Felix began making made false statements about Twitter's revenue to attract investors to invest in a Felix-affiliated fund organized to purchase Twitter shares.  Felix continued making false representations concerning its "senior Twitter executives as clients" and revenue projections.  The SEC alleged that "[u]ltimately, Twitter refused to allow additional stock to be sold to Felix's Twitter fund because it was concerned, among other things, about Felix's material misrepresentations regarding Twitter's revenue."

21.     On information and belief, Twitter's refusal to allow additional stock to be sold to Felix caused Felix and Bivona to create other shell corporations to buy Twitter shares, including

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

Tampa.  While Bivona and Felix do not have direct ownership interests in Tampa, Bivona and Felix exercised control over Tampa, and Bivona was the lawyer and "registered representative" for Tampa that communicated and negotiated with Weaver regarding the sale of his Twitter shares.  Moreover, while not noticed at the time, Bivona's emails sent to Weaver, purportedly on behalf of Tampa and from his "bivonalaw.com" account, indicated that they originated from Felix.

## V.    FACTUAL ALLEGATIONS

### A.    The Lucrative Secondary Market for Pre-IPO Stocks

22.    Over the last few years a number of technology and social media companies have reported record-high valuations of their privately owned stock.  Investors seeking to buy into these companies before their initial public offerings hope to profit later from a "pop" in the stock price after the IPO.  This "secondary market" for trading pre-IPO shares has grown tremendously since 2009.  The trading volume of private shares in the secondary market doubled last year to $9.3 billion, according to Nyppex Holdings LLC, which tracks and participates in the market for illiquid securities.

23.    The sellers in the secondary market are typically early employees and investors of technology or social media companies, like Twitter and Facebook.  Early employees sell shares to investors through a network of brokers and fund companies.  Through this network, investors pool their money together and buy interests in various associated investment vehicles that have been created solely to invest in these hard-to-obtain shares.

24.    Felix was among the first to tap into the secondary market, aggressively purchasing millions of shares in Facebook, LinkedIn, Twitter and Groupon at billion-dollar-plus valuations.  Felix's strategy was simple.  No matter how high companies' valuations climbed, Felix would buy as much of the shares as they could, for purposes of resale and otherwise.  As of July-2011, Felix's holdings were worth more than $1 billion.

25.    According to a New York Times article, Felix's rapid emergence drew strong criticisms from both sellers and investors in the secondary market.  For instance, on Quora, a questions and answers site, a thread on Felix is peppered with complaints from anonymous

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

would-be investors and sellers, claiming that Felix was not able to fill their orders or failed to get enough funds on time.  According to the Times article, "[o]ne well-known technology executive, who had sold some of his shares to Felix, said the firm did not close in a 'timely manner.'"

26.    Felix's reputation was worsened when allegations surfaced that Felix was making misleading and fraudulent statements regarding its funds and the shares comprising the funds. Facebook and Twitter, which represented the bulk of Felix's portfolio, began blocking sales of their shares to Felix by exercising the ROFR.  To increase the chance that purchases would not be blocked, Defendants organized a scheme to have another entity – Tampa – purchase the shares. However, Felix's prospects of funding and/or getting the funding for the purchases dimmed considerably through time, and Felix did not have a reasonable basis to believe that it could actually raise requisite funds.

### B.    Tampa, Halcyon and Felix Fraudulently Induce Weaver to Contract to Sell His Twitter Shares

27.     Felix had long been interested in acquiring shares in Twitter in the secondary market. Through Tampa, its alter ego, Felix had previously entered into at least two share purchase agreements with other Twitter share or option holders, and knew of other investors who had done so, only to have Twitter or its assigns prevent the purchases by exercising the ROFR.

28.    In late 2010, McCabe "cold called" Weaver and a number of other early-Twitter employees in order to solicit purchases of their Twitter stock holdings.  McCabe represented that he had clients ready and willing to buy Weaver's Twitter shares at various identified prices. Weaver was not interested at the time and advised McCabe call him back in about six months. McCabe did so.

29.    In August of 2011, McCabe contacted Weaver again, seeking to organize the purchase of Weaver's shares.  In one of these communications, McCabe represented that he had "*a buyer willing to pay [Weaver] $20 net then add my fee on top*."  On August 9, 2011, McCabe emailed Weaver stating that he would send a letter of intent and fee agreement soon, that these documents were "straightforward," and were the same documents used in previous transactions involving Twitter.

30.     During these conversations, McCabe represented that Tampa was the prospective buyer, but that Tampa was "frustrated" because Twitter recently exercised their right of first refusal ("ROFR") to block the sale. The ROFR prevented Twitter shareholders from selling shares without first providing Twitter, or one of its assigns, the option to purchase the shares at the quoted price. Twitter also restricted the amount of shares that a current Twitter employee could sell. Specifically, if a Twitter employee wanted to sell more than 20% of their share of stock, they were forced to terminate their employment and leave the company.

31.     McCabe represented that Tampa was willing to set the offering price higher than they had offered before in order to avoid the ROFR. On August 10, 2011, McCabe emailed Weaver (and copied Tampa's supposed lawyer, Bivona), attaching a draft letter of an agreement proposing a 100% purchase of Weaver's shares for $20.85 a share, netting over $27 million to Weaver.

32.     Oddly, the purchaser in the draft letter agreement was an entity identified as "Clear Sailing Group IV, LLC" with a New York City address. When asked why it was this entity rather than Tampa, McCabe responded in writing that it was the:

> Same group. They feel that putting the shares in a new entity gives them a better chance. The company has seen Tampa a few times and has rofr'd the shares. Make sense?

