THE KING LAW GROUP
DAVID A. KING, ESQ. (SBN212439)
dking@thekinglawgroup.com
707 Broadway, Suite 1240
San Diego, CA  92101
Telephone:      619-702-2008
Facsimile:      619-702-2009

Attorneys for Defendant Tampa Investment Group, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

EVAN WEAVER,

           Plaintiff,

    vs.

TAMPA INVESTMENT GROUP, LLC; and
DOES 1 – 50, inclusive,

        Defendants.

Case No. 5:12-cv-1117 EJD

**DEFENDANT TAMPA INVESTMENT GROUP, LLC'S NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT UNDER FED. R. CIV. P. 9(b) AND 12(b)(6), MOTION TO STRIKE UNDER RULE 12(f) AND MOTION FOR A MORE DEFINITE STATEMENT UNDER RULE 12(e)**

Date:  April 19, 2013
Time: 9:00 AM
Dept: 4, 5th Floor
Before: Honorable Edward J. Davila

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on April 19, 2013, at 9:00 AM, or as soon thereafter as the matter may be heard in Department 4 of the above-entitled Court, Defendant Tampa Investment Group, LLC ("Tampa") will and hereby does, bring this Motion to Dismiss Plaintiff Evan Weaver's ("Weaver") First Amended Complaint (the "FAC"), and in the alternative moves to strike irrelevant, impertinent and scandalous sections of the FAC, and seeks an order requiring Plaintiff to submit a more definite pleading. Fed. R. Civ. Pro. 9(b), 12(b)(6), 12(e), 12(f).  This motion is based upon this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Request for Judicial Notice filed herewith, all other pleadings on file or deemed to be on file, the arguments of counsel, and upon such other evidence and materials as this Court may consider.

## STATEMENT OF ISSUES

1.  Whether the FAC meets the particularity requirements under Fed. Rule Civ. Pro. 9(b) applicable when alleging a fraudulent course of conduct.

2.  Whether Weaver's fraud and tort are barred as a matter of law, as mere attempts to recast a contract action.

3.  Whether Weaver's contract claim is barred by the plain text of the writings attached as Exhibits.

4.  Whether Weaver's claim for breach of the covenant of good faith and fair deal is barred as a matter of law, since there was no contract.

5.  Whether the FAC includes redundant, immaterial, impertinent, or scandalous matter which should be stricken.

6.  Whether the FAC is incoherent, requiring a more definite pleading.

## MEMORANDUM

At its core, Weaver's FAC is nothing more than a meritless contract action on a non-binding letter of intent ("LOI"). Weaver attempts to morph his contract cause of action into fraud and tort claims, which he fails to plead with particularity. Weaver attempts to buttress his remarkably meritless claims with irrelevant mudslinging, incorporating allegations copied from an unrelated civil action filed by the SEC.

Weaver's FAC meanders ad infinitum with allegations which do not demonstrate viable

causes of action. Weaver's contract cause of action should be dismissed without leave to amend because the plain text of the LOI shows the proposal was non-binding. His fraud and tort causes of action should be dismissed as they are thinly-veiled attempts to recast contract claims, lacking the elements of each claim. If the Court finds that Weaver's allegations demonstrate any colorable causes of action, sections of the FAC must be stricken and a more definite FAC must be filed before Defendants can possibly file an Answer.

## I.      THE FIRST AMENDED COMPLAINT

Weaver alleges that Tampa breached an agreement with him for the "proposed" sale of over 1.3 million shares of Twitter stock, as reflected in the two writings attached to the FAC.  (FAC ¶ 48-53, 72-73, 75, FAC, Ex. A and B)  Exhibit A shows that his breach of contract claims are fatally flawed, because the parties executed a non-binding letter of intent:

> Notwithstanding any terms herein to the contrary, <u>no term or provision of this Letter</u> (and no negotiations or oral representations made in connection with this transaction) <u>shall constitute a commitment, agreement or binding agreement</u> on the part of the Seller or Purchaser <u>except for the provisions entitled "Expenses" and "Confidentiality" which shall be binding</u> and survive the termination of this Letter, except to the extent agreed to in definitive and final documentation relating to the share purchase.  For the avoidance of doubt, if the right of first refusal is exercised by the Company or its assigns, this Letter shall terminate and be rendered null and void.

(FAC, Ex. A, emphasis added)   Because his contract claims are meritless, Weaver's FAC reflects a classic example of a party attempting to rewrite an agreement with after-the-fact fraud and tort claims. Weaver claims that Defendants committed a fraud upon him by signing the LOI lacking intent to perform with no reason to believe they could raise the necessary funds.  (FAC ¶26, 85)  Weaver also claims that Tampa committed a fraud upon him by failing to disclose the nature of the relationship between all of the Defendants. (FAC ¶ 8, 21, 42)

Weaver attempts to incorporate an unrelated SEC civil action (one related to the SEC's efforts to protect <u>investors</u> in the funds managed by Defendant Felix Investments, LLC ("Felix")) in order to artificially boost the merits of his own allegations.  (FAC ¶13-20)[1]  Weaver includes meaningless allegations about Felix's business model and reputation. (FAC ¶22-26)  Weaver alleges that Defendants committed a fraud when they "concealed the fact that Twitter had refused to

---

[1] This Court may consider the actual allegations in the SEC Action, reflecting the SEC's efforts to protect "investors," taking judicial notice under Federal Rule of Evidence 201(b)(2).

finalize sales of its shares to Felix" (FAC ¶ 42) without demonstrating how this was a material non-disclosure, given that the LOI allowed either party to terminate the proposed sale at any time. (FAC, Ex. A)  Weaver alleges that Defendants represented that the agreements "were binding" (FAC, ¶ 45), although the express language of the LOI shows that they were non-binding.  (FAC, Ex. A)

The FAC admits that the parties openly discussed the "non-binding" nature of the LOI, and considered using alternative investment vehicles for the potential sale, demonstrating that no one concealed the status of the buyer, nor the non-binding nature of the proposal.  (FAC ¶32-33) Weaver alleges that Defendants failed to disclose a fee sharing arrangement, without showing how this had any bearing on his decision to execute the proposal.  (FAC 59, 75)  The FAC alleges that Tampa owed Weaver duties under broker-dealer standards and rules, though Tampa is not alleged to be a broker-dealer.  (FAC ¶66-69)

Weaver alleges that Tampa offered Weaver a high price to avoid Twitter's exercise of its right of first refusal (or "ROFR").  (FAC ¶31)  However, this allegation reflects the fact that Tampa did not commit a fraud, but genuinely intended to "move" under a non-binding LOI for a "proposed transaction." (FAC ¶38, Ex. A) Finally, Weaver alleges a variety of misrepresentations after the LOI was signed.  (FAC ¶49-50)

Each fraud and tort cause of action in Weaver's FAC fails as a matter of law because they are expressly contradicted by the parties' two writings attached as Exhibits A and B. The FAC simply ignores as inconvenient the LOI's express language.  The express non-binding provisions of the LOI preclude Weaver from being able to demonstrate justifiable reliance upon any representations.  Weaver cannot show that any of the broad range of alleged non-disclosures would have been material to his decision to execute the non-binding LOI.

Weaver's fraud claims are barred by longstanding California case law rejecting efforts to convert contract cases into tort cases. Furthermore, Weaver's fraud causes of action fail as a matter of law because they are not supported by the allegations in the FAC and its Exhibits.  Weaver attempts to spin a web of allegations based upon unrelated facts, including the SEC Action (FAC ¶13-20), media reports (FAC ¶25-26) and transactions with third parties (FAC ¶24, 27, 59).

