1
2
3
4
5
6

THE KING LAW GROUP
DAVID A. KING, ESQ. (SBN212439)
dking@thekinglawgroup.com
707 Broadway, Suite 1240
San Diego, CA  92101
Telephone:      619-702-2008
Facsimile:      619-702-2009

Attorneys for Defendant Tampa Investment Group, LLC

7
8
9
10

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11 EVAN PLAINTIFF, | |
| 12          Plaintiff, | Case No. 5:12-cv-1117 EJD |
|            vs. | Honorable Judge Edward J. Davila |
| 13 TAMPA INVESTMENT GROUP, LLC; HALCYON CABOT PARTNERS LTD. FELIX 14 INVESTMENTS, LLC and JOHN BIVONA, | **ANSWER TO FIRST AMENDED COMPLAINT; DEFENDANT'S COUNTER-CLAIMS:** |
| 15          Defendants. | **1.DECEIT: INTENTIONAL MISREPRESENTATION 2.DECEIT: NEGLIGENT MISRREPRESENTATION 3.DECEIT: CONCEALMENT 4.DECEIT: FALSE PROMISE AND DEMAND FOR JURY TRIAL** |
| 20 TAMPA INVESTMENT GROUP, LLC; | |
| 21          Cross-Complainant,         vs. | |
| 23 EVAN PLAINTIFF, and DOES 1 – 50, inclusive, | |
| 24          Cross-Defendants. | |

26      Defendant Tampa Investment Group, LLC ("Defendant"), admits, denies, and alleges as

27 follows:

28      1.      Answering paragraph 1 of the Complaint, Defendant is without sufficient knowledge

or information to form a belief as to the truth of the allegations contained in said paragraph and, on

that basis, denies each and every allegation contained therein.

2.      Answering paragraph 2 of the Complaint, Defendant admits that Defendant is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Florida.  Defendant further admits that Robert Forlizzo and his two secretaries are the two member-owners names in the Operating Agreement, with Forlizzo holding 99.99% membership interests. Defendant also admits that Tampa's stated purpose was to engage in the purchase and sale of pre-IPO technology securities. Except as so admitted, Defendant denies each and every allegation contained in the said paragraph.

3.      Answering paragraph 3 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

4.      Answering paragraph 4 of the Complaint, Defendant admits that Felix is currently the defendant in an SEC action. Regarding the remaining allegations contained in paragraph 4, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

5.      Answering paragraph 5 of the Complaint, Defendant admits that during the relevant period, Bivona served as Defendant's "lawyers," but denies Bivona "ostensibly" served as Defendant's "lawyer." Defendant also denies Bivona was an "authorized representative" and Bivona regularly communicated with Plaintiff, directly and indirectly, regarding the purchase of Plaintiff's Twitter shares, including discussions about the purchase price and buyers for the shares. Regarding the remaining allegations contained in paragraph 5, Defendant is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

6.      Answering paragraphs 6 & 7 of the Complaint, Defendant denies each and every allegation contained therein.

7.      Answering paragraph 8 of the Complaint, Defendant admits that it was formed with only $100 in capital and that Forlizzo and Bivona knew each other from high school and law

school, and Paul McCabe ("McCabe") – the broker who initially solicited Plaintiff to sell his Twitter shares – was introduced to Forlizzo through Bivona. Except as so admitted, Defendant denies each and every remaining allegations contained in the said paragraph.

8.     Answering paragraph 9 of the Complaint, Defendant admits that during the relevant period Bivona sent numerous emails to Plaintiff on behalf of Defendant and these e-mail were sent from Bivona's law firm address (johnv@bivonalaw.com). Regarding the remaining allegations contained in paragraph 9, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

9.     Answering paragraphs 10 & 11 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

10.     Answering paragraph 12 of the Complaint, Defendant admits that on or about March 6, 2012, Defendant removed this action to the Northern District of California pursuant to 28 U.S.C. § 1661(b). Remaining statements in paragraph 12 does not contain allegations as to which a response is required.

11.     Answering paragraphs 13 & 14 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

12.     Answering paragraph 15 of the Complaint, Defendant denies each and every allegation contained therein.

13.     Answering paragraphs 16 through 20 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

14.     Answering paragraph 21 of the Complaint, Defendant admits that Bivona and Felix do not have direct ownership interests in Defendant. Defendant further admits that Bivona was the lawyer for Defendant. Defendant denies that Twitter's refusal to allow additional stock to be sold to Felix caused Felix and Bivona to create other shell corporation to buy Twitter shares, including

Defendant. Defendant further denies that Bivona and Felix exercised control over Defendant and was a "registered representative" that communicated and negotiated with Plaintiff regarding the sale of his Twitter shares.  Regarding the remaining allegations contained in paragraph 21, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

15.     Answering paragraphs 22 through 25 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

16.     Answering paragraph 26 of the Complaint, Defendant denies that to increase the chance that purchases would not be blocked, Defendant organized a scheme to have another entity – Tampa – purchase the shares. Regarding the remaining allegations contained in paragraph 26, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

17.     Answering paragraph 27 of the Complaint, Defendant denies that through Defendant, its alter ego, Felix had previously entered into at least two share purchase agreements with other Twitter share or option holders, and knew of other investors who had done so, only to have Twitter or its assigned prevent the purchases by exercising the Right of First Refusal ("ROFR"). Regarding the remaining allegations contained in paragraph 27, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

18.     Answering paragraphs 28 through 33 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

19.     Answering paragraph 34 of the Complaint, Defendant admits that Plaintiff admitted to McCabe that he felt more comfortable with Defendant, the original entity McCabe had represented to be the buyer, because it had already submitted deals to Twitter. Defendant further

admits that there was an additional sentence added to a Non-binding Letter of Intent stating "For the avoidance of doubt, if the right of first refusal is exercised by the Company or it's assigned, this Letter shall terminate and be rendered null and void." Defendant denies that a letter agreement was edited to add a sentence at the end of the paragraph containing the non-binding language in order to confirm that such language was meant to address situations where the actions of Twitter frustrated the sale.  Regarding the remaining allegations contained in paragraph 34, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

20.     Answering paragraph 35 of the Complaint, Defendant admits that a Non-binding Letter of Intent has an expiration date of August 18, 2011, providing that it would "expire" if not fully executed. Regarding the remaining allegations contained in paragraph 35, Defendant is without sufficient knowledge or information to confirm or deny Plaintiff's characterization of "unambiguously" and "material terms," and on that basis, denies each and every remaining allegation contained therein.

