MARK C. MOLUMPHY (168009)
BRIAN M. SCHNARR (275587)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: 650.697.6000
Facsimile: 650.697.0577

ALEXANDER E. BARNETT (25522696)
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street
10th Floor
New York, New York 10013
Telephone: 212.201.6820
Facsimile: 917.398.7753

***Attorneys for Plaintiff and Counterdefendant EVAN WEAVER***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| EVAN WEAVER,<br><br>Plaintiff,<br><br>vs.<br><br>TAMPA INVESTMENT GROUP, LLC, HALCYON CABOT PARTNERS LTD., FELIX INVESTMENTS, LLC, and JOHN BIVONA,<br><br>Defendants. | Case No. CV-12-01117 EJD (PSG)<br><br>**PLAINTIFF AND COUNTERDEFENDANT EVAN WEAVER'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: April 16, 2015<br>Time: 9:00 a.m.<br>Dept.: Courtroom 4, 5th Floor<br>Judge: Hon. Edward J. Davila |
| TAMPA INVESTMENT GROUP, LLC,<br><br>Counterclaimant,<br><br>vs.<br><br>EVAN WEAVER, and DOES 1-50, inclusive,<br><br>Counterdefendants. | |

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that on April 16, 2015 at 9:00 am in Courtroom 4, 5th Floor, of the above court, Plaintiff and Counterdefendant Evan Weaver ("Plaintiff" or "Weaver") will move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment, or in the alternative, partial summary judgment on Defendant and Cross-Complainant Tampa Investment Group, LLC's ("Tampa") Counter-Claims filed on April 14, 2014. *See* Dkt. 108. Plaintiff's motion is made on the grounds that, based on the undisputed facts and applicable law, there is no triable issue of material fact and Plaintiff is entitled to summary judgment as a matter of law.

If the Court does not grant summary judgment, Plaintiff moves, in the alternative, for partial summary judgment finding for Plaintiff and Counterdefendant on: 1) the Deceit: Intentional Misrepresentation claim; 2) the Deceit: Negligent Misrepresentation claim; 3) the Deceit Concealment claim; and/or 4) the Deceit: False Promise claim.

This motion is based upon this Notice of Motion, the Memorandum of Points and Authorities in Support Thereof, filed herewith, the accompanying Declaration of Brian M. Schnarr, the Separate Statement of Undisputed Material Facts, the pleadings and documents herein, and on such other and further evidence and argument as may be presented prior to, at, or after the hearing.

Dated: February 16, 2015

**COTCHETT, PITRE & McCARTHY, LLP**

By: *\/s/ Brian M. Schnarr*
BRIAN M. SCHNARR

*Attorneys for Plaintiff and Counterdefendant Evan Weaver*

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................ 1

II. STATEMENT OF FACTS ........................................................ 2

A. The Underlying Complaint Against Defendants ........................................................ 2

B. Tampa's Counter-Claims Against Weaver ........................................................ 4

C. Uncontroverted Material Facts ........................................................ 4

III. LEGAL STANDARD ........................................................ 7

IV. ARGUMENT ........................................................ 7

A. The Undisputed Facts Prove that Tampa Cannot Show An Actual Misrepresentation or Omission To Support of its Fraud-Based Counter-Claims .... 8

B. The Undisputed Facts Prove that Tampa Cannot Sustain its Fraud-Based Counter-Claims Because its Damages Do Not Flow From the Fraud ........................................................ 9

V. CONCLUSION ........................................................ 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Deloitte & Touche*,
56 Cal. App. 4th 1468 (1997) ........ 8

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 7

*Anschutz Corp. v. Merrill Lynch & Co.*,
785 F. Supp. 2d 799 (N.D. Cal. 2011) ........ 8

*Batts v. Bankers Life & Cas. Co.*,
U.S. Dist. LEXIS 3983 (N.D. Cal. January 13, 2015) ........ 8

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 7

*Competitive Techs. v. Fujitsu Ltd.*,
286 F. Supp. 2d 1118 (N.D. Cal. 2003) ........ 10