33.     After reviewing the letter of intent, Weaver wrote McCabe back expressing concern about non-binding language in the August 10 letter of intent. Weaver also asked McCabe to confirm that this was the same letter of intent used in previous deals that were consummated. McCabe responded that this was the same letter used in and accepted by sellers in prior deals, explaining: "because twitter has blocked trades in the past…this way the **seller** wasn't tied up 'forever' with no options to get out" (emphasis added). In other words, McCabe represented that the non-binding language was to protect Weaver, and was only meant to address situations where the actions of Twitter frustrated the sale. On August 11, 2011, McCabe told Weaver, "I don't see a reason to worry at all."

34.     These discussions continued over the next several days and formed the basis of the parties' eventual Agreements, as well as their understanding of the Agreements. The documents

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

307767.10

were also edited and sent back with important changes to confirm these Agreements.  For example, Weaver advised McCabe that he felt more comfortable with Tampa, the original entity McCabe had represented to be the buyer, because it had already submitted deals to Twitter. Accordingly, both documents were then quickly edited to replace "Clear Sailing" with "Tampa." The Letter Agreement was also edited to add a sentence at the end of the paragraph containing the non-binding language, in order to confirm that such language was meant to address situations where the actions of Twitter frustrated the sale.  The new sentence stated:

> For the avoidance of doubt, if the right of first refusal is exercised by the Company or its assigns, this Letter shall terminate and be rendered null and void.

35.    The Letter Agreement also had a strict expiration date of August 18, 2011, providing that it would "expire" if not fully executed by then.  It unambiguously contained all of the material terms (the exact number of shares to be sold, and the exact price to be paid).  It also provided that the parties "will enter into and comply with the Company [i.e., Twitter] standard stock transfer agreement," and that definitive agreements, "will contain provisions usual and customary for similar transactions."

36.    The Term Sheet was also edited in important ways.  A signature block was added for the buyer, Tampa, and the Term Sheet provided that Tampa was "to work in good faith and use best efforts to finalize and execute definitive documentation."  This agreement also described all the material terms (the exact number of shares to be sold, and the exact price to be paid), and referred to the price to be paid as the "buyer obligation".  The Term Sheet also reflected that if Twitter exercised the right of first refusal, Halcyon would still receive its brokerage commission of $1,011,194.25 from Weaver.

37.    On August 11, 2011, McCabe reaffirmed that Tampa had the funds and investor commitments necessary to consummate the deal, writing, "*i'm told there [sic] investors are ready to go if this clears rofr*."

### C.    The Parties' Memorialize The Purchase in Two Agreements

38.    On <u>August 12, 2011</u>, Bivona emailed Weaver and Weaver's attorney and stated, emphatically, "*[w]e are ready to move on this.*"  The parties then executed two agreements to

307767.10

memorialize the sale.

39. Specifically, on or about <u>August 16, 2011</u>, Weaver and Tampa executed a written "Letter Agreement" unambiguously setting forth the material terms of the stock purchase, including the price to be paid per share ($20.85) and the total number of shares to be purchased (1,348,259). (A true and correct copy of the Letter Agreement is attached hereto as Exhibit A and is incorporated herein by this reference as though fully set forth.).

40. Similarly, on or about <u>August 16, 2011</u>, Weaver, Tampa and Halcyon executed the "Term Sheet" (together with the Letter Agreement, the "Agreements"), which unambiguously set forth the exact number of shares to be sold and the exact price to be paid. (A true and correct copy of the Term Sheet is attached hereto as Exhibit B and is incorporated by this reference as though fully set forth.) The Term Sheet, which Weaver signed after he signed the Letter Agreement, provided that Tampa was "to work in good faith and use best efforts to finalize and execute definitive documentation."

41. The Term Sheet also provided for a large commission, $1,011,194.25, payable to Halcyon.

42. Bivona, Tampa's lawyer and majority owner of Felix, participated in the drafting and negotiation of the Agreements, was copied on emails discussing the Letter Agreement, and communicated with Weaver regarding the terms of the deal. Defendants purposefully concealed the fact that Twitter had refused to finalize sales of its shares to Felix – the company owned by Bivona – because of concerns about Felix including, on information and belief, fraudulent misrepresentations regarding Twitter stock.

43. McCabe, who was also a licensed broker with Felix, instructed Weaver to not disclose any information to Twitter about his participation in the deal. McCabe also instructed Weaver not to submit documents to Twitter or discuss the broker-dealer's involvement, ostensibly for privacy concerns.

44. Weaver would not have entered into the Agreements had he known the truth behind Defendants' misrepresentations and concealments. At the time the written agreements were entered into, Defendants represented to Weaver and Weaver otherwise reasonably

understood that Tampa had the requisite funds available. In point of fact, Tampa did not have the requisite funds available then, and Weaver now believes that Tampa also had no reasonable basis to believe that the funds would later become available when the time for performance came. Moreover, neither Felix nor Halcyon nor Bivona had a reasonable basis to believe that they could fund the deal or find investors.

45. After signing the Agreements, and in reliance on Defendants' misrepresentations and concealments, Weaver was induced to and did leave his job at Twitter for the sole reason that current employees of Twitter were prohibited from selling stock holdings of this size. Prior to signing the Agreements, Weaver communicated Twitter's policy to McCabe and Halcyon, who each understood that the execution of the Agreements would cause Weaver to quit his job. Weaver only signed the Agreements and quit his job because of Defendants' representations that the material terms of the Agreements – *i.e.* the price and quantity of shares – were binding upon Tampa and Halcyon if Weaver fulfilled his obligations. Moreover, by signing the Agreements and quitting Twitter, Weaver gave up significant additional stock option vesting of 45,000 shares per month, and ceased receiving his monthly salary of $12,916.67 and other benefits.