1   Weaver is forced to rely upon an incoherent web of unrelated allegations and non-disclosures

2   because even his fraud claims are fatally flawed.  Weaver is unable to identify any material fact

3   which was misrepresented (or undisclosed) which caused him any losses due to the fact that he

4   signed a non-binding LOI.

5          Even Weaver's breach of contract causes of action include fraud allegations, such as

6   "failing to disclose all fee sharing arrangements, including fee sharing arrangements with Felix."

7   (FAC ¶75)  Weaver must cloud the waters with nebulous and far-reaching allegations of fraud,

8   because his contract claims are so readily disposed applying the text of the LOI.

9   **II.      LEGAL STANDARDS**

10  **A. Dismissal Is Appropriate Because Weaver Fails To State A Claim Upon Which Relief Can**
    **Be Granted.**

11

12         Under Federal Rule of Civil Procedure 12(b)(6), a purported cause of action may be

13  dismissed when the complaint fails to state a claim upon which relief can be granted. To survive a

14  motion to dismiss under Rule 12(b)(6), the complaint must meet two criteria:

15         1. It must assert a plausible claim; and

16         2. It must set forth sufficient factual allegations to support the claim.

17  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S.

18  544, 555 (2007)).  Pleadings are no longer satisfied by "an unadorned the-defendant-unlawfully-

19  harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly* 550 U.S. at 555).  Neither a

20  "formulaic recitation of the elements of a cause of action" nor "naked assertions [of fact] devoid of

21  further factual enhancement" is sufficient to withstand dismissal. *Id*.

22         To satisfy the new standard under *Twombly* and *Iqbal*, "a complaint must contain sufficient

23  factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (citing

24  *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads enough factual

25  content that allows the court to draw the reasonable inference that the defendant is liable under the

26  alleged claim. *Id*. (citing *Twombly*, 550 U.S. at 556). "A court considering a motion to dismiss can

27  choose to begin by identifying pleadings that, because they are no more than conclusions, are not

28  entitled to the assumption of truth." *Id*. at 1950. Therefore, if allegations are merely "conclusory,"

they are "not entitled to be assumed true." *Id*. Even if a court decides that the factual allegations are entitled to an assumption of truth, however, the facts must also "plausibly suggest an entitlement to relief." *Id*. at 1951.

Material properly submitted with the complaint, such as the Exhibits attached to the FAC, may be considered as part of the FAC for purposes of a Rule 12(b)(6) motion. *Hal Roach Studios, Inc. v. Richard Feiner & Co. Inc.*, 896 F.2d 1542, 1555 (9th Cir. 1989). Exhibits, like the two writings in this case, actually trump allegations of the complaint. *Thompson v. Ill. Dept. of Prof'l Reg.*, 300 F.3d 750, 754 (7th Cir. 2002) ("when a written instrument contradicts allegations in a complaint to which it is attached, the exhibit trumps the allegations"); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998).

The FAC reflects mere conclusions ("Weaver would not have entered into the Agreements had he known the truth behind Defendants' misrepresentations and concealments," FAC ¶44), implausible allegations ("Weaver only signed the Agreements and quit his job because of Defendants' representations that the material terms of the Agreements…were binding…" FAC ¶45), and allegations which are inconsistent with the writings attached to the FAC ("such language was meant to address situations where the actions of Twitter frustrated the sale," FAC ¶34). The FAC warrants dismissal without leave to amend.

**B. A Motion To Strike Is Appropriate For Redundant, Immaterial, Impertinent, Or Scandalous Sections Of Plaintiff's FAC.**

Federal Rule of Civil Procedure 12(f) provides "The court may strike from a pleading … any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. 12(f). "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney–Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir.1983). As set forth in Section VII below, numerous sections of Weaver's FAC should be stricken.

**C. A More Definite Statement Is Appropriate When A Defendant Cannot Reasonably Prepare A Response Because The FAC Is Ambiguous.**

Under Federal Rule of Civil Procedure 12(e), "[a] party may move for a more definite statement of a pleading . . . which is so vague or ambiguous that the party cannot reasonably

prepare a response." Although Rule 8(a) "requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief,' the complaint must be detailed enough to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Dorsey v. American Express Co*., 499 F. Supp. 2d 1, 3 (D.D.C. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted)); see, e.g., *Fraternal Order of Police v. Library of Congress*, 692 F. Supp. 2d 9, 20 (D.D.C. 2010) ("Because the Court cannot ascertain what the [plaintiff]'s promotion-related claim is, it cannot find that defendants are able to respond to it.").

## III.   WEAVER FAILS TO PLEAD WITH PARTICULARITY AS REQUIRED FOR FRAUD ALLEGATIONS.

### A.  The Entire FAC Alleges A Unified Course Of Fraudulent Conduct.

Although fraud is not a necessary element of Weaver's contract claim, the FAC alleges breaches in Defendants "advising Weaver … when they knew" certain facts, or "failing to disclose" certain facts. (FAC ¶ 75, 81).  Here, Weaver has effectively alleged a unified course of fraudulent conduct.  Thus, his claims are "said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Vess v. Ciba-Geigy*, 317 F.3d 1097, 1104 (2003).   The entire FAC is subject to the heightened pleading standard of Rule 9(b), but it fails to meet that standard.

### B.  Weaver Fails To Plead With Particularity As Required For Fraud Allegations.

The FAC's causes of action rely on an alleged course of fraudulent conduct by Defendants. However, because Weaver fails to allege the "who, what, when, where, and how," these claims must be dismissed. *Vess*, 317 F.3d at 1106. Weaver's fraud causes of action must be dismissed for failure to meet the pleading standard of Rule 9(b), and all other causes of action are subject to the heightened pleading standard as they are alleged under a unified course of conduct.  "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106.

To state an intentional misrepresentation claim, Weaver must allege with factual particularity: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. *See*, e.g., *Lovejoy v. AT&T*

*Corp.*, 92 Cal. App. 4th 85, 93 (2001); *Anderson v. Deloitte & Touche LLP*, 56 Cal. App. 4th 1468, 1475 (1997). A claim for negligent misrepresentation requires the same elements except that a plaintiff "need not allege the defendant made an intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believing the statement to be true." *Melican v. Regents of Univ. of Cal.*, 151 Cal. App. 4th 168, 182 (2007); see also *Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 173-174 (2003). The circumstances constituting alleged fraud must be "specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106. Weaver's nebulous FAC fails to meet the particularity standard under Rule 9(b) and should be dismissed.

Considering Weaver's allegations which could *conceivably* be considered material facts causing justifiable reliance: the FAC merely alleges that Paul McCabe wrote "because twitter has blocked trades in the past…this way the seller wasn't tied up 'forever' with no way out." (FAC ¶33) The FAC also alleges that McCabe wrote "I'm told there[sic] investors are ready to go if this clears rofr." (FAC ¶37) These allegations are insufficient, as they fail to demonstrate any misrepresentation of any material fact upon which Weaver justifiably relied. As to Weaver's mushroom cloud of allegations, it is impossible to determine how these alleged misrepresentations or non-disclosures were material to his decision to sign a non-binding LOI. By analogy, one need not confess all their darkest secrets before a first date. It's only a first date.