21.     Answering paragraph 36 of the Complaint, Defendant admits that the Term Sheet was edited. Defendant further admits that the Term Sheet also reflected that if Twitter exercised the ROFR, Halcyon would still receive its brokerage commission of $1,011,194.25 from Plaintiff. Defendant denies that a signature block was added for the buyer and that the term sheet provided that Defendant was "to work in good faith and use best efforts to finalize and execute definitive documentation." Regarding the remaining allegations contained in paragraph 36, Defendant is without sufficient knowledge or information to confirm or deny Plaintiff's characterization of "unambiguously" and "material terms," and on that basis, denies each and every remaining allegation contained therein.

22.     Answering paragraphs 37 & 38 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

23.     Answering paragraph 39 of the Complaint, Defendant admits that a true and correct copy of the Letter of Intent is attached to the Complaint as Exhibit A. Defendant denies that Exhibit

A is a Letter Agreement.

24.     Answering paragraph 40 of the Complaint, Defendant admits that a true and correct copy of the Term Sheet is attached to the Complaint as Exhibit B. Defendant denies that the Letter Agreement provided that Defendant was "to work in good faith and use best efforts to finalize and execute definitive documentation." Regarding the remaining allegations contained in paragraph 40, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

25.     Answering paragraph 41 of the Complaint, statements in paragraph 41 does not contain allegations as to which a response is required.

26.     Answering paragraph 42 of the Complaint, Defendant admits that Bivona is Defendant's lawyer. Regarding the remaining allegations contained in paragraph 42, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

27.     Answering paragraph 43 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

28.     Answering paragraph 44 of the Complaint, Defendant denies that Defendant represented to Plaintiff and Plaintiff otherwise reasonably understood that Defendant had the requisite funds available. Defendant further denies that Defendant had no reasonable basis to believe that the funds would later become available when the time for performance came. Regarding the remaining allegations contained in paragraph 44, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

29. Answering paragraph 45 of the Complaint, Defendant denies that Defendant's representations that the material terms of the Agreement – *i.e.* the price and quantity of shares – were binding upon Defendant and Halcyon if Plaintiff fulfilled his obligations. Regarding the

remaining allegations contained in paragraph 45, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

30.     Answering paragraph 46 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

31.     Answering paragraph 47 of the Complaint, Defendant admits that Plaintiff advised Defendant and Bivona that Twitter was not exercising the ROFR. Defendant further admits that Plaintiff forwarded the Twitter stock transfer agreement to Defendant and Bivona. Regarding the remaining allegations contained in paragraph 47, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

32.     Answering paragraph 48 of the Complaint, Defendant denies each and every allegation contained therein.

33.     Answering paragraph 49 of the Complaint, Defendant denies that Bivona continued to mislead Plaintiff.  Regarding the remaining allegations contained in paragraph 49, Plaintiff is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

34.     Answering paragraph 50 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

35.     Answering paragraph 51 of the Complaint, Defendant admits all allegations contained therein.

36.     Answering paragraph 52 of the Complaint, Defendant admits that Plaintiff sent Defendant a formal demand for an assurance of performance pursuant to California Commercial Code §2609. Defendant denies that Defendant's repudiation of obligations were clear. Defendant further denies that it was Plaintiff's right to receive assurance of performance. Regarding the

remaining allegations contained in paragraph 52, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

37.     Answering paragraph 53 of the Complaint, Defendant denies Plaintiff suffered any losses as a result of Defendants' breaches and representations. Regarding the remaining allegations contained in paragraph 53, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

38.     Answering paragraph 54 of the Complaint, Defendant denies Plaintiff suffered other damages as a result of Defendants' breaches. Defendant further denies that Halcyon instructed Plaintiff to not sell his shares to anyone else. Regarding the remaining allegations contained in paragraph 54, Plaintiff is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

39.     Answering paragraphs 55 through 57 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

40.     Answering paragraph 58 of the Complaint, Defendant denies each and every allegation contained therein.

41.     Answering paragraph 59 of the Complaint, Defendant admits that Defendant had entered into two earlier transactions involving Twitter stock and that each was for a per-share price at $20. Defendant further admits that Twitter exercised its ROFR on both deals. Defendant denies that the buyer-side broker on these deals was Paul McCabe and that Defendant received a fee of $18,000 for each of these transactions, supposedly for "services rendered." Regarding the remaining allegations contained in paragraph 59, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

42.     Answering paragraph 60 of the Complaint, Defendant denies each and every

allegation contained therein.

43.     Answering paragraphs 61 through 68 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

44.     Answering paragraphs 69 & 70 of the Complaint, Defendant denies each and every allegation contained therein.

45.     Answering paragraph 71, Defendant hereby incorporates by reference all of the answers to the foregoing paragraphs as though fully set forth herein.