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ........ 7

*McMahon v. Grimes*,
206 Cal. 526 (1929) ........ 7

*Mirkin v. Wasserman*,
5 Cal. 4th 1082 (1993) ........ 8

*Service by Medallion, Inc. v. Clorox*,
44 Cal. App. 4th 1807 (1996) ........ 10

*Woodson v. Winchester*,
16 Cal. App. 472 (1911) ........ 9

Case5:12-cv-01117-EJD Document140 Filed02/16/15 Page5 of 17

**Statutes**

Civil Code

§ 1709 .......... 8

§ 1710 .......... 8

§ 1710(1) .......... 8

§ 1710(2) .......... 7

§ 3333 .......... 10

**Other Authorities**

5 Witkin, Cal. Procedure (3d ed. 1985)
Pleading, § 680 .......... 10

iv

**Plaintiff's Motion for Summary Judgment; Memorandum of Points and Authorities**
Case No. CV-12-01117 EJD (PSG)

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiff Evan Weaver ("Weaver") files this motion for summary judgment to streamline the issues as this case proceeds to trial. In his affirmative case, Weaver alleges that Defendant Tampa Investment Group, LLC ("Tampa"), among others, induced him into entering an agreement to sell his shares of Twitter stock in return for over $27 million. However, Tampa (the buyer) was in reality just a shell company with only $100 in assets at its disposal. Tampa itself had no actual investors lined up for the Weaver deal. Weaver was never informed of these facts, and in reliance on Tampa's representation that it could consummate the deal, Weaver agreed to sell his stock and subsequently quit his position at Twitter. When it became time for Tampa to purchase Weaver's shares, Tampa was unable to do so. Accordingly, the deal fell through.

Each of the four named Defendants have answered Weaver's complaint, however, Tampa is the only Defendant to bring counter-claims against Weaver. Tampa's counter-claims are all rooted in allegations of fraud or deceit, and require Tampa to prove an actual misrepresentation (or omission), reliance, and resulting harm. However, the undisputed facts show there was no misrepresentation made by Weaver to Tampa relating to his understanding of the non-binding nature of the agreement, and even if there had been, Tampa could not have relied on it to its detriment.

Tampa's case against Weaver is based on the same nonsensical theory that "Weaver had no intention of honoring the non-binding" agreement to sell his Twitter shares to Tampa. *See* Tampa's Counter-Claim, Dkt. No. 108 ("CC") at ¶ 23. Setting aside whether such a theory is even actionable as a matter of law, the undisputed facts make clear that summary judgment is appropriate. For example, Tampa admitted at deposition that it had no communications with Weaver before the agreement was signed. In fact, Tampa's sole managing member, Robert Forlizzo, testified that the first time he ever heard of Weaver was when the final agreement was provided to him by his attorney. Thus, Tampa cannot credibly claim it relied on something Weaver did (or didn't) say when it choose to enter into the deal.

Furthermore, Tampa suffered no recoverable damages based on its dealings with Weaver. Even if one were to assume that Tampa relied upon Weaver's supposed failure to disclose his

understanding of the agreement, the deal never went forward. Tampa never purchased Weaver's shares. Thus it cannot claim it was harmed as a result of Weaver's fraud or concealment. Perhaps in recognition of this, Tampa bases its claim of damage on the theory that, after entering into a non-binding deal, it "reduced [] efforts to enter into similar letters of intent with other shareholders of Twitter stock." CC ¶ 51. Tampa also claims damage to its "reputation in the high-tech investment community including among Twitter and Twitter's shareholders." CC ¶ 52. However, these theories of harm are logically flawed and contradicted by Tampa's own sworn testimony, where it admitted that it made no efforts to locate or purchase Twitter stock from other shareholders in the time period following the Weaver deal. Nor can Tampa identify any Twitter shareholder that elected not to sell his/her shares to Tampa based on something Weaver allegedly said. So its damages in this regard are pure speculation.

Under these undisputed facts, Tampa cannot prove a claim for fraud or deceit. Accordingly, summary judgment should be granted.