46. Following his resignation, Weaver complied with his other obligations under the Agreements and provided notice of the Tampa deal to Twitter, including the price and amount of shares, so that Twitter could decide whether to exercise the ROFR. The Letter Agreement contractually obligated Weaver to provide this notice to Twitter and Tampa specifically instructed Weaver to provide this notice. Tampa and Halcyon (through McCabe) were aware that, by providing this notice, Weaver was representing to Twitter that he had a "bona fide" or "legitimate" offer.

47. On September 16, 2011, Twitter notified Weaver that the right of first refusal would <u>not</u> be exercised. This cleared the way for Tampa to proceed with the promised acquisition at the promised price. Weaver thus advised Tampa and Bivona on that very day that Twitter was not exercising the ROFR, and Weaver started working with Twitter's lawyers on the stock transfer agreement. Weaver then forwarded the Twitter standard stock transfer agreement to Tampa and Bivona.

1

### D.    Defendants' Breach the Agreements and Fail to Fund

2       48.    After Weaver complied with his obligations, Tampa purposefully refused to

3    purchase Weaver's Twitter stock at the contracted price.  Contrary to earlier representations and

4    the clear terms of the Agreements, Tampa and its lawyer, Bivona, took no steps, and exerted no

5    efforts, to finalize and execute definitive documentation, to work in good faith, or to expedite the

6    closing of the sale when Twitter declined to exercise its ROFR.

7       49.    Indeed, several days elapsed after Weaver advised that the sale could go through

8    and Bivona remained silent.  Finally, on September 21, 2011 Bivona responded with a

9    perfunctory email stating simply that he was "looking into it."  After getting this email, Weaver

10   told McCabe that if Tampa was not going to perform that he would have to consider

11   consummating the sale with another potential buyer.  McCabe, on behalf of Halcyon, responded

12   "***you can't do that let's see what [Tampa] says***."  A few days later, Bivona continued to mislead

13   Weaver, stating that there would be an "LP meeting Wed. afternoon regarding [the] transaction.".

14   In point of fact, Tampa had no "LP's."  Bivona added that he would be in touch "right after" to

15   discuss finalizing the purchase, but instead went silent.

16      50.    Over the next few days, McCabe and Bivona continued to string Weaver along.

17   Weaver was advised that Tampa found a different seller who was willing to sell Twitter shares,

18   and that Tampa was no longer interested in the price stated in the Agreements.  This was false.

19   Tampa did not find a different seller and did not provide funds to pay any prospective seller, let

20   alone Weaver.  Bivona also represented that "another" group "within" Tampa "might" be

21   "willing" to buy Weaver's stock at the contracted price.  Again, this was false.

22      51.    On September 30, 2011, Bivona, finally responded:

23          "Sorry we will not be able to raise the funds for the deal.  We have
            been unsuccessful with regard to our investors."
24

25      52.    Tampa's repudiation of its obligations was clear.  Weaver sent Tampa a formal

26   demand for an adequate assurance of performance pursuant to California Commercial Code

27   §2609, the common law, and as was otherwise his right.  Tampa did not provide any such

28   assurance, let alone an adequate one, within the time period specified in the notice, which time

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

307767.10

period was reasonable under the circumstances.  In fact, Tampa specifically confirmed that it would not perform.

53.     Weaver then exercised his right to mitigate his damages by reselling all of his shares to third parties in the secondary market.  These re-sales were commercially reasonable, and the net difference between the contracted price and the price of the resales was $7,595,064. Weaver suffered these and other losses as a result of Defendants' breaches and misrepresentations.

54.     Weaver suffered other damages as a result of Defendants' breaches.  Specifically, but without limitation, Weaver did not enter into a competing deal for his shares at the time he executed the two agreements.  Weaver also suffered reliance and lost opportunity damages by not pursuing other available opportunities to sell his shares during the time between the execution of the Agreements and the time he was notified of Defendants' breach.  The market for Twitter shares decreased during that time period – the same time period during which Halcyon specifically instructed Weaver to not sell his shares to anyone else.  Weaver also would not have terminated his employment at Twitter, and would have received additional stock option vesting, wages and other benefits had he remained an employee at Twitter.

55.     After filing his action against Tampa, in the context of discovery and otherwise, Weaver has uncovered facts and circumstances relating to Halcyon, Felix and Bivona.

56.     For example, when it was noted that the "boilerplate" disclaimer after Paul McCabe's signature and e-mail referenced Felix, McCabe advised that he was registered <u>both</u> with Felix and Halcyon and then revealed the bombshell: the lawyer, John Bivona, was a principal at Felix.  While McCabe was registered at both firms, the brokerage agreement that was used was that of Halcyon, not Felix, and McCabe could not explain why he used Halcyon rather than Felix.  The e-mail address for Bivona was a "Bivona law" address, not a Felix address.

57.     Furthermore, Weaver's discovery and investigation revealed the following additional facts, without limitation:

- McCabe testified that Bivona provided the "Clear Sailing" name to McCabe in connection with the first draft Letter Agreement.

- McCabe advised Weaver in writing that Tampa and Clear Sailing were the "same entity." McCabe testified that this was not true.

- McCabe advised Weaver by phone and in writing that Tampa's supposed investors were the "who's who" of Tampa real estate. McCabe testified that he actually had no knowledge of this.

- McCabe advised Weaver by phone and in writing that Tampa and its investors were ready and able to consummate the sale. McCabe did not have a reasonable basis upon which to make that factual assertion.