## IV.   WEAVER CONVERTS A CONTRACT ACTION INTO FRAUD AND TORT CLAIMS.

**A.  Weaver's Tort Claims Should Be Dismissed Because Longstanding California Case Law And Public Policy Prohibit Weaver From Seeking Or Recovering Tort Damages For A Contract Claim.**

Even if this Court found that Weaver plead with sufficient particularity, Weaver's fraud and tort causes of action should be dismissed under Rule 12(b)(6). The FAC plainly and impermissibly seeks tort damages for what is, at most, a breach of contract action. It has long been the law in California that parties are barred from converting a contract dispute into a tort cause of action. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994) ("An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty.") (quoting *Jones v. Kelly*, 208 Cal. 251, 255 (1929)).

The FAC is "a mosaic of varied pieces of discord," all of which are based on contract, not tort. *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co*., 47 Cal. App. 4th 464, 478 (1996). Any failure by Tampa to perform under the two writings does not give rise to a claim for fraud. *Tenzer v. Superscope Inc.*, 39. Cal. 3d 18, 30 (1985). "If unclear the action will be considered based on contract rather than tort." *Util. Audit Co. v. City of Los Angeles*, 112 Cal. App. 4th 950,958 (2003) (quotation omitted). Furthermore, the LOI states: "Notwithstanding any terms herein to the contrary, no term or provision of this Letter (and <u>no negotiations or oral representations</u> made in connection with this transaction) shall constitute a commitment…" (FAC, Ex. A, emphasis added) In accordance with the LOI, Weaver's references to any "negotiations or oral representations" are "trumped" by the LOI. *Thompson, supra,* 300 F.3d at 754.

## V.   WEAVER'S BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED SINCE THE WRITINGS WERE EXPRESSLY NON-BINDING.

**A. Weaver's Contract Claims Are Fatally Flawed.**

Because contract interpretation is a matter of law in California, disposition is appropriate by way of a motion to dismiss. *Even Street Productions, Ltd. v. Shkat Arrow Hafer & Weber, LLP* (S.D.N.Y. 2008) 643 F.Supp.2d 317, 324; see also *RealProp, Inc. v. Smith Residual Co., LLC* (2012) 203 Cal.App.4th 1215, 1221 (demurrer sustained without leave to amend after interpreting contract). The Exhibits attached by Weaver are integrated with the FAC. *Hal Roach Studios, Inc., supra,* 896 F.2d at 1555; *Allen v. Westpoint-Pepperell, Inc.* (2nd Cir. 1991) 945 F.2d 40, 44. Furthermore, a written exhibit trumps contradictory allegations. *Thompson supra,* 300 F.3d at 754.

To state a claim for breach of contract, Weaver must plead: (1) the existence of a contract; (2) Weaver's performance or excuse for non-performance; (3) Tampa's breach; and (4) damage to Weaver as a result of Tampa's breach. *Acoustics, Inc. v. Trepte Constr. Co*., 14 Cal. App. 3d 887, 913 (1971). Whether the agreements are reasonably susceptible to Weaver's interpretation is a question of law, which permits the Court to dismiss the breach of contract claim. *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc*., 971 F.2d 272, 277-78 (9thCir. 1992).  As discussed below, the two writings did not create contractual obligations.

Oddly, Weaver alleges that Tampa "breached" the two writings by:

> failing to use good faith and best efforts to execute additional documentation; failing to use good faith efforts to consummate the purchase and find a purchaser for Weaver's shares; failing to pursue the agreements' stated objectives; advising Weaver to terminate his employment so that he could tender the shares at a time when Tampa and Halcyon knew, or were reckless in not knowing, that there were no investors available to purchase the shares; failing to disclose all fee sharing arrangements, including fee sharing arrangements with Felix; and, advising Weaver to not sell his shares to other purchasers in bad faith, when Tampa and Halcyon knew or were reckless in not knowing that they could not secure investors to purchase Weaver's shares.

(FAC ¶75) Weaver's breach of contract claim depends on obligations that do not exist in the parties' written agreements. (FAC, Ex. A and B) Every alleged "breach" by Tampa was contemplated by the non-binding provision in the LOI. Under the LOI's clear and unambiguous terms, Tampa's actions cannot, as a matter of law, give rise to a breach of contract claim because the terms are not "reasonably susceptible" to Weaver's interpretation. *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968).

**B. The Court Should Interpret The Parties' Written Agreements: The Non-Binding LOI And Fee Agreement.**

There is no dispute that this Court should apply California law in interpreting the two writings. *See State of New York v. Blank* (2nd Cir. 1994) 27 F.3d 783, 788; *Allen v. Cedar Real Estate Group, LLP* (7th Cir. 2001) 236 F.ed 374, 376; *Harris v. Parker College of Chiropractic* (5th Cir. 2002) 286 F.3d 790, 793. "It is . . . *solely a judicial function* to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." *City of Chino v. Jackson* (2002) 97 Cal.App.4th 377, 383-384 (emphasis supplied) Likewise, this Court should apply state rules concerning admissibility of parol evidence. *Coplay Cement Co. v. Willis & Paul Group* (7th Cir. 1993) 983 F.2d 1435, 1438.

The California Supreme Court has explained, "[t]he primary object of all interpretation is to ascertain and carry out the intention of the parties. All the rules of interpretation must be considered and each given its proper weight, where necessary, in order to arrive at the true effect of the instrument." *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238. Cal. Civ. Code § 1642 provides: "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." Read together, the

LOI and "Fee Agreement" (Ex. B) show that the parties did not intend for Tampa to be bound to *any* obligations to consummate the sale of Weaver's stock.

**C. The Parol Evidence Rule Precludes Consideration Of Any Allegations Beyond The Text Of The LOI And Fee Agreement.**

The law could hardly be clearer that evidence of "intent" and prior negotiations is *not admissible* to alter the terms of a written contract. *See* Cal. Civ. Code § 1625 ("[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument"); *see also Cockerham v. Hathaway* (1952) 113 Cal.App.2d 885, 888 (evidence of negotiations could not affect terms of written contract); *Warner v. Taft Land Development Co.* (1931) 113 Cal.App. 71, 80 (where parties deal at arms-length, contract is measure of liability). Simply stated: **the intention of the parties is ascertained from the written contract alone**. Cal. Civil Code § 1638 (language of document itself governs so long as it is clear and explicit and does not involve an absurdity); Cal. Civil Code §1639; *Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 473.

The parol evidence rule prohibits the introduction of any extrinsic evidence to vary or add to the terms of an integrated written instrument. Code of Civil Procedure § 1856; *Alling v. Universal Mfg. Corp.* (1992) 5 Cal.App.4th 1412, 1433. "An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement." Rest.2d, Contracts § 209(1). Code of Civil Procedure section 1856(a), without using the term "integration," refers to "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein." Indeed, "[w]here there has been a partial integration, parol evidence is admissible to prove that part of the contract not reduced to writing but is not admissible to vary or contradict that part which is." *Schwartz v. Shapiro* (1964) 229 Cal.App.2d 238, 250. Evidence of intention contrary to a contract's express terms do not give it meaning but substitute a different meeting and such evidence is not admissible to prove intention. 2 *Evidence* at § 76 (Witkin 2012). "Whether a contract is integrated is a question of law when the evidence of integration is not in dispute." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 954. Here, the two writings

reflect that Weaver and Tampa intended the LOI and Fee Agreement to embody all of the terms of their non-binding "agreement to agree." Extrinsic evidence is inadmissible, particularly allegations contrary to the text of the writings, and all such allegations set forth in the FAC should be disregarded when interpreting the two writings.