46.     Answering paragraph 72, Defendant denies that Defendant was obligated to perform certain functions and duties to consummate the funding and eventual purchase of 100% of Plaintiff's Twitter shares if Plaintiff complied with his obligations under the Letter of Intent. Regarding the remaining allegations contained in paragraph 72, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

47.     Answering paragraph 73, Defendant admits that Halcyon would be paid a commission if Defendant successfully purchased the shares or if Twitter exercised it's ROFR, but denies that Halcyon and Defendant were obligated to use good faith and best efforts to execute additional documentation and consummate the purchase. Regarding the remaining allegations contained in paragraph 73, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every remaining allegation contained therein.

48.     Answering paragraphs 74 through 76 of the Complaint, Defendant denies each and every allegation contained therein.

49.     Answering paragraph 77, Defendant hereby incorporates by reference all of the answers to the foregoing paragraphs as though fully set forth herein.

50.     Answering paragraph 78 of the Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph and, on that basis, denies each and every allegation contained therein.

51.     Answering paragraphs 79 through 83 of the Complaint, Defendant denies each and every allegation contained therein.

52.     Answering paragraph 84, Defendant hereby incorporates by reference all of the answers to the foregoing paragraphs as though fully set forth herein.

53.     Answering paragraphs 85 through 92 of the Complaint, Defendant denies each and every allegation contained therein.

54.     Answering paragraph 93, Defendant hereby incorporates by reference all of the answers to the foregoing paragraphs as though fully set forth herein.

55.     Answering paragraphs 94 through 99 of the Complaint, Defendant denies each and every allegation contained therein.

56.     Answering paragraph 100, Defendant hereby incorporates by reference all of the answers to the foregoing paragraphs as though fully set forth herein.

57.     Answering paragraphs 101 through 109 of the Complaint, Defendant denies each and every allegation contained therein.

58.     Answering paragraph 110, Defendant hereby incorporates by reference all of the answers to the foregoing paragraphs as though fully set forth herein.

59.     Answering paragraphs 111 through 114 of the Complaint, Defendant denies each and every allegation contained therein.

These paragraphs set forth the statement of relief requested by Plaintiff to which no response is required.  Defendant denies that Plaintiff is entitled to any of the requested relief and denies any allegations contained in the Prayer for Relief to which a response is required.

## FIRST AFFIRMATIVE DEFENSE

Defendant is informed and believes and thereon alleges that, as to each alleged cause of action, Plaintiff has waived any and all claims that he may have had against Defendant.

///

///

**SECOND AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that, as to each alleged cause of action, Plaintiff failed to take reasonable steps to mitigate, alter, reduce, or otherwise diminish his alleged damages, if any.

**THIRD AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that, as to each alleged cause of action, Plaintiff has failed to state sufficient facts to constitute a cause of action against Defendant upon which relief may be granted.

**FOURTH AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that, as to each alleged cause of action, Plaintiff's remedies are barred by the equitable doctrine of unclean hands.

**FIFTH AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that, as to each alleged cause of action, Plaintiff is estopped to assert any alleged claims or demands against Defendant.

**SIXTH AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that Plaintiff did not exercise due caution or care with respect to the matters alleged in Plaintiff's Complaint and that if Plaintiff suffered any damage or injury, Plaintiff contributed in whole or in part to such damage or injury and therefore any remedy or recovery to which Plaintiff might otherwise be entitled must be denied or reduced accordingly.

**SEVENTH AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that, as to each alleged cause of action Plaintiff's Complaint is barred by the statute of limitations.

**EIGHTH AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that, as to each alleged cause of action, Plaintiff lacks standing to sue.

///

///

**NINTH AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that, as to each alleged cause of action, Plaintiff's Complaint is barred as the requested relief would constitute an undue hardship on Defendant.

**TENTH AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that, as to each alleged cause of action, Plaintiff's remedies are barred by the equitable doctrine of laches.

**ELEVENTH AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that if Plaintiff suffered any damage or injury, which Defendant expressly denies, such damage or injury was not caused by the acts or omissions of Defendant or anyone acting on its behalf, and therefore Plaintiff is barred from recovery from Defendant.

**TWELFTH AFFIRMATIVE DEFENSE**

Defendant is informed and believes and thereon alleges that if Plaintiff suffered any damage or injury as alleged in its Complaint, which Defendant expressly denies, Plaintiff's damages were caused in whole or in part by Plaintiff's own negligent acts or omissions, all of which negligence bars either completely or partially the recovery sought by Plaintiff.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Defendant alleges that the Complaint and each and every cause of action alleged therein are barred because Plaintiff engaged in conduct and activity sufficient to constitute a release of any claim or cause of action that it may otherwise have against DEFENDANT.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Defendant alleges that the Complaint and each and every cause of action alleged therein are barred in that, at all relevant times, Defendant acted reasonably and in good faith based upon relevant facts and circumstances known to them at the time they acted.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Defendant alleges that the Complaint and each and every cause of action alleged therein are barred because the damages suffered by Plaintiff, if any, were not foreseeable by Defendant.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Defendant alleges that Plaintiff's Cause of Action for "Breach of Written Agreement" is barred by Plaintiff's own failure to perform any of his own obligations.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

Any representations made by Defendant were made in good faith and if Defendant made any misrepresentations, which it expressly denies, they were made innocently and not intentionally or negligently.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

The Complaint, and each and every purported cause of action asserted against Defendant, was brought without reasonable cause and without a good faith belief that there was a justiciable controversy under the facts or applicable law.

**NINETEENTH AFFIRMATIVE DEFENSE**

The Complaint, and each and every purported cause of action asserted therein against Defendant, is barred by the doctrine of laches, in that Plaintiff has failed to act timely, to the detriment of Defendant.

**TWENTIETH AFFIRMATIVE DEFENSE**

The Complaint, and each and every purported cause of action asserted against Defendant, was brought without reasonable cause and without a good faith belief that there was a justiciable controversy under the facts or applicable law.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

The Complaint, and each and every purported cause of action asserted therein against Defendant, is barred by the fact that the obligations set forth in the complaint were fully discharged by Defendant's performance.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

The Complaint, and each and every purported cause of action asserted therein against Defendant, is barred by failure and/or lack of consideration.