## II. STATEMENT OF FACTS

### A. The Underlying Complaint Against Defendants

Weaver was an employee of Twitter who, through the exercise of stock options and otherwise, held shares of Twitter's common stock. First Amended Complaint, Dkt. No. 59 ("FAC") at ¶ 1. Weaver's right to sell his shares were encumbered by two relevant conditions: First, a right of first refusal ("ROFR") held by Twitter that allowed Twitter to block a sale of stock to a third party by meeting or exceeding the proposed purchase price; and second, a requirement that Weaver end his employment with Twitter if he sought to sell more than 20% of his shares. FAC ¶ 30.

In late 2010, Paul McCabe, a stock broker licensed with both Defendants Felix Investments, LLC ("Felix") and Halcyon Cabot Partners ("Halcyon"), "cold called" Weaver to solicit the sale of his Twitter stock. FAC ¶ 10. Six months later, McCabe contacted Weaver again and advised him that he had "a buyer willing to pay you $20 net then add my fee on top." FAC ¶ 29. According to McCabe, the buyer was a corporate entity called Tampa Investment Group, LLC (or "Tampa"). FAC ¶ 30. McCabe informed Weaver that Tampa's investor base was made up of the "who's who" of Tampa real estate. FAC ¶ 57. In reality, Tampa was a "non-funded vehicle" formed on May 31,

2011 by Robert Forlizzo ("Forlizzo") at the request of Forlizzo's longtime friend Defendant John Bivona ("Bivona"). FAC ¶ 8; Separate Statement of Undisputed Material Facts ("SSUMF"), ¶ 1. Tampa had only two members – Forlizzo and his legal secretary – and was funded entirely by a check of $100.00. SSUMF ¶ 16. As of 2011, during the time McCabe was communicating with Weaver, Tampa had no actual investors. SSUMF ¶ 17. However, operating under the false understanding that Tampa was a viable purchaser, Weaver began considering in earnest the prospect of going through with the deal.

On August 16, 2011, Weaver and Tampa signed a letter agreement that set forth the material terms of the transaction (hereinafter "Letter Agreement"). Tampa, Weaver, and McCabe also executed a Term Sheet (referred to collectively with the Letter Agreement as the "Agreements"). The Term Sheet disclosed that Halcyon (through McCabe) was to make **over $1,000,000 in commission** from the transaction. FAC ¶ 41. This lucrative commission was built into the price Tampa agreed to pay for Weaver's shares. FAC ¶ 29. However, in the event Twitter elected to ROFR the deal, the million dollar commission would be paid by Weaver directly to Halcyon. FAC ¶ 70. With the Agreements signed and in place, Weaver proceeded to give notice to Twitter of the pending sale and, pursuant to the Twitter Stockholder Agreement, tendered his resignation. FAC ¶ 45.

On September 16, 2011, Twitter notified Weaver that the ROFR would not be exercised, clearing the way for Tampa to purchase the shares. FAC ¶ 47. Weaver immediately shared the news with Tampa's attorney, Bivona. FAC ¶ 47. Two weeks later, Bivona responded to Weaver and informed him that Tampa was unable to raise the funds for the deal. FAC ¶¶ 48-51.

Having suffered considerable losses as a result of Defendants' breaches and various misrepresentations, Weaver filed a complaint for damages on February 2, 2012, alleging fraud, breach of contract, and breach of the implied covenant against Tampa. Weaver's first amended complaint was filed on December 20, 2012, naming as additional defendants Bivona, Felix, and Halcyon.

**B. Tampa's Counter-Claims Against Weaver**

On April 4, 2014, Tampa filed counter-claims against Weaver for (1) Intentional Misrepresentation, (2) Negligent Misrepresentation, (3) Concealment, and (4) False Promise. SSUMF ¶ 2. The counter-claims brought by Tampa allege that Weaver was aware that the Letter Agreement was non-binding between the parties, but had "no intention of honoring the non-binding" deal and surreptitiously tried to fashion a binding agreement with language that would provide "wiggle room" for Weaver to later argue the obligations were enforceable. Tampa's Counter-Claim, Dkt. No. 108 ("CC") ¶¶ 12-15, 21, 35-41. According to Tampa, Weaver allegedly took these steps to induce Tampa into signing the Agreements. CC ¶¶ 23, 47-51, 55-58, 60-64, 68-71. Tampa then relied its understanding that the Letter Agreement was non-binding when it signed the Agreements. CC ¶¶ 23, 49, 51, 58, 64, 71.