58.     At his deposition, Forlizzo revealed that, while the stated purpose of Tampa was to engage in the purchase and sale of securities, with the exception of real estate transactions that might be argued to involve "securities," he had never been involved in high tech or other equities. Forlizzo refused to divulge how Tampa planned to raise or make money in this business, this supposedly being protected by the attorney-client (and trade secret) privilege.

59.     Discovery has further revealed that, by letter agreements dated June 14, 2011 that look like the one given to Weaver, Tampa had entered into two earlier transactions involving Twitter stock. Each was for a per-share price at $20, but at much lower volumes than Weaver's deal.[1] The buyer-side broker on these deals was, again, Paul McCabe. Twitter exercised its right of first refusal on both deals, and Tampa received a fee of $18,000 for each of these transactions, supposedly for "services rendered." Forlizzo was not aware of any contractual documents relating to the entitlement to that fee, and Forlizzo was unsure who paid that fee (i.e., Felix, Halcyon or other). Forlizzo would also not reveal whether Tampa had any investors committed to those transactions, claiming attorney-client privilege because Bivona was involved.

60.     Turning to the Weaver deal, Forlizzo testified that Tampa had not directly hired McCabe to find additional sellers of Twitter stock. At best, that was done by Tampa's attorney and "authorized representative" Bivona.

61.     Forlizzo had no direct involvement in lining up investors for the $28 million transaction at any time, either before the LOI was executed or after Twitter advised that it would

---

[1]     The one with Brendan Thomas was for 100,000 shares, and a cumulative price of $2,000,000. The one with Santosh Jayaran was for 90,000 shares, and a cumulative price of $1,800,000.

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

307767.10

not exercise the right of first refusal.  Further, Forlizzo refused to testify concerning his knowledge of attempts to line up investors by Bivona, asserting the attorney-client privilege.

62.     Forlizzo had never heard of the "Clear Sailing" entity until the draft letter with it was shown to him at deposition.  He was unaware that Clear Sailing had offered the same price, $20.85.  It is therefore self-evident that the lawyer, Bivona, never got Forlizzo to sign a waiver as to this conflict of interest relating to a competing offer from a supposed competitor.  Forlizzo also had no involvement in negotiating the $20.85 price with Weaver, and the first time he saw it was when he was asked to sign the final Letter Agreement (despite the fact that McCabe told Weaver he was negotiating with Tampa's "board.").  Forlizzo never saw the changes proposed by Weaver's attorney to the Letter Agreement and Term Sheet, simply signing the documents as edited.

63.     At one point before the Weaver deal, Twitter called Forlizzo, and Forlizzo refused to divulge anything about the nature of Tampa or its supposed investors.

64.     Forlizzo was not involved in any discussions over the standard Twitter Stock Transfer Agreement.  In fact, Forlizzo never looked at the Stock Transfer Agreement until the deposition, despite Tampa's affirmative duty to use best efforts to execute final documentation for the sale.  No comments were ever relayed back to Weaver about any concerns or problems with the documentation.  The only "final" documentation to be signed was that document.

65.     While it was not necessarily noted as significant at the time, emails from McCabe and Bivona indicated that they were coming from Felix.  For instance, Bivona sent Weaver an email on August 12, 2011, which stated that it was "powered by Felix Investments LLC emailing system."  Furthermore, McCabe's emails each contained a disclosure statement indicating that the email originated from Felix's email system.  The street address for the Clear Sailing entity was the same as Felix's address.

**E.     Defendants' Duties**

66.     Defendants were subject to standards of care based on applicable state and federal laws, industry standards, and professional codes of ethics.  For example, Halcyon and Felix were both self-regulated organizations registered with the SEC and FINRA, with duties of care defined

by their profession.  Moreover, the Agreements required Halcyon and Tampa, as the entities
Weaver entrusted to secure the purchase of his 100% interest in $28 million of stock, to exercise
professional standards of care.  Halcyon and Tampa represented that they would consummate the
purchase and specifically instructed Weaver to not sell his shares elsewhere.

67.     As a registered broker-dealer, Halcyon owed a fiduciary duty of undivided loyalty
to Weaver, prohibiting it from self-dealing, misappropriating Weaver's opportunities, or
otherwise profiting from transactions with Weaver in bad faith.  Defendant Halcyon owed a duty
to exercise the care of a prudent investment advisor and/or broker, and to exercise good
judgment, applying their education, skills, and expertise in securing investors and prospective
purchasers for Weaver.

68.     Additionally, all Defendants owed a duty of honesty and fair dealing to Weaver.
Indeed, honesty is fundamental to the role of an investment advisor and/or broker that is placed in
a position of trust and confidence, such as here.  Similarly, all Defendants owed Weaver the duty
to provide full and fair disclosure of all material facts.  This includes a duty to disclose and
manage material conflicts of interest, including secret arrangements with unnamed participants
and fee sharing agreements.  Finally, all Defendants owed Weaver a duty to act with due care and
in good faith towards Weaver.

69.     As described herein, Defendants disregarded their duties owed to Weaver, and
misrepresented their belief about available investors and market conditions required to
consummate the purchase of Weaver's Twitter shares.  Tampa did not have and did not seek out
investors to fund the purchase of Weaver's shares.  Halcyon failed to disclose that the broker
negotiating the Agreements also worked for Felix, and that it was Twitter's policy to frustrate
sales to Felix or its alter egos.  Felix, an unknown entity at the time of the Agreements,
orchestrated the entire transaction from behind the scenes and aided and abetted the breaches
complained of herein.  Felix did not have a reasonable basis to assume that it could fund or find
investors for those shares.  Indeed, Felix created risk for Weaver because it knew that if its true
involvement were known that Twitter would refuse to finalize the deal, leaving Weaver in limbo
while market conditions changed and while other sales opportunities came and went.