**D.  The LOI And Fee Agreement Reflect The Parties' Intent Not To Be Bound To Complete The Sale.**

Read together, the LOI and the Fee Agreement show that the parties did not intend to be bound to any obligations to consummate the sale of Weaver's stock.  The final paragraph of the LOI (the "Non-Binding Paragraph") was drafted to reflect the parties' specific objective that the proposal be non-binding:

> Notwithstanding any terms herein to the contrary, <u>no term or provision</u> of this Letter (and no negotiations or oral representations made in connection with this transaction) <u>shall constitute a commitment, agreement or binding agreement</u> on the part of the Seller or Purchaser <u>except for the provisions</u> entitled "Expenses" and "Confidentiality" which shall be binding and survive the termination of this Letter, <u>except</u> to the extent agreed to in definitive and final documentation relating to the share purchase.  For the avoidance of doubt, if the right of first refusal is exercised by the Company or its assigns, this Letter shall terminate and be rendered null and void.

(FAC, Ex. A, Emphasis added)  Numerous sections of the LOI and Fee Agreement are consistent with the Non-Binding Paragraph, and no terms in either document conflict with the Non-Binding Paragraph.

**E.  Weaver Offers An Implausible Interpretation Of The Non-Binding Paragraph.**

Weaver asserts that the final sentence of the Non-Binding Paragraph describes *the only* situation under which the LOI would be non-binding—if Twitter exercised its right of first refusal ("ROFR"). (FAC ¶ 33, 34) This is entirely inconsistent with the text of the paragraph.

As set forth below, Weaver has not sufficiently plead that any "words" of the Non-Binding Paragraph have a "special meaning," and thus the Court must simply interpret the text. Except for the obligations set forth in the sections entitled "Expenses" and "Confidentiality," all other sections of the LOI were non-binding, and the parties were permitted to terminate the proposed sale for any reason or for no reason at all.   (FAC, Ex. A) The fact that Twitter might exercise its ROFR was but one reason the LOI was non-binding. In his allegations, Weaver conflates two distinct possibilities

11

which might have arisen after he presented his notice of a proposed sale to Twitter:

1. Twitter might have exercised its ROFR, and thus, Weaver would receive the purchase price set forth on his LOI, either from Twitter or one of its assignees; or

2. Twitter might "block" the transaction, claiming inter alia, a potential violation of securities laws, and Weaver would receive nothing.

(FAC ¶ 33, 34). The FAC vaguely refers to the possibility that Twitter might "frustrate the sale," merging these two concepts. *Id.* Certainly, Weaver was not worried about the "risk" that he might be paid in full by Twitter or its assignee—although this would be the end result if Twitter exercised its ROFR. The final sentence of the Non-Binding Paragraph *only* addresses Twitter's exercise of its ROFR. The Non-Binding Paragraph does not include the word "block," nor does it include the ambiguous term "frustrate." This Court must see through this obvious smokescreen and enforce the plain language of the LOI.

## F. The Non-Binding Paragraph Precludes Contractual Obligations Under Any Circumstances.

The first sentence of the Non-Binding Paragraph sets forth the parties unambiguous intent that the LOI shall not be binding except (i) for two specific provisions ("Expenses" and "Confidentiality"), and except (ii) "to the extent agreed to in definitive and final documentation relating to the share purchase." (FAC, Ex. A) The first sentence was drafted as broadly as possible. The second sentence of the Non-Binding Paragraph begins with a standard phrase used to emphasize clarification, and to transition from a broad term to a narrow term.

Words following the transitional phrase "for the avoidance of doubt" explicitly reinforce that which is already covered by the broader language. The objective meaning of the second sentence of the Non-Binding Paragraph is clear: Twitter's exercise of its ROFR was one circumstance (among an infinite list) where the LOI would not be binding.

## G. The LOI Was An "Agreement To Agree."

The parties agreed that "except to the extent agreed to in definitive and final documentation" their obligations shall not be binding. *Id.* Thus, the LOI was a quintessential "agreement to agree." "Neither law nor equity provides a remedy for breach of an agreement to

agree in the future." *Autry v. Republic Productions*, 30 Cal.2d 144, 151 (1947). "[A]n agreement to agree [..] could not be made the basis of a cause of action." *Beck v. American Health Group Int'l, Inc.*, 211 Cal.App.3d 1555, 1563 (1989).

The other sections of the LOI are consistent with the Non-Binding Paragraph. The first paragraph twice refers to the "proposed" sale. (FAC, Ex. A) The final sentence of the first paragraph states, "The *purpose of this letter* … is to set forth certain understandings between Seller and Purchaser with respect to this *proposed transaction*." (*Id.*, emphasis added)

## H. The LOI Reflects The Fact That All Obligations Were Subject To The Non-Binding Paragraph, No Matter How They Were Drafted.

All obligations under the LOI were subject to the Non-Binding Paragraph. If the Non-Binding Paragraph were not given full effect, the execution of the LOI would have created the following absolute obligations, not merely "best efforts obligations":

> The parties <u>will enter into and comply with</u> the Company's standard stock transfer agreement…. Definitive <u>agreements will contain</u> provisions usual and customary for similar transactions…. <u>The parties will take reasonable steps</u> to comply with any other Company requirements…
>
> <u>Seller will provide</u> to Purchaser, within seven (7) business days…all relevant documentation … (the "Shareholder Agreements").
>
> <u>Seller shall</u> provide a notice for this offer…

(FAC, Ex. A, emphasis added) The LOI reflected the parties' objective intent that all such obligations were unenforceable unless a subsequent, binding agreement were signed.

## I. Twitter's Right Of First Refusal Is Both A "Condition" And A Reason Why The LOI Was "Non-Binding."

The first sentence in the "Close" section of the LOI reflects a condition precedent to the proposed sale:

> Purchaser and Seller will use their reasonable commercial efforts to expedite the closing of the purchase and sale of the Shares as soon as practical <u>once the right of first refusal process expires without exercise</u>.

(FAC, Ex. A, emphasis added)   The final sentence of the Non-Binding Paragraph provides one among the infinite number of reasons why the LOI was non-binding:

> For the avoidance of doubt, if the right of first refusal is exercised by the Company or its assigns, this Letter shall terminate and be rendered null and void.

1    *Id.* Weaver claims that since Twitter did not exercise its ROFR, Tampa was bound to purchase his

2    stock. (FAC, ¶ 34, 47-48) Thus, Weaver interprets the final sentence of the Non-Binding Paragraph

3    as a "condition" to sale, which renders these two sentences duplicative, and the second superfluous.

4         Weaver's interpretation is inconsistent with the plain text of the Non-Binding Paragraph and

5    disfavored under law. "An interpretation which gives effect to all provisions of the contract is

6    preferred to one which renders part of the writing superfluous, useless or inexplicable." *Carson v.*

7    *Mercury Ins. Co.* (2012) 210 Cal.App.4th 409, (citing 11 Williston on Contracts (4th ed.2012) §

8    32:5).

9         The plain text of the LOI shows that these two sentences are distinct.  The first provides a

10   condition to the sale, and the second describes one of the infinite facts under which the LOI would

11   be non-binding.  This Court should disregard Weaver's misinterpretation of the text where two

12   sentences repeat one condition.