///

///

1

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

2          Defendant is informed and believes and thereon alleges that the Complaint and each and

3  every cause of action alleged therein fails to state facts sufficient to entitle Plaintiff to recover his

4  costs.

5

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

6          Plaintiff is barred from obtaining any recovery on the allegations set forth in the Complaint

7  by the doctrine of impossibility.

8

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

9          Plaintiff is barred from obtaining any recovery on the allegations set forth in the Complaint

10  by the doctrine of frustration of purpose.

11

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

12          Plaintiff is barred from obtaining any recovery on the allegations set forth in the Complaint

13  by the doctrine of impracticability.

14

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

15          Defendant presently has insufficient information upon which to form a belief as to whether

16  additional affirmative defenses are available to it.  Defendant therefore reserves the right to assert

17  additional affirmative defenses in the event discovery or further analysis indicates that other

18  defenses would be available.

19

**DEMAND FOR JURY TRIAL**

20          In accordance with Fed. R. Civ. P. 38(b), Defendant hereby demands trial by jury of all

21  issues triable by jury.

22

23  ///

24

25  ///

26

27  ///

28

14

**THEREFORE**, Tampa Investment Group, LLC respectfully pray for judgment herein as follows:

        1.      That Plaintiff take nothing by way of his Complaint;

        2.      A judgment dismissing Plaintiff's Complaint with prejudice;

        3.      A declaration that Defendant has not breached any contract or related covenant;

        4      For reasonable attorneys' fees;

        5.      For costs of suit incurred herein; and

        6.      For such other and further relief as the Court may deem just and proper.

## COUNTERCLAIMS

Defendant/Counterclaimant, TAMPA INVESTMENT GROUP, LLC, ("Tampa") by and through its undersigned counsel files these Counterclaims against Plaintiff/Counter Defendant, EVAN WEAVER, ("Weaver") and alleges as follows:

## PARTIES

1.      Tampa is a limited liability company organized under the laws of the State of Delaware, with its sole office located in the state of Florida.   Tampa was organized as a limited liability company for the sole purpose of acquiring stock of Twitter, Inc. ("Twitter").

2.      Tampa is informed and believes and thereon alleges Weaver is an individual who, at all times relevant hereto, resided in San Francisco, California. Weaver is a former employee of Twitter.

3.      Tampa does not know the true names of the Counter Defendants sued herein as DOES 1 through 50, inclusive, and therefore sue such Counter Defendants by those fictitious names.  Tampa will amend this Counterclaim to allege their true names and capacities when ascertained.  Tampa is informed and believes, and thereon alleges, that each of these fictitiously

named Counter Defendants is in some manner responsible for the acts, omissions, and/or damages alleged herein.

4.      Tampa is informed and believe and thereon allege that each of the DOE Counter Defendants sued herein as DOES 1 through 50 were the agents, employees, representatives, partners, subsidiaries, parent or related companies or agencies, and/or joint ventures of the other Counter Defendants sued herein and, at all times relevant hereto, were acting within the course and scope of such agency, employment, representation, or other relationship, with the authority, permission, consent and/or ratification of such other Counter Defendants.

## JURISDICTION AND VENUE

5.      This action is properly before this Court under diversity jurisdiction pursuant to 28 U.S.C §1332(a).  The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      The Counterclaims arise out of the same matters and transactions described in the Complaint, and this Court has jurisdiction over the matters and transactions that are the subject of these Counterclaims pursuant to Federal Rule of Civil Procedure 13.

7.      Venue is proper in this judicial district under 28 U.S.C. §1391. Weaver resides in this district, and a substantial part of the events and injury giving rise to the claims set forth herein occurred in this district.

## GENERAL ALLEGATIONS

8.      Tampa is informed and believes and thereon alleges that, prior to the spring of 2011, Weaver planned to quit his job at Twitter and sell all of his shares of Twitter stock.

9.      Tampa is informed and believes and thereon alleges Weaver began pursuing his plan to sell his shares of Twitter stock and leave his job at Twitter in the spring of 2011.

10.      In 2010 and 2011, Paul McCabe ("McCabe"), a broker who worked for the firm Halcyon Cabot Partners Ltd. ("HCP"), approached Weaver via email and through an online network known as LinkedIn. McCabe identified himself as a broker licensed under HCP and Felix

Investments, LLC. McCabe identified himself as a broker who was working for a buyer of Twitter stock.

11.     McCabe and Weaver communicated about the terms of a proposed sale of Weaver's Twitter stock to Tampa. The parties negotiated over a proposed price and the number of shares that Tampa might purchase from Weaver.

12.     On or about August 10, 2011, McCabe delivered to Weaver a draft letter of intent ("LOI"), setting forth proposed terms.  The LOI included language  reflecting the fact that the LOI was non-binding (such paragraph, as modified by the parties from time to time, the "Non-Binding Paragraph"):

> Notwithstanding any terms herein to the contrary, no term or provision of this Letter (and no negotiations or oral representations made in connection with this transaction) shall constitute a commitment, agreement or binding agreement on the part of the Seller or Purchaser except for the provisions entitled "Expenses" and "Confidentiality" which shall be binding and survive the termination of this Letter, except to the extent agreed to in definitive and final documentation relating to the share purchase.

13.     After his receipt of this draft of the LOI, Weaver wrote to McCabe via email and noted that the LOI was non-binding. Specifically, on August 10, 2011, after reviewing the first draft of the LOI, Weaver sent an email to McCabe stating that his attorney "**was surprised to see that the LOI isn't binding**."