Tampa claims that it was harmed by Weaver's deceit in two ways:

First: Following the execution of the Letter Agreement "Tampa reduced its efforts to enter into similar letters of intent with other shareholders of Twitter stock." SSUMF ¶ 14; CC ¶¶ 51, 58.

Second: "Weaver [] damaged Tampa's reputation in the high-tech investment community including among Twitter and Twitter's shareholders" which has "harmed and completely obstructed Tampa's sole business purpose – the acquisition of Twitter stock for investment and gain." SSUMF ¶ 15; CC ¶¶ 32-33, 52, 59, 65, 72.

**C. Uncontroverted Material Facts**

Tampa was formed by Forlizzo at the request of Defendant Bivona on May 31, 2011. SSUMF ¶ 1. It was a "non-funded vehicle" that had no investors. SSUHF ¶¶ 16, 17. Since its formation, Tampa only negotiated the potential purchase of stock from three individuals: Brendan Thomas; Santosh Jayaram; and Plaintiff Evan Weaver. SSUMF ¶ 18. The transactions involving Messrs. Thomas and Jayaram both pre-date the potential transaction with Weaver. SSUMF ¶ 19. Both Thomas' and Jayaram's proposed sales of Twitter stock to Tampa were ROFR'd by Twitter, and as a result, Tampa received a "breakup fee" from the seller. Apart from the Jayaram, Thomas

and Weaver deals, Tampa has not been involved in any other deals involving Twitter stock. SSUMF ¶ 20.

With respect to the Weaver transaction, Tampa never had conversations with potential investors interested in purchasing Weaver's Twitter stock. SSUMF ¶ 21. In fact, no one at Tampa directly spoke with Weaver, or anyone representing Weaver, about the purchase of his Twitter stock. SSUMF ¶ 3. The negotiations for the Weaver transaction were all handled by Tampa's attorney Bivona, who was also the owner and executive vice president at Defendant Felix Investments, LLC. SSUMF ¶ 4. In fact, the first time Tampa learned about Weaver and his Twitter stock was when it received the Letter Agreement from Bivona. SSUMF ¶ 5. Tampa had never authorized Bivona to offer a specific price for Weaver's shares, and had "no idea" what prices were conveyed to Weaver during the negotiations. SSUMF ¶ 6.

Because of Tampa's assertion of the attorney-client privilege, the record only reflects two non-privileged conversations about the Weaver transaction that occurred between Tampa and its attorney, Bivona, and neither conversation addressed the binding nature of the Letter Agreement. SSUMF ¶ 7. At no time before receiving the Letter Agreement did Tampa discuss with Weaver his understanding of the language contained in the document. SSUMF ¶ 8. In fact, the only representation made by Weaver on that subject was an email sent dated August 12, 2011 from Weaver to Paul McCabe, not to Tampa. SSUMF ¶ 9. And Tampa testified that McCabe was not acting as its broker with respect to the deal, stating:

> Q: Was Mr. McCabe acting as Tampa's broker?
>
> A: No.
>
> [objection]
>
> A: As far as I'm concerned. The answer for me is no. I couldn't have possibly employed him [McCabe] as a broker when I never met him or talked to him. It was my understanding from the papers that I got that he was Mr. Weaver's broker.

SSUMF ¶ 10. And Tampa did not had any conversations with McCabe before entering into the Letter Agreement. SSUMF ¶ 11. McCabe could not recall a single conversation with Tampa or Bivona where he conveyed Weaver's understanding of the language in the Letter Agreement.

SSUMF ¶ 12. Accordingly, at the time the deal was being negotiated, Tampa's understanding that the Letter Agreement was non-binding was based solely on its interpretation of the language that appeared in the Letter Agreement. SSUMF ¶ 13.