307767.10

70.     Defendants, in order to maximize commissions, concealed material information that directly contradicted earlier representations. In addition, Defendants, hoping to earn exclusive commissions if Twitter exercised its ROFR, failed to seek reasonable investor commitments in advance of signing the agreements. Tampa and Halcyon breached their duties by not working in good faith to consummate the purchase immediately after Weaver complied with his obligations, which included submitting the offer for Twitter's ROFR and leaving his employment at Twitter. Put simply, Weaver was not given the benefit of Defendants' stated promises and representations that they had available investors and that they would consummate the purchase if it was not ROFR'd. Rather, in a reckless and bad faith dereliction of duty, during a time period when Defendants concealed material information, Defendants advised Weaver to not sell his Twitter shares to other potential buyers and to continue following Defendants' charade. As a result, Weaver suffered millions in losses.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

71.     Plaintiff Weaver hereby incorporates all of the foregoing paragraphs as though fully set forth herein.

72.     On August 16, 2011, Weaver and Tampa entered into the Letter Agreement whereby the parties agreed to the material terms, including the price and quantity, of a stock purchase. Under the Letter Agreement, Tampa was obligated to perform certain functions and duties to consummate the funding and eventual purchase of 100% of Weaver's Twitter shares if Weaver complied with his obligations under the Letter Agreement.

73.     On August 16, 2011, Weaver, Tampa and Halcyon entered into the Term Sheet, whereby the parties agreed to the material terms, including the price and quantity, of a stock purchase. Under the Term Sheet, Halcyon would be paid a commission if Tampa successfully purchased the shares or if Twitter exercised its ROFR. Under the Term Sheet, Halcyon and Tampa were obligated to use good faith and best efforts to execute additional documentation and consummate the purchase.

74.     Weaver performed all conditions, covenants and promises required of him under the Letter Agreement and Term Sheet, except such obligations as were excused, waived, modified or prevented by Defendants' conduct or by the mutual agreement of the parties by, among other things, submitting the agreed upon purchase terms to Twitter in accordance with Twitter's right of first refusal; terminating his employment with Twitter so that he could sell his Twitter shares; and, by at all times acting in good faith and not selling his Twitter shares to other potential investors.

75.     Tampa and Halcyon breached their obligations to Weaver under, as applicable, the Letter Agreement and Term Sheet by, among other things, failing to use good faith and best efforts to execute additional documentation; failing to use good faith efforts to consummate the purchase and find a purchaser for Weaver's shares; failing to pursue the agreements' stated objectives; advising Weaver to terminate his employment so that he could tender the shares at a time when Tampa and Halcyon knew, or were reckless in not knowing, that there were no investors available to purchase the shares; failing to disclose all fee sharing arrangements, including fee sharing arrangements with Felix; and, advising Weaver to not sell his shares to other purchasers in bad faith, when Tampa and Halcyon knew or were reckless in not knowing that they could not secure investors to purchase Weaver's shares.

76.     As a direct and proximate result of Halcyon's and Tampa's breach of the agreements, Weaver has suffered compensatory damages in the sum of at least $7 million, or such other damages as are according to proof.  Weaver suffered additional reliance damages in the form of the wages and benefits he lost, and the additional stock option vesting which did not accrue, out of pocket and lost opportunity costs, all in amounts to be proven at trial.  Weaver suffered other damages in an amount to be proven at trial as well.  Weaver is entitled to prejudgment interest at the highest allowable percentage.

## <u>SECOND CAUSE OF ACTION</u>
**(Breach of the Covenant of Good Faith and Fair Dealing)**

77.     Plaintiff Weaver hereby incorporates all of the foregoing paragraphs as though fully set forth herein.

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

78.     On August 16, 2011, Weaver and Tampa entered into the Letter Agreement and Weaver, Tampa and Halcyon entered into the Term Sheet.

79.     Inherent and implied by law and fact in the agreements is the implied covenant of good faith and fair dealing and Tampa and Halcyon were bound by this covenant to not do anything in bad faith to deprive Weaver of the benefits of the agreements.

80.     Weaver performed all conditions, covenants, and promises required of him under the agreements and, among other things, acted with good faith in performing his obligations.

81.     Tampa and Halcyon unfairly interfered with and frustrated Weaver's right to receive the benefits of the agreements by failing to pursue the agreements' stated objectives, by advising Weaver to quit his job at Twitter so that he could sell the restricted Twitter shares when Halcyon and Tampa knew that there were no investors available to purchase the shares; advising Weaver to not sell his shares to other potential investors when Tampa and Halcyon knew that they had not found, and could not find potential investors.  Tampa and Halcyon further interfered with and frustrated Weaver's right to receive benefits of the agreements by abandoning the relationship, refusing to perform its contractual duties and ignoring Weaver's inquiries and concerns.

82.     As a direct and proximate result of Halcyon's and Tampa's breach of the covenants under the agreements, Weaver has suffered compensatory damages in the sum of at least $7 million, or such other damages as are according to proof.  Weaver suffered additional reliance damages in the form of the wages and benefits he lost, and the additional stock option vesting which did not accrue, out of pocket and lost opportunity costs, all in amounts to be proven at trial.  Weaver suffered other damages in an amount to be proven at trial as well. Weaver is entitled to prejudgment interest at the highest allowable percentage.