13   **J.  The Parol Evidence Rule Precludes Application Of Weaver's Unreasonable Interpretation**

14   **Of The Non-Binding Paragraph.**

15        Parol evidence may be admitted to ascertain the meaning of a contract only if the agreement

16   is ambiguous. Code of Civil Procedure § 1856(g).  "The test of admissibility of extrinsic evidence

17   to explain the meaning of a written instrument is not whether it appears to the court to be plain and

18   unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which

19   the language of the instrument is reasonably susceptible." *Pacific Gas & Elec. Co. v. G.W. Thomas*

20   *Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 37.  "Whether [a contract] is reasonably susceptible

21   to a party's interpretation can be determined from the language of the contract itself." *Curry v.*

22   *Moody* (1995) 40 Cal.App.4th 1547, 1555.  Moreover, "evidence of the meaning the parties gave to

23   the contract language is only relevant if the contract itself is reasonably susceptible to that

24   meaning." *Curry, supra,* 40 Cal.App.4th at 1555.  "Thus, extrinsic evidence cannot be used to show

25   that when the parties said 'Bunker Hill Monument' they meant 'the Old South Church' or that when

26   they said 'pencils' they really meant 'car batteries.'" *Curry, supra,* 40 Cal.App.4th at 1555.   As

27   demonstrated above, the LOI is not "reasonably susceptible" to the meaning Weaver alleges in the

28   FAC. (FAC ¶ 33, 34)

> *Pacific Gas & Electric* is not a cloak under which a party can smuggle extrinsic evidence to add a term to an integrated contract, in defeat of the parol evidence rule. Instead, it calls for a two-step process. First, the court must determine whether the language of the contract is reasonably susceptible to the meanings urged by the parties. In so doing, the court must give consideration to any evidence offered to show that the parties' understanding of **words** used differed from the common understanding. If the court determines that the contract is reasonably susceptible of the meanings urged, extrinsic evidence relevant to prove the meaning agreed to by the parties is admissible.

*Bionghi v. Metropolitan Water District of Southern California* (1999) 70 Cal.App.4th 1358, 1363. "Whether the language of an agreement is reasonably susceptible to a proposed interpretation is a question of law." *250 L.L.C. v. Photopoint Corp. (USA)* (2005) 131 Cal.App.4th 703, 726. Because the LOI is not reasonably susceptible to Weaver's interpretation, Weaver's allegations that the Non-Binding Paragraph only applies in the event that Twitter might "frustrate the sale" are irrelevant and inadmissible.

Weaver reveals the implausibility of his interpretation of the LOI's Non-Binding Paragraph by making an obtuse allegation about Twitter potentially "frustrating the sale." What does Weaver mean that Twitter might have "frustrated the sale?"

The text of the LOI states "if the right of first refusal is exercised by the Company or its assigns, this Letter shall terminate and be rendered null and void," and Weaver would have received the price set forth in the LOI from Twitter or its assignee. The word "block" is not written on the LOI. After 27 cloudy pages of scandalous allegations, Weaver merely delivers an intellectually insulting argument shrouded in obtuse language: "frustrated the sale." This Court should disregard Weaver's implausible interpretation and enforce the plain language of the LOI.

**K. The Fee Agreement Does Not Reflect A "Best Efforts" Obligation To Advance The Proposed Sale.**

The Fee Agreement does <u>not</u> reflect an obligation for Tampa to use its best efforts. The Fee Agreement states: "By Executing below, Buyer <u>affirms their intent</u> to work in good faith and use best efforts to finalize and execute definitive documentation." (FAC, Ex. B, emphasis added) Certain sections of the Fee Agreement reflect Weaver's and Halcyon's intent to undertake "mandatory obligations":

<u>Fee is to be paid</u> to Halcyon Cabot Partners upon completion of the transaction…

<u>Seller pays fee</u> to Halcyon Cabot Partners…

Halcyon Cabot Partners <u>shall</u> (a) use its best efforts…(b) arrange for and pay directly the costs for the legal opinion…(c) interface…, and (d) keep Seller informed of status.

(FAC, Ex. B, emphasis added) Certain sections of the Fee Agreement reflect Halcyon's intent to make "representations and warranties":

> Halcyon Cabot Partners represents and warrants that it is a registered broker-dealer under Section 15 of the Securities Exchange Act of 1934, as amended, and has appropriate state licenses to provide the services and receive the fees hereunder.

(FAC, Ex. B, emphasis added) Thus, although the parties used express mandatory language for obligations, representations and warranties, Tampa merely "affirms their intent." In contrast, the Fee Agreement provides that Halcyon "shall use its best efforts…" (FAC, Ex. B) Webster's Dictionary shows that these words have very different meanings:

> "Affirm": 1 a: validate, confirm; b : **to state positively** (he affirmed his innocence); 2. : to assert (as a judgment or decree) as valid or confirmed; 3. : to express dedication to (affirm life)

> "Intent": 1 a: the act or fact of intending : purpose; especially : the design or purpose to commit a wrongful or criminal act (admitted wounding him with intent) b : the state of mind with which an act is done : volition; 2: **a usually clearly formulated or planned intention** : aim (the director's intent)

> "Shall": 2 a —used to express a command or exhortation (you shall go); b —**used in laws, regulations, or directives to express what is mandatory** (it shall be unlawful to carry firearms)

The plain language, "affirms their intent," demonstrates the lack of an affirmative duty, which would be reflected with a word like "shall." However, even if this Court found the phrase to be ambiguous, the totality of the Fee Agreement shows no affirmative duty.  "Under rule of contract construction '*expressio unius est exclusio alterius*', mention of one matter implies exclusion of all others."  *Steven v. Fidelity & Cas. Co. of New York* (1963) 58 Cal.2d 862, 871; *White v. Western Title Ins. Co.* (1985)  40 Cal.3d 870, 881.

**L.  The LOI And Fee Agreement Should Be Read As One Contract, Where The Specific Non-Binding Paragraph Controls Over Any Terms In The Fee Agreement.**

The Fee Agreement includes general language affirming Tampa's then-current intent "to work in good faith and use best efforts."  As to Tampa's intent to be bound to any obligations related to the purchase Weaver's stock, the specific language in the Non-Binding Paragraph would control over this general text. If the Court finds any inconsistency between these two documents which were signed simultaneously, the specific Non-Binding Paragraph in the LOI takes precedence over the general "affirmation" of intent set forth in the Fee Agreement.  "[U]nder well-

established principles of contract interpretation, when a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision." *Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1235; Code Civ. Proc., § 1859; Civ.Code, § 3534.

Cal. Civ. Code § 1642 requires the two writings "be taken together."  "[T]aken together" ultimately means "one contract." *Meier v. Paul X. Smith Corp*, 205 Cal.App.2d 207, 217 (1962). "Two or more instruments relating to the same subject matter and executed as parts of substantially one transaction are to be construed together as one contract." *Id.* The LOI and Fee Agreement concern the same proposed sale, and they were executed together. (FAC ¶39-40, Ex. A and B) Accordingly, the specific Non-Binding Paragraph must control over the general affirmation of intent in the Fee Agreement.

**M. Case Law Supports The Non-Binding Nature Of The LOI And Fee Agreement.**

This Court should enforce the language of the LOI which reflects the parties' unambiguous intent *not* to be bound to the proposed purchase and sale of Weaver's stock.

> Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily on the intention of the parties. In the absence of ambiguity this must be determined by a construction of the instrument taken as a whole.

*Beck v. American Health Group Internat., Inc.*, 211 Cal.App.3d 1555, 1562 (1989). The LOI and Fee Agreement are unambiguous.  The parties intended that the "proposed transaction" be non-binding except for those sections specifically identified.  The LOI reflects an "agreement to agree":

> Notwithstanding any terms herein to the contrary, no term or provision of this Letter …shall constitute a commitment, agreement or binding agreement… except to the extent agreed to in definitive and final documentation relating to the share purchase.