14.     Weaver was represented by a transactional attorney named Daniel Hansen through the negotiation, drafting and execution of the LOI.

15.     On August 11, 2011, Weaver wrote to McCabe via email stating that his attorney was "**on the fence about whether it should be binding or not**…"

16.     Unbeknownst to Tampa and its agents, and contrary to Weaver's representations, Weaver sought to modify the non-binding provisions in such a way that he might create an argument to circumvent the non-binding provisions set forth in the Non-Binding Paragraph, while concealing from Tampa the effect his revisions to the LOI.

17.     At some time during the period between August 10, 2011 and August 12, 2011,

Weaver and/or his attorneys or agents drafted modifications to two separate drafts of the LOI that would have made binding the obligations set forth in the **"Close"** section. The "**Close**" section of the LOI sets forth the parties' obligations to "**execute definitive documentation** and **"expedite the closing of the purchase and sale."** In both of these two drafts, the "Non-Binding Paragraph" was modified to read as follows:

> Notwithstanding any terms herein to the contrary, no term or provision of this Letter (and no negotiations or oral representations made in connection with this transaction) shall constitute a commitment, agreement or binding agreement on the part of the Seller or Purchaser except for the provisions entitled **"Close,"** "Expenses" and "Confidentiality" which shall be binding and survive the termination of this Letter, except to the extent agreed to in definitive and final documentation relating to the share purchase.

18.   The addition of the additional word "Close" would have made binding the provisions set forth in that section. Under the terms of these two drafts modified by Weaver between August 10, 2011, and August 12, 2011, the "Close" section would have been "excepted" or "carved out" of all of the "non-binding" provisions and added to the enumerated list of binding provisions—just like the listed "Expenses" and "Confidentiality" sections were specifically identified as being "binding."

19.   With such minimal editing, Weaver and/or his attorneys or agents modified the LOI in a significant fashion, as this would have modified the essence of the proposed purchase and sale from being a "non-binding" letter of intent to being a "binding" letter of intent. A **simple and more direct** means of making the LOI "binding" would have been to **delete the Non-Binding Paragraph**. Thus, Weaver demonstrates his obvious intent to conceal his efforts to effectively invalidate or "flip" the very essence of the LOI. However, Weaver never delivered either of these two versions of the LOI modified between August 10, 2011, and August 12, 2011 (the "Undelivered Drafts") to Tampa or its agents.

20.   Believing that Tampa and its agents would notice and understand the effect of the addition of "Close" in the Non-Binding Paragraphs in the Undelivered Drafts, Weaver and his agents chose not to deliver the Undelivered Drafts to Tampa and its agents. Instead, Weaver made

18

a more obtuse modification to the LOI in order to preserve his contorted "wiggle room" to dishonor the non-binding nature of the LOI. This new revision to the Non-Binding Paragraph reflected Weaver's intent on August 12, 2011 through August 16, 2011 to dishonor the parties' express agreement to execute a "non-binding" LOI and to dishonor the express non-binding language set forth in the LOI.

21.     Rather than modify the paragraph so that the obligations to "Close" would become binding, Weaver inserted the following underlined sentence into the Non-Binding Paragraph to leave himself wiggle room to dishonor the parties' agreement to execute a non-binding LOI and to make a nonsensical contorted argument that the LOI was binding but "conditional."

> Notwithstanding any terms herein to the contrary, no term or provision of this Letter (and no negotiations or oral representations made in connection with this transaction) shall constitute a commitment, agreement or binding agreement on the part of the Seller or Purchaser except for the provisions entitled "Expenses" and "Confidentiality" which shall be binding and survive the termination of this Letter, except to the extent agreed to in definitive and final documentation relating to the share purchase. For the avoidance of doubt, if the right of first refusal is exercised by the Company or its assigns, this Letter shall terminate and be rendered null and void.

22.     On August 12, 2011, Weaver wrote to McCabe via email that "**we'll do the non-binding agreement**."  Weaver never intended to honor this representation.

## WEAVER HAD NO INTENTION OF HONORING THE NON-BINDING NATURE OF THE LOI

23.     Unbeknownst to Tampa and its agents, Weaver had no intention of honoring the non-binding terms of the proposed sale at the times he was representing his willingness to execute a "non-binding" agreement, including on August 12, 2011, when he emailed McCabe expressing his willingness to "do the non-binding agreement" and on August 16, 2011, when he executed the LOI with its express non-binding provisions set forth in the Non-Binding Paragraph. Tampa relied upon Weaver's representation that he understood and agreed that the LOI documented the parties "non-binding agreement."

24.     On August 16, 2011, Tampa and Weaver executed the LOI.  The express language in

the Non-Binding Paragraph of the final LOI reflects the non-binding nature of the LOI.  However, Weaver had no intent of honoring this express language in the Non-Binding Paragraph at the time he executed the LOI on August 16, 2011.  The Non-Binding Paragraph in the final LOI executed on August 16, 2011, included Weaver's revision as underlined in paragraph 20 above.

25.     Following the August 16, 2011, execution of the LOI with Weaver, Tampa reduced its efforts to enter into any similar letters of intent with other shareholders of Twitter stock.

26.     On September 16, 2011, Twitter declined to exercise its Right of First Refusal. Weaver subsequently wrote via email to McCabe to inquire: "Is Tampa ready to go?"

27.     Weaver knew that Tampa understood the parties executed a non-binding proposal for the sale of his shares of Twitter stock. Weaver knew that Tampa understood it was not obligated to purchase his shares of Twitter stock.  Between September 16, 2011, and September 30, 2011, Weaver demonstrated his knowledge that Tampa understood the LOI to be "non-binding" when he emailed McCabe and Tampa's attorney John Bivona repeatedly, writing that he was "anxious" that the deal "isn't going to happen."