Other than the three transactions with Thomas, Jayaram, and Weaver, Tampa did not consider or evaluate the purchase of Twitter shares from any other Twitter employee. SSUMF ¶ 22. When asked about other potential deals, Tampa testified as follows:

> Q: Did Tampa ever consider or evaluate possibly purchasing Twitter shares from other Twitter employees at any time other than those three?
>
> A: No.
>
> Q: Why not?
>
> A: I formed Tampa at the request of Mr. Bivona specifically for Twitter shares that basically Felix could identify. I did no solicitations. I'm really not in the securities business.

*Id.* In fact, Tampa did not actively seek out the purchase of any other Twitter employee's stock:

> Q: So is it fair to say that Tampa, other than those three that you've identified [Jayaram, Thomas and Weaver], did not actively seek out the purchase of any other Twitter employees' stock?
>
> A: Tampa did not. Whether Mr. Bivona and Felix were, I don't know.
>
> Q: Okay. I just want to focus on what Tampa did or didn't do.
>
> A: Tampa did not. Tampa did not.
>
> Q: Okay. And nothing prevented Tampa from seeking out, if it wanted to, the purchase of other Twitter stock. Fair?
>
> A: Well, yes. It's possible, but it wouldn't have happened because I'm Tampa and I wouldn't have done it.
>
> Q: And why not?
>
> A: Because I'm not interested in it. I have a legal practice that's centered in real estate not securities.

SSUMF ¶ 23. And in fact, Tampa did not make any attempts to engage in any additional business opportunities from October 2011 until the present. SSUMF ¶ 24. When asked, it could not identify

a single deal it claims to have lost due to Weaver's alleged comments. *Id.* Specifically, Tampa made the following concessions during its deposition:

> Q: Which business opportunity did Tampa lose as a result of the filing of this lawsuit?
>
> A: Never had an opportunity to lose any business opportunities. It was too smart enough to entertain any business opportunities and get egg all over its face.
>
> Q: So are you saying that Tampa did not attempt to engage in any additional business opportunities after the filing of this lawsuit?
>
> A: I guess you would say that.

*Id.*

## III. LEGAL STANDARD

Summary judgment is appropriate when there is no issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment has the initial burden of identifying the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 387 (9th Cir. 2010). Where the moving party meets its burden, the nonmoving party must identify facts showing that a genuine issue for trial exists. *In re Oracle*, 627 F.3d at 387 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The non-moving party may not rely on the pleadings, but must come forward with evidence from which a jury could reasonably render a verdict in its favor. *Id.* (citing *Anderson*, 477 U.S. at 252).

## IV. ARGUMENT

Tampa asserts four counter-claims against Weaver, all of which sound in fraud or deceit.[1] A claim based on fraud must satisfy the following elements: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or 'scienter'); (3) intent to

---

[1] Under California law, Tampa's Second Counter-Claim for Negligent Misrepresentation is treated as a form of deceit. *See* Civ. Code § 1710(2) (defining "deceit" as including "[t]he representation, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true."); *see also McMahon v. Grimes*, 206 Cal. 526, 534 (1929). Tampa's three remaining counter-claims for intentional misrepresentation, concealment, and false promise are all rooted in fraud.

defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Batts v. Bankers Life & Cas. Co*., Case No. 13-cv-04394-SI2015, U.S. Dist. LEXIS 3983, ** 12-13 (N.D. Cal. January 13, 2015), *citing Anderson v. Deloitte & Touche*, 56 Cal. App. 4th 1468, 1474 (1997); *see also* Civ. Code §§ 1709, 1710.[2]

As described below, each of Tampa's Counter-Claims against Weaver are subject to summary judgment because the undisputed facts confirm (1) that no actionable misrepresentations were made by Weaver to Tampa, and (2) the damages that Tampa claims to have suffered are unrelated to the theory of fraud that it alleges.

### A. The Undisputed Facts Prove that Tampa Cannot Show An Actual Misrepresentation or Omission To Support of its Fraud-Based Counter-Claims

Tampa's counter-claims against Weaver require the existence of an actual misrepresentation of a material fact or material omission to support a claim based in fraud. *See* Civ. Code § 1710(1), (3). To satisfy this element, Tampa must point to "a statement of fact that is not true and made by one who doesn't believe it to be true . . . ." *See Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1088 (1993).