83.     Weaver has fully performed or offered to perform all of his obligations under the agreements, except such obligations as were excused, waived, modified or prevented by defendant's conduct or by mutual agreement of the parties.

///

///

### THIRD CAUSE OF ACTION
#### (Fraud)

84.     Plaintiff Weaver hereby incorporates all of the foregoing paragraphs as though fully set forth herein.

85.     Defendants made material representations and omissions to Weaver that were false and misleading, including, but not limited to, representations that Tampa would be the true purchasing entity; that Tampa was financially ready, willing and able to perform under the agreements; that Tampa had already secured investors to fund the purchase of Weaver's shares; that the purchase would be consummated if Twitter did not execute its ROFR; and, that all fees and financial arrangements, including those with Felix, were fully disclosed.

86.     As discussed more fully above, Defendants concealed material facts from Weaver. As Weaver's broker and investment advisor, Defendant Halcyon had a duty to disclose all material facts to Weaver.  Furthermore, all Defendants had a duty to disclose Felix's true involvement, and Weaver would have acted differently had he known the true facts.  Defendants also had a duty to disclose all material facts, and to speak the whole truth, when making representations.  Defendants' concealment of material facts was a substantial factor in causing Weaver harm.

87.     Throughout negotiations, Defendants purposefully misrepresented to Weaver that Tampa was a respectable, funded entity with pre-existing investor commitments.  However, Tampa was not funded and had no prospect of raising funds the $28 million sale.  The owners of Tampa had no participation in the negotiation and it was Bivona, Tampa's lawyer and majority owner of Felix, who orchestrated the negotiation and proposed sale from behind the scenes. Further, Defendants failed to advise Weaver of Felix's involvement, and Halcyon's McCabe falsely represented to Weaver that Tampa was comprised of the "who's who" of Tampa real estate.  None of the Defendants had a reasonable basis to believe that they or any third party could fund or raise money for the deal.

88.     Defendants made the false and misleading representations, and knew the representations were false or made the representations recklessly and without regard for their

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

307767.10

truth, because Defendants were aware that there were no investors available to purchase Weaver's shares, and that even if Twitter declined to exercise its ROFR, Defendants were incapable or had no intention of consummating the purchase.

89.     Weaver did not know the representations were false and believed them to be true, and he detrimentally relied upon these false representations.  At the time Defendants made the representations they intended, or were reckless in causing, Weaver to rely on the representations. If Weaver had known the representations were false he would have sold to others in a more favorable market environment and/or would not have terminated his employment immediately after signing the Agreements.

90.     The Defendants, and each of them, conspired, aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct, their wrongful goals, and other wrongdoing complained of herein.  In taking action, as particularized herein, to conspire, aid and abet, and substantially assist the commission of these wrongful acts and other wrongdoings complained of, Defendants acted with an awareness of his/its primary wrongdoing and realized that his/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

91.     As a proximate result of the misrepresentations, Weaver has been damaged in an amount to be proven at trial, and as otherwise set forth above.

92.     In committing the acts alleged above, Defendants acted with malice, oppression and fraud, and in conscious disregard of Weaver's rights.  Weaver is thus entitled to punitive damages in a sum according to proof.

**FOURTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**

93.     Plaintiff Weaver hereby incorporates all of the foregoing paragraphs as though fully set forth herein.

94.     Defendants made material representations to Weaver that were false and misleading and concealed material information from Weaver.

95.     Defendants' representations were false and misleading.  When Defendants made

the representations they had no reasonable ground for believing the representations were true.

96.     At the time the misrepresentations were made, Defendants intended that Weaver rely on the misrepresentations and omissions.

97.     Weaver justifiably and reasonably relied on Defendants' misrepresentations and omissions.  Had Weaver known the true facts, Weaver would have sold to others in a more favorable market environment, or would not have terminated his employment when he did. Defendants' misrepresentations were a substantial factor in causing Weaver harm.

98.     The Defendants, and each of them, conspired, aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct, their wrongful goals, and other wrongdoing complained of herein.  In taking action, as particularized herein, to conspire, aid and abet, and substantially assist the commission of these wrongful acts and other wrongdoings complained of, Defendants acted with an awareness of his/its primary wrongdoing and realized that his/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

99.     As a proximate result of the misrepresentations, Weaver has been damaged in an amount to be proven at trial, and as otherwise set forth above.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

100.    Plaintiff Weaver hereby incorporates all of the foregoing paragraphs as though fully set forth herein.

101.    By virtue of its relationship with Weaver, and its position as Weaver's broker and/or investment advisor, Halcyon set out to create and did in fact create a special relationship of trust and confidence, and thereby owed Weaver a fiduciary duty.  A fiduciary relationship existed at all times herein.

102.    While Halcyon also acted on behalf of Felix and Tampa, Halcyon acted on Weaver's behalf as a broker and/or investment advisor for the purposes of soliciting and securing investors to purchase Weaver's securities in accordance with the objectives and guidelines set forth in the agreements.

307767.10

103.    Halcyon breached its fiduciary duties to Weaver by failing to act with due care and the utmost good faith as a reasonably careful broker and/or advisor would have acted under the same or similar circumstances by, among other things, not disclosing Felix's involvement; advising Weaver to present the right of first refusal to Twitter; quoting and bidding a price that supposed investors would pay for the shares when in fact there were no investors; informing Weaver that investors were available to purchase his Twitter shares when in fact there were no investors; advising Weaver to comply with his side of the agreements, which required Weaver to terminate his employment in order to sell his Twitter shares, with knowledge that Tampa and Halcyon could not fulfill their obligations; advising Weaver to not sell his Twitter shares to other potential purchasers; and, abandoning the relationship after Weaver fulfilled his obligations.