(FAC, Ex. A) The LOI was an agreement to agree, for a "proposed" transaction, binding only if "definitive and final documentation" were executed. As set forth in *Beck*, this plain language must be given effect:

> Taken in their ordinary sense, the words of the letter manifested an intention of the parties that no binding contract would come into being until the terms of the letter were embodied in a formal contract to be drafted by corporate counsel.

*Beck*, 211 Cal.App.3d at 1563. This Court should interpret the plain language of the LOI and Fee Agreement:

> Where a written contract is pleaded by attachment to and incorporation in a complaint, and where the complaint **fails to allege that the terms of the contract have any special meaning**, a court will construe the language of the contract on its face to determine whether, as a matter of law, the contract is reasonably subject to a construction sufficient to sustain a cause of action for breach.

*Beck* 211 Cal.App.3d at 1561.  To avoid the clear language of the LOI, Weaver has made only a cursory allegation that the entire Non-Binding Paragraph "was meant to address the situations where the actions of Twitter frustrated the sale." (FAC, ¶33-34)   Weaver's obtuse allegation is insufficient to constitute an allegation of "special meaning" for any "word" or "words" in the LOI.

> **The words of a contract** are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or **unless a special meaning** is given to them by usage, in which case the latter must be followed.

*Don Johnson Productions, Inc. v. Rysher Entertainment* (2012) 209 Cal.App.4th 919, 935 (quoting Civ.Code, § 1644) (emphasis added).

Simply stated: to which "words" in the Non-Binding Paragraph does Weaver give "special meaning?"  Webster's Dictionary defines "words": "a written or printed character or combination of characters representing a spoken word."  Weaver's complaint identifies no "words" which have a "special meaning." Thus, Weaver's cursory attempt to plead around the plain language of the LOI should be disregarded, and the Court should interpret the parties' objective intent as set forth in the writings.  *Beck* at 1562.

In *Beck*, "The trial court did not err in construing the contract **on demurrer without admitting extrinsic evidence** since plaintiff did not allege his interpretation of the attached and incorporated writing, **save the conclusional allegation**..."  *Id.* at 1555 (emphasis added)   To consider Weaver's conclusory, illogical interpretation of the Non-Binding Paragraph and its impact upon the parties' agreement to agree, this Court must find the text is "reasonably susceptible" to the meaning Weaver alleges.  *Curry, supra,* 40 Cal.App.4th at 1555.

It is not.

The plain language of the LOI demonstrates that Weaver has alleged breaches of contractual obligations which do not exist. (FAC ¶75, Ex. A) Accordingly, Weaver's First Cause of Action should be dismissed without leave to amend.

**VI.   WEAVER'S CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING SHOULD BE DISMISSED SINCE THE PARTIES NEVER ENTERED A CONTRACT.**

The parties executed a non-binding "agreement to agree," not a contract, and thus neither party owes a duty of good faith and fair dealing.  "There is no obligation to deal fairly or in good faith absent an existing contract." *Racine & Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal.App.4th 1026, 1032.

"The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation." *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683–684, 689–690, 254 Cal.Rptr. 211, 765 P.2d 373. "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." *Racine & Laramie, Ltd.* 11 Cal.App.4th at 1031. Thus, this Court should dismiss Weaver's Second Cause of Action without leave to amend.

**VII.   A MOTION TO STRIKE IS APPROPRIATE FOR REDUNDANT, IMMATERIAL, IMPERTINENT AND SCANDALOUS SECTIONS OF THE FAC.**

**A.  Weaver Makes Redundant, Immaterial, Impertinent And Scandalous Allegations.**

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. 12(f); *Sidney–Vinstein v. A.H. Robins Co*., 697 F.2d 880, 885 (9th Cir.1983).  Weaver attempts to hoist his frivolous claims onto the coat-tails of a civil action filed by the SEC, while the SEC applies existing securities laws to an evolving new secondary securities market.   The Court should strike these immaterial, prejudicial allegations which have no bearing on any of Weaver's claims against Defendants.

"Redundant" has been defined as including allegations that are wholly foreign to the issues involved or the needless repetition of allegations. *Gilbert v. Eli Lilly Co., Inc.* (D PR 1972) 56 FRD 116, 120, fn. 4. "Immaterial" means the matter has no bearing on the controversy before the court. *Fantasy, Inc. v. Fogerty* (9th Cir. 1993) 984 F2d 1524, 1527, rev'd on other grounds in *Fogerty v. Fantasy, Inc.* (1994) 510 US 517, 534–535. "Impertinent" allegations are not responsive or relevant to issues involved in the action. *Fantasy, Inc. v. Fogerty*, *supra*, 984 F2d at 1527.   "Scandalous" allegations cast a "cruelly" derogatory light on a party or other person. *Skadegaard v. Farrell* (D NJ

1984) 578 F.Supp. 1209, 1221.

Weaver's FAC unfairly paints the SEC civil allegations as somehow related to Weaver's claims (they are not), factual (they are mere allegations in a civil action), and indicative that Weaver's claims bear merit (his claims are devoid of merit, notwithstanding the unrelated action by the SEC). Since there is no relationship between the SEC's allegations and Weaver's claims, a FRCP 12(f) motion is proper. *See In re Platinum and Palladium Commodities Litigation* (S.D.N.Y 2011) 828 F.Supp.2d 588 (findings of fact in Commodities Futures Trading Commission order instituting administrative proceedings against hedge fund immaterial to claim again fund and thus references to CFTC order in complaint was stricken.)

**B. Weaver's References To Alter Ego Liability Should Be Stricken.**

"[T]he two requirements for application of the alter ego doctrine are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Automotriz etc. De California v. Resnick* (1957) 47 Cal. 2d 792, 796 (citing *Stark v. Coker*, 20 Cal. 2d 839, 846). Prong one requires an ownership interest in the corporation or company. *Riddle v. Leuschner* 51 Cal.2d 574, 580 (1959). If an individual's ownership is not established, the corporation's obligations cannot be imposed on him or her. *Id.*

In *Riddle*, the court held that the alter ego defendant did not satisfy prong one because "he held none of the stock, and there is no evidence that he had any interest…or that he had a right to share in any profits…" *Id*. Federal Courts in the 9th Circuit have adopted this ruling. *Firstmark Capital Corp. v. Hempel Financial Corp.* 859 F.2d 92, 94. Felix and Tampa could not be alter egos of each other because they have no unity of ownership. (FAC, ¶2, 3, 21)

| Weaver's Immaterial, Impertinent, and Scandalous Allegations Should be Stricken | |
|---|---|
| **Allegation in FAC** | **Analysis** |
| ¶4: Felix's owners include Defendant John Bivona and his nephew, Frank Mazzola ("Mazzola"). | Frank Mazzola is not alleged to have any relationship with this dispute and should not be identified in the FAC if he is not part of the dispute. |
| ¶4: Felix is currently the defendant in an SEC action alleging, inter alia, that Felix did not disclose the true relationship between it and the broker soliciting interest in pre-IPO shares and that it misstated material facts about Felix- | The allegations in the FAC bear no relationship to the allegations in the SEC action. Weaver's FAC does not allege that any Defendants made any misleading statements to investors about investment funds |