28.     Knowing that Tampa understood the LOI to be "non-binding," as Weaver had represented to Tampa and as the LOI was drafted, Weaver began seeking a new buyer soon after Twitter declined to exercise its right of first refusal.

29.     On September 21, 2011, John Bivona wrote to Weaver that he would "see where we are with regard to our investors and get back to you…" Weaver replied to John Bivona, and he forwarded John Bivona's email to McCabe with a message to McCabe, with both of Weaver's email messages showing he was not surprised Bivona needed to check on the status of the investors.

30.     On September 30, 2011, John Bivona wrote Weaver to state that Tampa was unable to raise funds from investors and could not buy his shares.  Demonstrating his awareness that Tampa understood the LOI was non-binding, on September 30, 2011, Weaver immediately wrote back to John Bivona, writing, "Thanks, John. We will get back to you shortly."

**WEAVER DISHONORED THE NON-BINDING NATURE OF THE LOI
WHICH HAS HARMED TAMPA BY PREVENTING ITS SOLE BUSINESS PURPOSE**

31.     On September 27, 2011, Weaver first demonstrated to McCabe and Tampa his intention to dishonor the non-binding nature of the LOI when he wrote an email to Paul McCabe stating "they [Tampa] are probably bound anyway."

32.     On information and belief, Tampa alleges that in or around the period from September 30, 2011, to October 2, 2011, Weaver communicated to employees of Twitter, including Twitter's officers and legal staff as well as to other shareholders of Twitter, that Tampa was not a viable business enterprise and could not be trusted as a counter-party. Accordingly, Tampa's reputation was damaged with Twitter and its shareholders and Tampa was unable to find Twitter shareholders who were willing to enter letters of intent or any other forms of agreement. Following Weaver's deceitful misinformation, Tampa has been entirely frustrated and foreclosed from acquiring any Twitter stock, and has never been able to acquire any shares of Twitter stock.

33.     Weaver's intention to dishonor the non-binding nature of the LOI was ultimately confirmed on October 7, 2011, when Weaver wrote a letter demanding that Tampa purchase his shares of Twitter stock.

34.     As a natural result of his intent to dishonor his express representation that he was willing to enter a "non-binding agreement" and his intent to dishonor the express language in the LOI, Weaver has disparaged Tampa by dishonoring the non-binding nature of the LOI, and thereby misrepresenting the events related to  the LOI among the business associates who are crucial to Tampa's sole business purpose—Twitter and Twitter's shareholders.  As a natural result of his dishonoring of the LOI, misrepresentation of the events and thereby his disparagement of Tampa, Weaver has damaged Tampa's reputation in the high-tech investment community including among Twitter and its shareholders.  Weaver's actions to misrepresent his intent to enter a non-binding agreement and his misrepresentation through his execution of the LOI which contained the Non-Binding Paragraph have harmed and entirely obstructed Tampa's sole business purpose of

21

existence—the acquisition of Twitter stock for investment and gain.

**WEAVER UNDERSTOOD AND REPRESENTED HIS UNDERSTANDING OF THE MEANING OF "BINDING" AND "NON-BINDING"**

35.     In writing, on numerous occasions, Weaver communicated his clear understanding of the words "binding" and "non-binding," and thus he specifically misrepresented his intent to enter a non-binding agreement.  In at least three emails between Weaver and Tampa's agents exchanged before the August 16, 2011 execution of the LOI, Weaver demonstrated his clear understanding of the distinction between binding letters of intent and non-binding letters of intent.

36.     Immediately upon the receipt of the first draft of the letter of intent, Weaver specifically wrote the issue of its "non-binding" nature, even referring to his attorney's unambiguous understanding of its "non-binding" terms.  On August 10, 2011, after reviewing the first draft of the LOI, Weaver wrote to McCabe via email that his attorney "was surprised to see that the LOI isn't binding."

37.     On August 11, 2011, Weaver wrote to McCabe via email that his attorney was "on the fence about whether it should be binding or not…"

38.     On August 12, 2011, Weaver wrote to McCabe via email to represent "we'll do the non-binding agreement…"

39.     In at least four emails after the August 16, 2011 execution of the LOI Weaver demonstrated his clear understanding of the distinction between "binding" and "non-binding."

40.     On September 20, 2011, Weaver wrote to Paul McCabe regarding the stock transfer agreement (the definitive documentation for the purchase and sale) and emphasized "the transfer agreement, which is binding…"

41.     On September 26, 2011, Paul McCabe wrote an email to Weaver explaining that they might have had better results using "the standard Twitter docs," and Weaver replied "What was different in the docs?" On September 27, 2011 Paul McCabe answered Weaver that other deals used "docs that are binding from the beginning."  On September 27, 2011, Weaver then replied to

22

Paul McCabe via email, stating that "yeah, in hindsight binding would have been better."

42.     On September 29, 2011, Weaver wrote to another broker to advise that the "original buyers backed out" and inquired whether they "have buyers willing to do binding escrowed deal?" Weaver expressed his preference for a binding deal in numerous other emails following the frustration of his prospective sale to Tampa.

43.     Contemporaneously with the negotiation and execution of the LOI with Tampa, in August of 2011, Weaver also demonstrated his familiarity with the distinction between binding and non-binding agreements through his negotiations with other prospective buyers, where Weaver had already received letters of intent that were non-binding.  Two drafts of a letter of intent proposed by Stratim Capital (dated August 9, 2011 and August 11, 2011) included the following non-binding provision:

> Non-Binding. Except for paragraph 4 which shall be legally binding, this Offer is not intended to create and it does not create any legal rights, obligations or consequences and only those rights and obligations that are set forth in the definitive agreements, duly executed by all parties to them, will create any legally binding rights, obligations or consequences with respect to the subject matter of the letter.