Tampa alleged in its Counter-Claims that "Weaver falsely represented to Tampa that he was agreeing to a non-binding LOI" on August 12, 2011. CC ¶ 22-23. Yet, the undisputed facts show that the August 12, 2011 communication from Weaver was sent to McCabe, not to Tampa or its agents. SSUMF ¶ 9. Tampa admits that McCabe was not working for Tampa, and Tampa had no conversations with McCabe before entering into the Agreements. SSUMF ¶¶ 10, 11. In fact, Tampa had never even heard of Weaver before the Letter Agreement was provided by Bivona on August 16, 2011. SSUMF ¶ 5. And Tampa's sworn testimony reflects that it had no direct communications with Weaver or anyone representing Weaver before the Letter Agreement was signed. SSUMF ¶¶ 3, 8. As for McCabe, during his deposition he could not recall a single conversation between him and either Tampa or Bivona where he conveyed Weaver's understanding of the language in the Letter

---

[2] Although Tampa is not required to show scienter to prevail on a negligent misrepresentation claim, it still must show that Weaver made certain statements "without any reasonable ground for believing [the statements] to be true," *see* Civ. Code § 1710(2), and that "its damages were 'proximately caused' by [Weaver's] conduct. *Anschutz Corp. v. Merrill Lynch & Co*., 785 F. Supp. 2d 799, 827 (N.D. Cal. 2011).

Agreement. SSUMF ¶ 12. These undisputed facts prove there was no false promise, or affirmative representation, made directly by Weaver to Tampa.

Given the lack of any direct communications from Weaver to Tampa, all that could possible remain to support its counter-claims are communications between Weaver (or his agents) and Bivona. However, this avenue is also foreclosed by undisputed facts. The record reflects only two non-privileged conversations between Tampa and Bivona about the Weaver transaction, and neither conversation addressed the non-binding nature of the documents, let alone Weaver's understanding of them. SSUMF ¶ 7. At bottom, the only representation whatsoever made by Weaver to Tampa was the language that existed in the Letter Agreement.

The Letter Agreement itself includes no false promise, affirmative misrepresentation, or material omission made by Weaver sufficient to support a claim for fraud or deceit. *See* Schnarr Decl., Exh. A. The parties dispute whether the Letter Agreement contains binding obligations, however that dispute that is at the heart of Weaver's affirmative breach of contract claim against Tampa. If the jury agrees with Tampa's interpretation then there can be no fraud let along any resulting damages to Tampa. Conversely, if the agreement is found to be binding, Weaver had no affirmative duty to explain the terms or inform Tampa of that fact. In either event, the counter-claims based on fraud or deceit become moot. Tampa cannot re-cast its affirmative defense to Weaver's breach of contract claim into a new cause of action based on fraud, and without an actionable misrepresentation, these counter-claims should be dismissed.

**B.     The Undisputed Facts Prove that Tampa Cannot Sustain its Fraud-Based Counter-Claims Because its Damages Do Not Flow From the Fraud**

As noted above, each counter-claim requires Tampa to prove actual damage proximately resulting from the theory of fraud alleged. *See Woodson v. Winchester*, 16 Cal. App. 472, 476-77 (1911) ("It must be shown in the pleading that the damage claimed was sustained by reason of the fraud and should show the relation between the fraud and the damage alleged; that is, it must appear that the fraud and the damage sustain to each other the relation of cause and effect."). Stated another way, Tampa "must plead and prove the 'detriment proximately caused' by [Weaver]'s tortious

conduct." *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1149-50 (N.D. Cal. 2003), *citing Service by Medallion, Inc. v. Clorox*, 44 Cal. App. 4th 1807, 1818 (1996); *see also* Civ. Code, § 3333. "Deception without resulting loss is not actionable fraud. [] Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the representations must be shown." *Service by Medallion*, 44 Cal. App. 4th at 1818 (internal citations removed), *citing* 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 680, p. 131.