104.    Halcyon breached its fiduciary duty of honesty not to mislead Weaver and to provide full and fair disclosure of all material facts by misrepresenting to Weaver – as memorialized in two agreements – that an investor was ready, willing and able to purchase Weaver's shares once Weaver complied with his obligations under the agreements.  Halcyon continued to breach its duties by not informing Weaver that there were in fact no investors available to purchase his shares when Weaver fulfilled his obligations by terminating his employment with Twitter.  Halcyon further breached its duties by, among other things, failing to disclose the interrelationship between Tampa, Halcyon and Felix, including the fact that the lawyer of Tampa, Bivona, was also the majority owner of Felix (a company that Twitter had stated it would not transfer shares to); failing to disclose all aspects of the fee-sharing between Tampa, Halcyon and Felix; misrepresenting the terms of the agreements and the effect of certain language in the agreements, including the "non-binding" clause, which was represented to Weaver to only be relevant in the event that Twitter frustrated the sale.

105.    Halcyon breached its fiduciary duties of loyalty and failed to disclose and manage material conflicts of interest by, among other things, failing to disclose the contentions between Felix, including registered representatives and/or owners of Felix, and Twitter, which frustrated the ability of Felix, including its registered representatives and owners, to purchase Twitter shares; misrepresenting the viability and nature of Tampa, which was in fact a shell-company that

Page 24

307767.10

operated as the alter ego of Felix; and failing to disclose fee sharing arrangements between Tampa, Halcyon and Felix.

106.    Halcyon's repeated breaches of fiduciary duty were substantial factors in causing Weaver harm.

107.    Tampa, Halcyon, Felix, and Bivona, and each of them, conspired, aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct, their wrongful goals, and other wrongdoing complained of herein.  In taking action, as particularized herein, to conspire, aid and abet, and substantially assist the commission of these wrongful acts and other wrongdoings complained of, Defendants acted with an awareness of his/its primary wrongdoing and realized that his/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

108.    As a proximate result of the misrepresentations, Weaver has been damaged in an amount to be proven at trial, and as otherwise set forth above.

109.    In committing the acts alleged above, Defendants acted with malice, oppression and fraud, and in conscious disregard of Weaver's rights.  Weaver is thus entitled to punitive damages in a sum according to proof.

### SIXTH CAUSE OF ACTION
**(Professional Negligence)**

110.    Plaintiff Weaver hereby incorporates all of the foregoing paragraphs as though fully set forth herein.

111.    By virtue of its relationship with Weaver, Halcyon owed Weaver a duty to exercise reasonable skill and care that an ordinary broker or investment advisor would use in soliciting a private placement of Weaver's $28 million stock portfolio, communicating with Weaver, in providing advice and consultation as to the price and quantity of Twitter shares that could successfully be sold in the secondary market, and in exercising its obligations in accordance with the objectives and guidelines in the Agreements.  Halcyon owed Weaver further duties under applicable state and federal laws, industry standards, and professional codes of ethics, including, but not limited to, those set forth under the rules and regulations of the SEC and

FINRA.

112.    Halcyon's duties to Weaver included, but were not limited to, the duty to: (1) act honestly and not mislead Weaver; (2) disclose all material facts; (3) act in good faith; (4) solicit investors to purchase Weaver's shares; (5) consult with Weaver about when the investors were available to purchase the securities, and thus when Weaver would have to terminate his employment; (6) act in Weaver's best interests; and (7) disclose and manage material conflicts of interest.

113.    Halcyon was negligent in failing to exercise the reasonable skill and care an ordinary broker or investment advisor would use with respect to exercising these duties as set forth above.  Halcyon's negligence was a substantial factor in causing Weaver harm.

114.    As a direct and legal result of Halcyon's negligent acts and omissions, Weaver has suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Weaver prays for judgment as follows:

1.    Awarding compensatory damages and exemplary damages in an amount to be proven at trial;

2.    Awarding such other and further reliance, lost opportunity, out of pocket and other damages as is appropriate;

3.    Awarding interest and prejudgment interest thereon at the maximum allowable rate;

4.    Awarding punitive damages;

5.    Awarding appropriate prejudgment remedies such as a writ of attachment, a right to attach order, and otherwise;

6.    Awarding reasonable attorneys' fees, and other costs and expenses, to the extent provided by law; and

///

///

///

///

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

307767.10

1           7.     Awarding such other and further relief as is necessary and appropriate.

2    Dated:  December 20, 2012           ROGERS JOSEPH O'DONNELL

3                        /s/ *Thomas H. Carlson*

4                    By: _____
                         THOMAS H. CARLSON

5                    311 California Street, 10th Floor

6                    San Francisco, California 94104
                     Telephone:  415.956.2828

7                    Facsimile:  415.956.6457

8                    **COTCHETT PITRE & McCARTHY, LLP**

9                    **MARK C. MOLUMPHY** (State Bar No. 168009)
                     **BRYAN M. PAYNE** (State Bar No. 272871)

10                   830 Malcolm, Suite 200
                     Burlingame, California 94133

11                   Telephone: 650.697.6000
                     Fax: 650.697.0577

12                   *Attorneys for Plaintiff*     *EVAN WEAVER*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT – Case No. CV-12-01117 EJD (PSG)

307767.10

# EXHIBIT A

Tampa Investment Group, LLC
2903 Rigsby Lane
Safety Harbor, FL 34695

August 16, 2011

Evan Weaver

Dear Evan:

We at Tampa Investment Group, LLC (the "Purchaser") are excited to proceed with the proposed purchase from you (the "Seller") of 1,348,259 shares of common stock (after giving effect to the 2-for-1 stock split which occurred on May 3, 2011) (the "Shares") of Twitter, Inc. (the "Company") for consideration of $20.85 per share, or aggregate consideration of $28,111,200.15 as further described below. The purpose of this letter (this "Letter") is to set forth certain understandings between Seller and Purchaser with respect to this proposed transaction.