| | | |
|---|---|---|
| 1 | affiliated funds investing in pre-IPO stock in violation of the Securities Act, the Exchange Act and the Advisers Act. | or the securities held in such funds. |
| 2 3 4 5 6 7 8 9 10 11 12 13 14 15 | ¶8 At all relevant times, there was a unity of interest and control of Tampa by Felix. This control was exercised in such a manner as to eliminate the corporate identity of Tampa, **making Felix the alter ego of Tampa**. Tampa was formed with only $100 in capital, had little or no assets during the relevant period and, on information and belief, is no active. On information and belief, Tampa was a shell company formed by Felix and Bivona, and Tampa was essentially a front for Felix's activities. On information and belief, Forlizzo and Bivona knew each other from high school and law school, and Paul McCabe ("McCabe") – the broker who initially solicited Weaver to sell his Twitter shares – was introduced to Forlizzo through Bivona. | All allegations that Tampa is the alter ego of Felix (or vice versa) are immaterial. As set forth above, **alter ego liability** is a "drastic remedy" allowing claims against the "shareholders," "members" or "**owners**" of a business entity. There is no allegation of any common ownership between Felix and Tampa. To the contrary, Weaver concedes in the FAC:<br><br>**Tampa's two owners:**<br>"Robert **Forlizzo** ("Forlizzo") and **his secretary** are the two member-owners named in the Operating Agreement, with Forlizzo holding 99.99% membership interest." (FAC ¶ 3)   "Bivona and Felix do not have direct ownership interests in Tampa…" (FAC ¶ 21)<br><br>**Felix's two owners:**<br>"Felix's owners include Defendant John Bivona and his nephew, Frank Mazzola ("Mazzola")." (FAC ¶ 2)<br><br>The long-standing friendship of Messrs. Bivona and Forlizzo could not have any potential relevance to this dispute, nor is this relationship relevant to any claim of alter ego liability between Tampa and Felix. |
| 16 17 18 19 | ¶13. On March 14, 2012, the SEC initiated an action against Felix, Mazzola, and the investment advisor for two Felix-affiliated funds that were organized to invest in pre-IPO technology stocks, including Twitter. | The allegations in the FAC bear no relationship to the allegations in the SEC action. Weaver's FAC does not allege that any Defendants made any misleading statements to investors about investment funds or the securities held in such funds. The SEC protects "investors," those who buy securities; not sellers, like Weaver.[2] |
| 20 21 22 23 | ¶13. In addition to the SEC action, Felix settled a related action with FINRA on March 14, 2012. Under that settlement, Felix will pay a fine of $250,000 and hire an independent consultant to review the firm's policies. | Weaver makes a prejudicial reference to a "related action with FINRA" without sharing any substance of such FINRA action.<br><br>Weaver's attempt to boost his meritless case with the imprimatur of FINRA's regulatory authority is no different from his incorporation of the SEC action. |
| 24 25 26 | ¶14. The SEC alleged that Felix created, marketed, managed, and raised money for investment funds designed to invest in pre-IPO companies. According to the SEC complaint, Felix "created other investment funds to invest in the pre-IPO securities of Twitter" and made | The allegations in the FAC bear no relationship to the allegations in the SEC action. Weaver's FAC does not allege that any Defendants made any misleading statements to investors about investment funds or the securities held in such funds. |

27

28 _____
[2] "The mission of the U.S. Securities and Exchange Commission is to **protect investors**, maintain fair, orderly, and efficient markets, and facilitate capital formation." (U.S. Securities and Exchange Commission, Oct. 12, 2012, http://www.sec.gov/about/whatwedo.shtml)

| | |
|---|---|
| "false and misleading statements in **marketing those funds."** | All such allegations relate to the SEC's protection of "investors" to whom "funds" were "marketed." |
| ¶15. On information and belief, Tampa is one of the funds mentioned in the SEC's complaint that Felix used or created to invest in Twitter securities. | The allegations in the FAC bear no relationship to the allegations in the SEC action. Weaver's FAC does not allege that any Defendants made any misleading statements to investors about its funds or the securities held in such funds. |
| ¶16. The SEC alleged that, from approximately mid-2010 to mid-2011, Felix was unsuccessful in purchasing shares from pre-IPO companies because the companies exercised or assigned the right of first refusal to third parties who thereafter purchased the shares. As a result, the SEC alleged that Felix began to increase the price offered to purchase the shares with the hope that the pre-IPO company would be unsuccessful in assigning the right of first refusal to another party. **Similarly**, and as alleged further below, Defendants Tampa, Bivona and Halcyon represented that the proposed purchase price for Weaver's shares took into account the possibility of Twitter exercising its right of first refusal. | The allegations in the FAC bear no relationship to the allegations in the SEC action. Weaver's FAC does not allege that any Defendants made any misleading statements to investors about investment funds or the securities held in such funds.<br><br>The fact that Tampa executed an LOI with Weaver at a high price to avoid Twitter's ROFR does not somehow give "relevance" to an unrelated SEC action. |
| ¶17. Additionally, the SEC alleged that, in late 2010, Felix entered into a written referral fee agreement with "another broker-dealer to share in the commissions generated" whenever a pre-IPO shareholder sold stock to a Felix-affiliated fund. As a result of this undisclosed fee agreement, "Felix realized substantial compensation beyond the five percent placement fee that Defendants **disclosed in the Offering Materials**." | The allegations in the FAC bear no relationship to the allegations in the SEC action. Weaver's FAC does not allege that any Defendants made any misleading statements to investors about investment funds or the securities held in such funds.<br><br>All such allegations relate to the SEC's protection of the interests of "investors" (i.e., the recipients of "Offering Materials").<br><br>The fact that Weaver alleges Defendants may have agreed to share a break-up fee does not give "relevance" to an unrelated SEC action. |
| ¶18. In order to facilitate these highly profitable transactions, the SEC alleged that Felix employed a "registered representative of the other broker-dealer" who worked to locate the pre-IPO stock for the Felix-affiliated funds to purchase and that: Although purportedly supervised by the other broker-dealer, this representative was physically located in Felix's offices, was paid a salary by Felix, was given job responsibilities by Felix, and used a Felix e-mail address. Accordingly, this arrangement was nothing more than a secret way to route the commissions back to Felix, but make it appear as though an independent entity was brokering the sales transactions. | The allegations in the FAC bear no relationship to the allegations in the SEC action. Weaver's FAC does not allege that any Defendants made any misleading statements to investors about investment funds or the securities held in such funds.<br><br>All such allegations relate to the SEC's protection of the interests of "investors." |