44.     Similar to the ultimate LOI between Tampa and Weaver, the non-binding paragraph of the Stratim Capital LOI specifically excepted the binding provisions in "paragraph 4" regarding "Non-Solicitation and Confidentiality," but not the "consummation" or "closing" of a sale. Through his agents Weaver was specifically admonished to honor the binding Confidentiality provisions of the Stratim Capital LOI.

45.     Through his agents, Weaver was once instructed, in writing, to "Go to hell" when he requested a binding, escrowed transaction for his stock.

### FIRST CAUSE OF ACTION AGAINST WEAVER
### DECEIT: INTENTIONAL MISREPRESENTATION

46.     Tampa re-alleges paragraphs 1 through 45 above and incorporates them herein by reference as though set forth in full.

47.     On or about August 12, 2011, Weaver falsely represented to Tampa that he was

agreeing to a non-binding LOI. On or about August 16, 2011, Weaver falsely represented to Tampa that he was agreeing to a non-binding LOI by executing an LOI which was drafted to reflect its non-binding nature as set forth in the Non-Binding Paragraph.

48.    The representations made by Weaver were in fact false. The true facts were that Weaver never intended to agree to and honor a non-binding LOI and he concealed this fact from Tampa.

49.    When the Weaver made these representations, Weaver knew them to be false, and these representations were made by Weaver with the intent to defraud and deceive Tampa and with the intent to induce Tampa to execute the LOI. At the time Weaver made the representations and promises to Tampa, Weaver had no intention of performing or honoring them.

50.    At the time Weaver's promises were made and at the time Tampa took the actions herein alleged, Tampa was ignorant of Weaver's secret intention not to honor a non-binding LOI and Tampa could not, in the exercise of reasonable diligence, have discovered Weaver's secret intention.

51.    In reliance on these representations, Tampa was induced to and relied upon Weaver's representation that the he understood and agreed that the LOI documented the parties' "non-binding agreement."  On August 16, 2011, Tampa and Weaver executed the LOI. Accordingly, following the execution of the LOI Tampa reduced its efforts to enter into similar letters of intent with other shareholders of Twitter stock.  The express language in the Non-Binding Paragraph of the final August 16, 2011 LOI reflects the non-binding nature LOI.  However, Weaver had no intent of honoring this express language in the Non-Binding Paragraph at the time he executed the LOI on August 16, 2011. Had Tampa known the actual facts, Tampa would not have taken such actions.

52.    As a result of Weaver's fraudulent conduct, Tampa has suffered compensatory, general and special damages in an amount according to proof at trial. As a natural result of

Weaver's intent to dishonor his express representation that he was willing to enter a "non-binding agreement" and his intent to dishonor the express language in the LOI, Weaver has disparaged Tampa by dishonoring the non-binding nature of the LOI, thereby misrepresenting the events related to this action among the business associates who are crucial to Tampa's sole business purpose—Twitter and Twitter's shareholders.  As a natural result of Weaver's dishonoring of the LOI, misrepresentation of the events and thereby his disparagement of Tampa, Weaver has damaged Tampa's reputation in the high-tech investment community including among Twitter and Twitter's shareholders.  His actions to misrepresent his intent to enter a non-binding agreement and his misrepresentation through his execution of the LOI which contained the Non-Binding Paragraph have harmed and completely obstructed Tampa's sole business purpose –the acquisition of Twitter stock for investment and gain.

53.    Additionally, Weaver acted with malice, fraud and/or oppression and, thus, Tampa is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION AGAINST WEAVER
## DECEIT: NEGLIGENT MISREPRESENTATION

54.    Tampa re-alleges paragraphs 1 through 53 above and incorporates them herein by reference as though set forth in full.

55.    On or about August 12, 2011, Weaver falsely represented to Tampa that he was agreeing to a non-binding LOI. On or about August 16, 2011, Weaver falsely represented to Tampa that he was agreeing to a non-binding LOI by executing an LOI which was drafted to reflect its non-binding nature as set forth in the Non-Binding Paragraph.

56.    The representations made by Weaver were in fact false. Weaver may have honestly believed that the representation was true; Weaver had no reasonable grounds for believing the representation was true when he made it.

57.    At the time Weaver's representations were made and at the time Tampa took the actions herein alleged, Tampa was ignorant of Weaver's secret intention not to honor a non-binding

LOI and Tampa could not, in the exercise of reasonable diligence, have discovered Weaver's secret intention.

58.     Weaver intended that Tampa rely on these representations. Tampa did rely on these representations by executing the LOI. In reliance on these representations, Tampa was induced to and relied upon Weaver's representation that the he understood and agreed that the LOI documented the parties' "non-binding agreement." On August 16, 2011, Tampa and Weaver executed the LOI. Accordingly, following the execution of the LOI Tampa reduced its efforts to enter into similar letters of intent with other shareholders of Twitter stock. The express language in the Non-Binding Paragraph of the final August 16, 2011 LOI reflects the non-binding nature of the LOI. However, Weaver had no intent of honoring this express language in the Non-Binding Paragraph at the time he executed the LOI on August 16, 2011. Had Tampa known the actual facts, Tampa would not have taken such actions.