Tampa claims that it was misled by Weaver – either purposefully or negligently – into signing documents that it maintains to this day are non-binding. *See* CC ¶¶ 23, 47-51, 55-58, 60-64, 68-71. According to Tampa, had it known that Weaver intended the Agreements to be enforceable, it would have never entered into them in the first place. *Id.* at ¶¶ 23, 49, 51, 58, 64, 71. But, as a result of Weaver's deceit, it signed the Agreements and proceeded under the impression that it had no binding commitments. *Id.* Under Tampa's theory of the case, it remained free to take whatever actions it saw fit, not only with respect to Weaver, but with any other potential transactions that may arise. Logically, then, Tampa's course of conduct was not altered in any material respect as a result of entering into the Agreements with Weaver.

Despite its apparent lack of committed to Weaver, Tampa offers the contradictory assertion that it was harmed from its "reduced [] efforts to enter into similar letters of intent with other shareholders of Twitter stock." SSUMF ¶ 14. This position is both illogical and contrary to undisputed facts that show Tampa did not actively seek out the purchase of any other Twitter employee's stock, SSUMF ¶¶ 22-23, and it did not attempt to engage in any additional business opportunities. SSUMF ¶ 24. Since there are no disputed facts to support this claim of damage, and it should be dismissed.

Tampa also claims it was harmed as a result of Weaver's disparagement of Tampa's "reputation in the high-tech investment community including among Twitter and Twitter's shareholders." SSUMF ¶15; CC ¶¶ 32-33, 52, 59, 65, 72. This theory of damage is purportedly based on Weaver telling other Twitter shareholders that Tampa was not "a viable business enterprise" and "could not be trusted." CC ¶ 32. However, as an initial matter, Tampa did not sue Weaver for statements he may have made to unnamed Twitter employees. Tampa sued for fraud in

relation to the Letter Agreement. Under Tampa's theory, had Weaver mislead Tampa about his understanding of the binding nature of the Letter Agreement, the proximate result would be Tampa unknowingly entering into a binding contract. In that event, the only possible result would be in the form of Tampa having to comply with the Agreements, which it hasn't done.

Tampa tries to bridge this gap by alleging that Weaver's disparagement took the form of mischaracterizing the nature of the agreement to other Twitter employees. CC ¶¶ 52, 59, 65, 72 (alleging Weaver "misrepresent[ed] the events related to this action among business associates who are crucial to Tampa's sole business purpose – Twitter and Twitter's shareholders"). However, even assuming this occurred, Weaver's comments to Twitter shareholders after his deal fell through would have no logical connection to (1) Weaver's supposed representations to Tampa before the Agreements were signed, (2) Tampa's decision to enter into the Agreements, (3) the course of conduct Tampa took in reliance on its mistaken belief, and (4) the current position it's in ***as it relates to the Agreements***. The void between the obligations of the Letter Agreement and Weaver's alleged comments to Twitter shareholders is fatal to Tampa's fraud claims.

Last, Tampa's position is directly contradicted by undisputed testimony of Tampa's own corporate representative, Forlizzo. In its deposition, Tampa admitted that it did not actively seek out the purchase of any other Twitter employees' stock. SSUMF ¶¶ 22-23. And nothing prevented Tampa from seeking out, if it had wanted to, the purchase of other Twitter stock. *Id*. From October 2011 to the present, including the time after Weaver filed his lawsuit against Tampa, Tampa did not attempt to engage in any additional business opportunities. SSUMF ¶ 24.

In sum, Tampa has failed to allege any non-speculative damage resulting from its theory of fraud. More to the point, the undisputed facts prove that Tampa did not in fact suffer any lost opportunity, let alone any harm flowing from Weaver's conduct. Summary judgment should be granted.

/ / /

/ / /

/ / /

## V. CONCLUSION

In sum, it is Defendant Tampa's burden to establish, to a reasonable probability, that there was an actual misrepresentation by Weaver and a causal connection between Weaver's alleged wrongful act and the damages asserted. For the foregoing reasons, Weaver respectfully request that Court grant his motion for summary judgment, or in the alternative, partial summary judgment.

Dated:  February 16, 2015                              **COTCHETT, PITRE & McCARTHY, LLP**

                                         By:    */s/ Brian M. Schnarr*
                                                         BRIAN M. SCHNARR

*Attorneys for Plaintiff and Counterdefendant Evan Weaver*