COMMON STOCK PURCHASE

| | |
|---|---|
| Shares: | 1,348,259 shares common stock of the Company (after giving effect to the 2-for-1 stock split which occurred on May 3, 2011) |
| Purchase Price: | $28,111,200.15 of aggregate cash compensation ($20.85 per share) |
| Close: | Purchaser and Seller will use their reasonable commercial efforts to expedite the closing of the purchase and sale of the Shares as soon as practical once the right of first refusal process expires without exercise. |
| | The parties will enter into and comply with the Company's standard stock transfer agreement or amend it in a manner that is mutually satisfactory and approved by the Company. Definitive agreements will contain provisions usual and customary for similar transactions, including appropriate representations and warranties and covenants. The parties will take reasonable steps to comply with any other Company requirements in respect of the purchase and sale of the Shares. |
| Definitive Documentation: | Seller will provide to Purchaser, within seven (7) business days of the date of this Letter, all relevant documentation in connection with the Seller's acquisition of the Shares, including without limitation, any agreements or constituting documents of the Company containing restrictions on the resale or other transfer of the Shares, rights of first refusal or similar provisions (the "Shareholder Agreements"). |

| | |
|---|---|
| Notice to the Company: | Seller shall provide a notice for this offer to the Company immediately following the execution and delivery hereof (and not any sooner). |
| Expenses: | Purchaser and Seller shall be responsible for their own legal fees and expenses. |
| Confidentiality: | Purchaser and Seller will keep confidential and not disclose to any person the terms of this letter (with the exception of legal and financial advisors and the Company) without the express prior consent of the other party. |
| Expiration: | This agreement if not executed by both parties expires on August 18, 2011. |

Notwithstanding any terms herein to the contrary, no term or provision of this Letter (and no negotiations or oral representations made in connection with this transaction) shall constitute a commitment, agreement or binding agreement on the part of the Seller or Purchaser except for the provisions entitled "Expenses" and "Confidentiality" which shall be binding and survive the termination of this Letter, except to the extent agreed to in definitive and final documentation relating to the share purchase. For the avoidance of doubt, if the right of first refusal is exercised by the Company or its assigns, this Letter shall terminate and be rendered null and void.

[Remainder of page intentionally left blank]

Agreed and Accepted:

SELLER

By: _____
Name: Evan Weaver, an individual
Date: 8/16/2011
Address: 943 Lombard St
San Francisco, CA 94133

BUYER

Tampa Investment Group, LLC

By: _____
Name: Robert Forlizzo

Title: Managing Member

# EXHIBIT B

Order Number:      137

# Halcyon Cabot Partners, Ltd.

*Strictly Confidential — Not to be Disclosed or Distributed to Third Parties*

### Summary of the Transaction

Date Issued: 8-16-2011
Time Issued: 9:00 a.m.

Issuer Name: Twitter                              Security Type: common

Purchaser name: Tampa Investment Group, LLC

Amount / Number of Shares: 1,348,259 (after May 3, 2011 2:1 split)
         Price per Share: $20.85

Gross Amount (BUYER OBLIGATION): $28,111,200.15

Less: HCP Fee: $1,011,194.25 ($0.75 per share)

SELLER PROCEEDS: $27,100,005.90

Fee is to be paid to Halcyon Cabot Partners upon completion of the transaction described above. Seller pays fee to Halcyon Cabot Partners should the company exercise its right of first refusal or assign that right and the seller receives his funds on completion of such exercised right of first refusal transaction. Wire instructions to follow.

By Executing below, Buyer affirms their intent to work in good faith and use best
efforts to finalize and execute definitive documentation.

Halcyon Cabot Partners shall (a) use its best efforts to facilitate the transaction and closing thereof, including, without limitation, timely delivery to the Issuer of the legal opinion, transfer fee, and parties' signature pages and exhibits, (b) arrange for and pay directly the costs for the legal opinion and any other securities laws compliance, (c) interface with the Issuer on any outstanding items and issues, and (d) keep Seller informed of status.

Halcyon Cabot Partners represents and warrants that it is a registered broker-dealer under Section 15 of the Securities Exchange Act of 1934, as amended, and has appropriate state licenses to provide the services and receive the fees hereunder.

This Agreement shall be governed by the laws of the State of California, without giving effect to its choice of law rules. The

[00070516.DOC;1 ]

exclusive venue for disputes arising out of or relating to this agreement shall be the state and federal courts in Santa Clara County, California, and the parties waive all defenses of inconvenient forum and submit to personal jurisdiction in California.

[Signature page follows]

In witness whereof, the parties have executed this fee agreement.

|  |  |
|---|---|
| **FOR SELLER** | **FOR HCP** |

| | | | |
|---|---|---|---|
| Name: | Evan Weaver | Signed By: | Paul McCabe |
| Title: | | Title: | SVP |
| Signed: | | Signed: | |
| Date: | 8/16/2011 | Date: | 8-15-11 |

**FOR BUYER**

Name of Buyer: Tampa Investment Group, LLC
Signed By:
Title: Managing Member
Signed: Robert A. Foehr, Jr.
Date: 8/15/11