| | | |
|---|---|---|
| 1<br>2 | Under the terms of the referral fee agreement, the SEC alleged that the broker-dealer earned "over $1.1 million" and of this amount "the broker-dealer would return to Felix 87.5%." | |
| 3<br>4<br>5<br>6 | ¶19. On information and belief, Halcyon is the "broker-dealer" and McCabe is the "registered representative" that are mentioned in the SEC's complaint. This allegation is supported by the fact that McCabe's emails to Weaver indicated that the emails originated from Felix's email system and made reference to "your [i.e. Weaver's] Felix Investment LLC account." | The allegations in the FAC bear no relationship to the allegations in the SEC action.  Weaver's FAC does not allege that any Defendants made any misleading statements to investors about investment funds or the securities held in such funds.<br><br>All such allegations relate to the SEC's protection of the interests of "investors." |
| 7<br>8<br>9<br>10<br>11<br>12<br>13 | ¶20. The SEC alleged that, in December 2010, Felix began making made false statements about Twitter's revenue to attract investors to invest in a Felix-affiliated fund organized to purchase Twitter shares. Felix continued making false representations concerning its "senior Twitter executives as clients" and revenue projections. The SEC alleged that "[u]ltimately, Twitter refused to allow additional stock to be sold to Felix's Twitter fund because it was concerned, among other things, about **Felix's material misrepresentations regarding Twitter's revenue.**" | The allegations in the FAC bear no relationship to the allegations in the SEC action.  Weaver's FAC does not allege that any Defendants made any misleading statements to investors about investment funds or the securities held in such funds.<br><br>All such allegations relate to the SEC's protection of the interests of "investors." |
| 14<br>15<br>16<br>17<br>18 | ¶24. Felix was among the first to tap into the secondary market, aggressively purchasing millions of shares in Facebook, LinkedIn, Twitter and Groupon at billion-dollar-plus valuations. Felix's strategy was simple. No matter how high companies' valuations climbed, Felix would buy as much of the shares as they could, for purposes of resale and otherwise. As of July-2011, Felix's holdings were worth more than $1 billion. | These allegations attempt to describe Felix's business model and strategy, but are immaterial to the causes of action in Weaver's FAC. |
| 19<br>20<br>21<br>22<br>23<br>24<br>25 | ¶25. According to a New York Times article, Felix's rapid emergence drew strong criticisms from both sellers and investors in the secondary market. For instance, on Quora, a questions and answers site, a thread on Felix is peppered with complaints from anonymous would-be investors and sellers, claiming that Felix was not able to fill their orders or failed to get enough funds on time. According to the Times article, "[o]ne well-known technology executive, who had sold some of his shares to Felix, said the firm did not close in a 'timely manner.'" | These allegations are hearsay and are immaterial to the causes of action in Weaver's FAC. |
| 26<br>27<br>28 | ¶26. Felix's reputation was worsened when allegations surfaced that Felix was making misleading and fraudulent statements regarding its funds and the shares comprising the funds. | These allegations are hearsay and are immaterial to the causes of action in Weaver's FAC.<br><br>The allegations are immaterial.   Weaver's FAC does not allege that any Defendants made any misleading statements to investors about |

| | | |
|---|---|---|
| 1 | | investment funds or the securities held in such funds. |
| 2 3 4 | ¶27. **Through Tampa, its alter ego, Felix** had previously entered into at least two share purchase agreements with other Twitter share or option holders, and knew of other investors who had done so, only to have Twitter or its assigns prevent the purchases by exercising the ROFR. | All allegations that Tampa is the alter ego of Felix (or vice versa) are immaterial. Alter ego liability is a "drastic remedy" allowing claims against the "shareholders," "members" or "owners" of a business entity.  There is no allegation of any common ownership between Felix and Tampa. |
| 5 6 | ¶31. On August 10, 2011, McCabe emailed Weaver (and copied **Tampa's supposed lawyer, Bivona**) | This reference to John Bivona, Esq. as Tampa's "supposed lawyer" is impertinent. |
| 7 8 9 10 11 12 13 | ¶33. McCabe responded that this was the same letter used in and accepted by sellers in prior deals, explaining: "because twitter has blocked trades in the past…this way the seller wasn't tied up 'forever' with no options to get out" (emphasis added). In other words, McCabe represented that the non-binding language was to protect Weaver, and was only meant to address situations where the actions of Twitter frustrated the sale. On August 11, 2011, McCabe told Weaver, "I don't see a reason to worry at all." | Weaver has provided the LOI and Fee Agreement as exhibits to the FAC, which thus trump any attempts to summarize such terms within the body of the FAC.

The LOI states: "Notwithstanding any terms herein to the contrary, no term or provision of this Letter (and <u>no negotiations or oral representations made in connection with this transaction</u>) shall constitute a commitment…"

In accordance with the terms of the parties' writings, Weaver's references to any "negotiations or oral representations" are immaterial to his causes of action. |
| 14 15 16 17 18 19 20 21 22 | ¶45. After signing the Agreements, and in reliance on Defendants' misrepresentations and concealments, Weaver was induced to and did leave his job at Twitter for the sole reason that current employees of Twitter were prohibited from selling stock holdings of this size. Prior to signing the Agreements, Weaver communicated Twitter's policy to McCabe and Halcyon, who each understood that the execution of the Agreements would cause Weaver to quit his job. **Weaver only signed the Agreements and quit his job because of Defendants' representations that the material terms of the Agreements – i.e. the price and quantity of shares – were binding upon Tampa and Halcyon if Weaver fulfilled his obligations.** | Weaver has provided the LOI and Fee Agreement as exhibits to the FAC, which thus trump any attempts to summarize such terms within the body of the FAC.

The LOI states: "Notwithstanding any terms herein to the contrary, no term or provision of this Letter (and <u>no negotiations or oral representations made in connection with this transaction</u>) shall constitute a commitment…"

In accordance with the terms of the parties' writings, Weaver's references to any "negotiations or oral representations" are immaterial to his causes of action. |
| 23 24 25 26 27 | ¶62. Forlizzo had never heard of the "Clear Sailing" entity until the draft letter with it was shown to him at deposition. He was unaware that Clear Sailing had offered the same price, $20.85. **It is therefore self-evident that the lawyer, Bivona, never got Forlizzo to sign a waiver as to this conflict of interest** relating to a competing offer from a supposed competitor. | These allegations are immaterial and scandalous. |
| 28 | | |

| | |
|---|---|
| ¶75 …failing to use good faith and best efforts to execute additional documentation; failing to use good faith efforts to consummate the purchase and find a purchaser for Weaver's shares; failing to pursue the agreements' stated objectives; advising Weaver to terminate his employment so that he could tender the shares at a time when Tampa and Halcyon knew, or were reckless in not knowing, that there were no investors available to purchase the shares; failing to disclose all fee sharing arrangements, including fee sharing arrangements with Felix; and, advising Weaver to not sell his shares to other purchasers in bad faith, when Tampa and Halcyon knew or were reckless in not knowing that they could not secure investors to purchase Weaver's shares. | Weaver has provided the LOI and Fee Agreement as exhibits to the FAC, which thus trump any attempts to summarize such terms within the body of the FAC.<br><br>The LOI states: "Notwithstanding any terms herein to the contrary, no term or provision of this Letter…shall constitute a commitment…"<br><br>In accordance with the terms of the parties' writings, Weaver's references to any obligations beyond those set forth in "Expenses" and "Confidentiality" are immaterial. |

## VIII.   BECAUSE THE FAC IS INCOHERENT, THE COURT SHOULD ORDER A MORE DEFINITE PLEADING.

Weaver's FAC is woefully incoherent. Weaver begins with a contract claim for ill-defined breaches under written agreements which are expressly non-binding. To this baseless foundation the FAC adds fraud causes of action which are premised upon facts irrelevant to any of the terms of the parties' written agreements. Facing such a nebulous cloud of allegations and claims, Tampa cannot be expected to file a meaningful answer to the FAC. A more definite pleading is necessary.

When a "'defendant is unclear about the meaning of a particular allegation in the complaint, the proper course of action is not to move to dismiss but to move for a more definite statement.'" *Potts v. Howard University*, 269 F.R.D. 40, 42 (D.D.C. 2010) (quoting *Am. Nurses' Ass'n v. Illinois*, 783 F.2d 716, 725 (7th Cir. 1986)). It is unreasonable for Tampa to bear the burden of interpreting viable fraud claims from the FAC in order to show why such claims are barred as a matter of law. Thus, a more definite statement is necessary.

## IX.   CONCLUSION

This Court should dismiss all causes of action set forth in the FAC for failure to plead with particularity as required under Rule 9(b). In the alternative, this Court should dismiss Weaver's FAC under Rule 12(b)(6) without leave to amend. In the alternative, this Court should strike sections of the FAC and order Plaintiff to file a more definite pleading.

Dated:        January 10, 2013              The King Law Group

                                                    /s/ David A. King
                                      By:    _____
                                                    David A. King
                                                    Attorney for Defendant Tampa
                                                    Investment Group, LLC