59.     As a result of Weaver's fraudulent conduct, Tampa has suffered compensatory, general and special damages in an amount according to proof at trial. As a natural result of Weaver's intent to dishonor his express representation that he was willing to enter a "non-binding agreement" and his intent to dishonor the express language in the LOI, Weaver has disparaged Tampa by dishonoring the non-binding nature of the LOI, thereby misrepresenting the events related to this action among the business associates who are crucial to Tampa's sole business purpose—Twitter and Twitter's shareholders. As a natural result of Weaver's dishonoring of the LOI, misrepresentation of the events and thereby his disparagement of Tampa, Weaver has damaged Tampa's reputation in the high-tech investment community including among Twitter and Twitter's shareholders. His actions to misrepresent his intent to enter a non-binding agreement and his misrepresentation through his execution of the LOI which contained the Non-Binding Paragraph have harmed and entirely obstructed Tampa's sole business purpose of existence—the acquisition of Twitter stock. Additionally, Weaver acted with malice, fraud and/or oppression and, thus, Tampa

is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION AGAINST WEAVER
### DECEIT: CONCEALMENT

60.     Through his written representations on August 12, 2011, and again through his execution of the final LOI on August 16, 2011, Weaver disclosed a material fact to Tampa by stating that he was willing to enter a "non-binding agreement," but he intentionally failed to disclose that he intended to dishonor the "non-binding" nature of the LOI by arguing that it was "binding" but "conditional."  Weaver intentionally failed to disclose that he intended to dishonor the "non-binding" nature of the LOI by arguing that it was "binding" but "conditional," and this fact was known only to him.  Tampa could not have discovered the fact that Weaver intended to dishonor his representations that he would execute a "non-binding agreement."

61.     Weaver actively concealed this material fact from Tampa and prevented Tampa from discovering this fact by concealing the Undelivered Drafts of the LOI.  Weaver actively concealed this material fact from Tampa and prevented Tampa from discovering this fact by sharing his true intentions with only his legal counsel and his other agents and associates who assisted him in devising his scheme.

62.     Tampa did not know that Weaver intended to dishonor the "non-binding" nature of the LOI by arguing that it was in fact "binding" but "conditional."

63.     Weaver intended to deceive Tampa by concealing the fact that he intended to dishonor the "non-binding" nature of the LOI by arguing that it was in fact "binding" but "conditional."

64.     Tampa reasonably relied on Weaver's deception.

65.     As a result of Weaver's fraudulent conduct, Tampa has suffered compensatory, general and special damages in an amount according to proof at trial. As a result of Weaver's intent to dishonor his express representation that he was willing to enter a "non-binding agreement" and his intent to dishonor the express language in the LOI, Weaver has disparaged Tampa by

dishonoring the non-binding nature of the LOI, thereby misrepresenting the events related to this action among the business associates who are crucial to Tampa's sole business purpose—Twitter and Twitter's shareholders.  Consistent with this dishonoring of the LOI, misrepresentation of the events and thereby his disparagement of Tampa, Weaver has damaged Tampa's reputation in the high-tech investment community, including among Twitter and its shareholders.  His actions to misrepresent his intent to enter a non-binding agreement and his misrepresentation through his execution of the LOI which contained the Non-Binding Paragraph have harmed and entirely obstructed Tampa's sole business purpose of existence—the acquisition of Twitter stock. Additionally, Weaver acted with malice, fraud and/or oppression and, thus, Tampa is entitled to an award of punitive damages.

66.     Weaver's concealment was a substantial factor in causing Tampa's harm as it would not have executed the LOI with Weaver had it known of his true concealed intentions.

**FOURTH CAUSE OF ACTION AGAINST WEAVER**
**DECEIT: FALSE PROMISE**

67.     Tampa re-alleges paragraphs 1 through 66 above and incorporates them herein by reference as though set forth in full.

68.     On or about August 12, 2011, Weaver falsely and fraudulently promised to Tampa that he was agreeing to a non-binding LOI. On or about August 16, 2011, Weaver falsely and fraudulently promised to Tampa that he was agreeing to a non-binding LOI by executing an LOI which was drafted to be non-binding as set forth in the Non-Binding Paragraph.

69.     At the time Weaver made these promises to Tampa, Weaver had no intention of agreeing to a non-binding LOI.

70.     At the time Weaver's promises were made and at the time Weaver took the other actions herein alleged, Tampa was ignorant of Weaver's secret intention not to agree to a non-binding agreement and Tampa could not, in the exercise of reasonable diligence, have discovered

Weaver's secret intention.

71.     If Tampa has known of the actual intention of Weaver, Tampa would not have agreed to the LOI.

72.     As a result of Weaver's false promises, Tampa has suffered compensatory, general and special damages in an amount according to proof at trial.  As a result of Weaver's false promises, Tampa has suffered compensatory, general and special damages in an amount according to proof at trial. As a result of his intent to dishonor his express representation that he was willing to enter a "non-binding agreement" and his intent to dishonor the express language in the LOI, Weaver has disparaged Tampa by dishonoring the non-binding nature of the LOI, thereby misrepresenting the events related to this action among the business associates who are crucial to Tampa's sole business purpose—Twitter and Twitter's shareholders.  As a result of dishonoring the LOI, misrepresentation of the events and thereby his disparagement of Tampa, Weaver has damaged Tampa's reputation in the high-tech investment community.  His actions to misrepresent his intent to enter a non-binding agreement and his misrepresentation through his execution of the LOI which contained the Non-Binding Paragraph have harmed and entirely obstructed Tampa's sole purpose of existence-the acquisition of Twitter stock for investment and gain.  Additionally, Weaver acted with malice, fraud and/or oppression and, thus, Tampa is entitled to an award of punitive damages.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Tampa hereby demands trial by jury of all issues triable by jury.

WHEREFORE, Tampa prays for judgment as follows:

1.     For actual damages according to proof at the time of trial;

2.     For compensatory, general and special damages damages according to proof at the time of trial;

3.     For punitive damages against Weaver for fraud in that amount sufficient to punish

him and to deter similar conduct in the future;

4. For attorneys' fees as authorized by statute and agreement;

5. For costs of suit incurred herein;

6. For all other relief the Court deems proper.

Dated:      April 14, 2014                    The King Law Group

                                         By:    _/s/ David A. King_____
                                                David A. King
                                         Attorneys for Defendant/Counterclaimant
                                         Tampa Investment Group, LLC