THE KING LAW GROUP
DAVID A. KING, ESQ. (212439)
402 West Broadway, Suite 950
San Diego, CA 92101
Tel: (619) 702-2008
Fax: (619) 702-2009

Attorney for Defendant Tampa Investment Group, LLC

UNITED STATES DISTRIC COURT

NORTHERN DISTRICT OF CALIFORNIA– SAN JOSE DIVISION

| | |
|---|---|
| EVAN WEAVER,<br><br>　　　Plaintiff,<br>　vs.<br><br>TAMPA INVESTMENT GROUP, LLC;<br>HALCYON CABOT PARTNERS LTD.<br>FELIX INVESTMENTS, LLC and JOHN<br>BIVONA,<br><br>　　　Defendants.<br><br>TAMPA INVESTMENT GROUP, LLC;<br><br>　　　Counterclaimant,<br>　vs.<br><br>EVAN WEAVER,<br><br>　　　Counter-Defendant. | Case No.: CV-12-01117EJD<br><br>**DEFENDANT TAMPA INVESTMENT GROUP, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　April 16, 2015<br>Time:　9:00 a.m.<br>Judge:　Hon. Edward J. Davilla<br>Dept:　Courtroom 5, 4th Floor |

Defendant Tampa Investment Group, LLC's Opposition to Plaintiff's Motion for Summary Judgment
Case No.: CV-12-01117EJD

# TABLE OF CONTENTS

I. INTRODUCTION . . . 1

II. STATEMENT OF FACTS . . . 2

   A. The Real Negotiation and the Execution of the LOI . . . 2

   B. Weaver Relies Upon Immaterial and Disputed Facts in the MSJ . . . 4

      1. Weaver Made Two Misrepresentations to Tampa . . . 4

      2. Tampa Suffered Losses as a Result of Weaver's Misrepresentations . . . 6

      3. Tampa Was a Viable Investment Vehicle Which Lost all Value . . . 7

III. SUMMARY JUDGMENT STANDARDS . . . 7

IV. ARGUMENT . . . 9

   A. Plaintiff's MSJ Fails to Address the Elements of Each Claim . . . 9

      1. Intentional Misrepresentation . . . 9

      2. Negligent Misrepresentation . . . 10

      3. Concealment . . . 10

      4. False Promise . . . 11

   B. Agency . . . 12

V. CONCLUSION . . . 13

Defendant Tampa Investment Group, LLC's Opposition to Plaintiff's Motion for Summary Judgment
Case No.: CV-12-01117EJD

# TABLE OF AUTHORITIES
**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*    7, 8
     477 U.S. 242, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)

*Celotex Corp. v. Catrett*    8
     477 U.S. 317, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986)

*First National Bank of Arizona v. Cities Service Co.*    7, 8
     391 U.S. 253 (1968)

*Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*    8
     475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed. 2d 538 (1986)

*Valandingham v. Bojorquez*    8
     866 F.2d 1135 (9th Cir. 1989)

*Wilkerson v. McCarthy*    8
     366 U.S. 53 (1949)

**State Cases**

*Anderson v. Beloitte & Touche*    9
     (1997) 56 Cal.App.4th 1468

*Boschma v. Home Loan Center, Inc.*    10
     (2011) 198 Cal.App.4th 230

*Columbia Pictures Corp. v. DeToth*    12
     (1948) 87 Cal.App.2d 620

*Continental Airlines, Inc. v. McDonnell Douglas Corp.*    10
     (1989) 216 Cal.App.3d 388

*Engalla v. Permanente Medical Group, Inc.*    11
     (1997) 15 Cal.4th 951

*Gagne v. Bertran*    9
     (1954) 43 Cal.2d 481

<2025-01-01>

| | | |
|---|---|---|
| 1 | *Gonsalves v. Hodgson* | 9 |
| 2 | (1951) 38 Cal.2d 91 | |
| 3 | *Hobart v. Hobart Estate Co.* | 9 |
| 4 | (1945) 26 Cal.2d 412 | |
| 5 | *Limandri v. Judkins* | 11 |
| 6 | (1997) 52 CalApp.4th 326 | |
| 7 | *Magpali v. Farmers Group, Inc.* | 11 |
| 8 | (1996) 48 Cal.App.4th 471 | |
| 9 | *O'Riordan v. Federal Kemper Life Assurance Co.* | 12 |
| 10 | (2005) 36 Cal.4th 281 | |
| 11 | *Tri-Delta Engineering, Inc. v. Insurance Co. of North America* | 9 |
| 12 | (1978) 80 Cal.App.3d 752 | |
| 13 | *Wittenbrock v. Parker* | 12 |
| 14 | (1894) 102 Cal.93 | |

**Statutes**

Federal Rule of Civil Procedure 56 — 7, 8

Delaware Limited Liability Company Act §18-402 — 4

**Other Authorities**

California Civil Jury Instruction No. 1900 — 9

California Civil Jury Instruction No. 1901 — 10

California Civil Jury Instruction No. 1902 — 11

California Civil Jury Instruction No. 1903 — 10

## I. INTRODUCTION

Defendant Tampa Investment Group, LLC ("Tampa") opposes Plaintiff Evan Weaver's ("Weaver") Motion for Summary Judgment ("MSJ") on Tampa's Counterclaim. Weaver's MSJ is based upon immaterial facts, facts which are in conflict with the evidence (even Weaver's own testimony), misstatements of the law, misstatements of fact, and illogical contortions of Tampa's causes of action.

Contrary to Weaver's contentions, it was Weaver who deceived and induced Tampa, and Tampa that incurred $2,453.5 in out of pocket costs, opportunity costs and lost profits on other pre-IPO transactions in Twitter stock, worth hundreds of thousands or millions of dollars as a result of Weaver's misrepresentations. Tampa was a viable and valuable business entity which obtained Twitter's consent to purchase its stock. All of this value was lost as a result of Weaver's fraud.

Weaver made two misrepresentations of fact to Tampa through its agents.[1] Weaver clearly understood the distinction between "binding" and "non-binding" letters of intent ("LOIs"). Weaver and his attorney drafted two revisions to the LOI that would have made the LOI binding—in a surreptitious manner. (Tampa's Answer and Counterclaim "CC" ¶¶ 17-20.)[2] These two versions of the LOI were never delivered to Tampa's agents.

Instead, Weaver represented in an email that he would sign a "non-binding LOI" and executed an LOI that included all the original non-binding language originally proposed by Tampa. Weaver makes an incredible claim that one superfluous sentence—addressing only *one* reason why the LOI was non-binding—alters the non-binding nature of the LOI. (CC ¶21.) By adding this superfluous sentence, Weaver executed the LOI intending to preserve this claim that he understood the LOI to be "binding," while concealing this ulterior motive.

---

1 For purposes of this Opposition, Paul McCabe, John Bivona and Robert Forlizzo are referred to as Tampa's agents. Issues of fact over whether McCabe was Tampa's agent remain for trial.
2 Instead of simply deleting the non-binding paragraph, Weaver or his attorney added the section "Close" to the listed exceptions—those sections of the LOI which were binding ("Expenses" and "Confidentiality").

-1-
Defendant Tampa Investment Group, LLC's Opposition to Plaintiff's Motion for Summary Judgment
Case No.: CV-12-01117EJD

Because of Weaver's misrepresentations, Tampa's agents focused their efforts on the Weaver "deal" (since it was more than ten times larger than any prior LOI Tampa had executed for Twitter stock) and reduced their efforts to buy Twitter stock from other shareholders. Because of Weaver's misrepresentation, Tampa invested money and wasted attorneys' hours and other costs to advance the Weaver "deal." Because Weaver never intended to dishonor and later dishonored the non-binding LOI, Tampa's sole business purpose was entirely frustrated—causing Tampa to lose millions in gains on other Twitter stock.

## II.   STATEMENT OF FACTS

### A.   The Real Negotiation and the Execution of the LOI.

The LOI is not ambiguous. Weaver's extensive correspondence confirms that he fully understood the LOI to be "non-binding." The fact that Twitter might exercise its right of first refusal ("ROFR") was but one reason the LOI was non-binding. Weaver has contrived a story that conflates two very different possibilities which might have arisen after he presented his notice of a proposed sale to Twitter.

Weaver wrote extensive emails about the distinction between a "block" and a "ROFR," reflecting his clear understanding of these two discreet possibilities. Now, Weaver has blended (a) a "blocked trade" and (b) Twitter's exercise of its "ROFR;" creating a hybrid concept: (c) "frustrating the sale." This one issue shows that Weaver has contrived this claim and that the original LOI was clearly non-binding.

Weaver was never told that Tampa had the funds to buy his stock, and he never asked if Tampa had assets until September 22, 2011. ((Tampa's Opposition to Weaver's Motion to Amend Complaint ("OMAC"), King Dec., Ex. 3) To the contrary, several emails document Weaver's clear understanding that Tampa was continuing to solicit potential "investors" after the non-binding LOI was signed. (OMAC, King Dec., Ex. 39.)

In discovery, Weaver has produced emails showing he understood and was willing to execute a non-binding LOI for good reason: the dramatically higher price in Tampa's proposal.

1.   On August 3, 2011, Weaver wrote to his colleague Eric Maland that McCabe was offering a "too-good-to-be-true price." (OMAC, King Dec., Ex. 20.)

-2-

2. On August 10, 2011, after reviewing the LOI Weaver wrote to McCabe that his attorney "was surprised to see that the LOI isn't binding." (OMAC, King Dec., Ex. 26.)

3. On August 11, 2011, Weaver replied to McCabe that his attorney was "on the fence about whether it should be binding or not..." (OMAC, King Dec., Ex. 28.)

4. On August 12, 2011 Weaver wrote to McCabe, "We'll do the non-binding agreement although it still would be cool to see previous LOIs." (OMAC, King Dec., Ex. 29.)

The record shows Weaver hoped and expected that Twitter would exercise its ROFR, creating the best of all worlds where:

- this "too-good-to-be-true price" (OMAC, King Dec., Ex. 20),
- offered in a "non-binding" LOI (OMAC, King Dec., Ex. 26, 27, 28, 29),
- by a "half-assed buyer" (OMAC, King Dec., Ex. 24),
- through a "shady" broker (OMAC, King Dec., Ex. 20),
- would be ROFR'd by Twitter and assigned to the "well-capitalized ROFR buyers." (OMAC, King Dec., Ex. 24),
- On August 22, 2011, Weaver wrote to McCabe, "[Twitter] will ROFR after 30, 99% chance." (OMAC, King Dec., Ex. 25.)

Weaver knew *exactly* what he was doing: assuming the risk of executing a non-binding deal with Tampa, hoping Twitter would exercise or assign its ROFR and thereby secure a binding agreement with a "well-capitalized" buyer. However, Weaver never intended to honor the non-binding LOI if Twitter did not exercise or assign its ROFR; rather, he intended to claim the LOI was *binding*. This was an incredible scheme of greed and deception by a software engineer earning tens of millions on his stock.

B. **Weaver Relies Upon Immaterial and Disputed Facts in the MSJ**

1. <u>Weaver Made Two Misrepresentations to Tampa.</u>

Weaver made his first misrepresentations of fact when he claimed in an August 12, 2011 email message that he would execute a non-binding LOI. (SSUMF ¶ 9.) Weaver made his

-3-

second misrepresentation when he executed the non-binding LOI with the secret intention of later claiming it was binding if Twitter did not exercise its ROFR. Weaver made these representations to people he understood to be Tampa's agents – Bivona and McCabe.

Weaver testified extensively that he believed both McCabe and Bivona were agents and representatives of Tampa, and both McCabe and Bivona had actual knowledge of the terms of the deal before the term sheet arrived.[3] (SSUMF ¶ 3 and 4.) Tampa's Managing Member, Robert Forlizzo, is also an agent of Tampa, the limited liability company. (Del. Limited Liability Company Act §18-402.) As a matter of law set forth below, Tampa, the entity, knew of Weaver's misrepresentations, imputed from the knowledge of its agents. McCabe and Bivona each spoke directly to Weaver about the "deal." (SSUMF ¶ 3.) Indeed, Weaver negotiated with both McCabe and Bivona, and Weaver testified that both were "Tampa's agents." (SSUMF ¶ 4.)

Furthermore, McCabe and Bivona spoke with each other about the "deal." (Id.) And Bivona communicated with Tampa's Managing Member, Forlizzo, about the LOI, having a few conversations about the "deal." (SSUMF ¶ 5.) Several of Bivona's conversations with Forlizzo were attorney-client privileged communications, but Bivona advised Forlizzo to expect delivery of the LOI, and that the LOI was "in good enough shape to sign." (SSUMF ¶ 7.) The evidence shows that Tampa, through its agents, was aware of the "deal" with Weaver before the LOI was delivered and was aware that Weaver agreed the LOI was non-binding. (SSUMF ¶ 5.)

Whether Tampa's Managing Member, Forlizzo, communicated directly with Weaver about his understanding of the LOI is immaterial. (SSUMF ¶ 8.) Bivona was given full authority by Forlizzo to act on behalf of Tampa, demonstrating that Tampa negotiated the terms of the LOI. (Id.)[4]

---

[3] Weaver relies upon testimony from Tampa's Managing Member, Forlizzo, that McCabe was not Tampa's broker. However, Weaver's testimony shows that he believes McCabe was Tampa's agent and broker, creating an issue of fact for trial. (SSUMF ¶ 4 and 10.)

[4] Weaver's writings are crystal clear, while his testimony is nebulous at best. (OMAC, King Dec., Ex.26, 28, 29, Ex. 21, pg. 162-63, 165,).

-4-
Defendant Tampa Investment Group, LLC's Opposition to Plaintiff's Motion for Summary Judgment
Case No.: CV-12-01117EJD

Weaver misstates the counterclaim by ignoring Tampa's claim that Weaver made a misrepresentation when he signed and delivered the final LOI. (CC p. 21:1, p. 21:12-13) Weaver's execution and delivery of the LOI is a second written misrepresentation of Weaver's intent to execute a non-binding LOI (the first being the email, referenced above).

Had Weaver written an email: "I demand a binding LOI," and executed an LOI, he would not have made a misrepresentation by signing an LOI—so long as he *truly believed* the text was binding. Since he mislead Tampa in his August 12, 2011 email message, he mislead Tampa again when he signed the final non-binding LOI. (SSUMF ¶ 9.)

Tampa's understanding of Weaver's agreement to enter a non-binding LOI was based upon misrepresentations Weaver made to Tampa's agents and the express non-binding language in the LOI. Weaver testified that the non-binding text in the LOI was the language "Paul [McCabe] provided" to him, which his own attorney labeled "non-binding," and Weaver himself described as "non-binding" when he agreed to execute the final LOI. (NOL: Ex. B, Weaver Dep. Vol. II at 143:22-144:7; 144:16-24; 156:1-8; 157:14-23; Ex. 28, 33 ) (SSUMF ¶ 13.)

Even if Tampa's Managing Member, Forlizzo, did not authorize "Bivona to offer a certain price," this is not material to Tampa's counterclaim. Tampa's Managing Member, Forlizzo, gave Bivona full authority to act on Tampa's behalf. (SSUMF ¶ 6.) Bivona also served as Tampa's placement agent for the Twitter transactions and fundraising. (Id.)

2. <u>Tampa Suffered Losses as a Result of Weaver's Misrepresentations.</u>

Weaver's MSJ misstates and illogically contorts the Counterclaim. (MSJ, p. 10:27-11:4.) Tampa does not seek damages simply from disparagement or its reduced efforts to solicit Twitter shareholders; harm is also alleged to have arisen because Weaver "dishonored the Non-Binding LOI." (CC p. 21:1, p. 21:12-13.)

In addition to the harm Tampa has plead, damages will be established by Tampa showing the expenses incurred in reliance on Weaver's misrepresentation. (Declaration of Robert A. Forlizzo in Support of Oppo. to MSJ, ("Forlizzo Dec.") ¶4.) Barring Weaver's misrepresentation and dishonor of the non-binding LOI, and the resulting futility of future efforts to solicit sellers and investors, Tampa would have remained a viable business entity with the potential to reap

-5-
Defendant Tampa Investment Group, LLC's Opposition to Plaintiff's Motion for Summary Judgment
Case No.: CV-12-01117EJD

extraordinary gains on Twitter stock transactions. (Forlizzo Dec. ¶6.) The fact that an investment fund is foreclosed from investing in stocks is a "logical" loss of business opportunities, as much as any other business with foreclosed operations suffers a "loss." Weaver's MSJ contorts logic to draw a caricature of Tampa's claims. (MSJ, p. 11:9-13.) Weaver's dishonor of the LOI and related forms of disparagement are the facts that prove that his representations to enter a non-binding LOI were untrue. Tampa was induced by Weaver's misrepresentations, and following Weaver's dishonor of the representations, Tampa became a worthless entity.

Weaver did not notify Twitter employees that his "deal" fell through because he signed a "nonbinding LOI," as he represented to Tampa; rather, Weaver told Twitter employees (including its in-house counsel) and investors that Tampa breached the LOI. (CC ¶¶ 34, 52, 59.) Tampa's decision to execute the LOI was induced as a direct result of Weaver's representation that he would sign a "non-binding" LOI, and his execution of such LOI.

Due to Weaver's misrepresentations around the LOI and his execution of the LOI, Tampa agents solicited investors for specifically for this "deal" (SSUMF ¶ 21), which was nearly ten times the dollar amount of Tampa's previous LOIs for Twitter stock. Tampa's agents also reduced efforts to secure other LOIs while Tampa had a $28,111,200 LOI pending with Weaver. Weaver's First Amended Complaint ("FAC") states the reasons why Tampa would reduce its efforts to solicit more sellers of Twitter stock:

> Discovery has further revealed that, by letter agreements dated June 14, 2011, that look like the one given to Weaver, Tampa had entered into two earlier transactions involving Twitter stock. Each was for a per-share price at $20, but at much lower volumes than Weaver's deal. The one with Brendan Thomas was for 100,000 shares, and a cumulative price of $2,000,000. The one with Santosh Jayaran was for 90,000 shares, and a cumulative price of $1,800,000.

(FAC ¶ 59, fn. 1.)

/ /

/ /

/ /

3. <u>Tampa Was a Viable Investment Vehicle Which Lost all Value.</u>

In 2011, Tampa's placement agents had approximately 1,400 qualified investors who had purchased interests in Pre-IPO stock, and both agents had solicited investors for Weaver's shares who were interested in buying Twitter stock. (SSUMF ¶ 21.) The fact that Tampa had not been fully funded at the time of executing the LOI has no bearing on its expenses and lost profits.

The number of Tampa's initial members and the capitalization of the LLC are both immaterial, in light of the fact that Tampa merely executed a non-binding LOI, maintaining ongoing fundraising efforts by its placement agents. (SSUMF ¶ 16) Similarly, the fact that Tampa had only executed two LOIs for Twitter stock prior to the Weaver deal is immaterial to Weaver's MSJ. (SSUMF ¶ 18, 19.)

After Weaver dishonored the LOI and took actions in furtherance thereof, Tampa's sole business purpose was completely frustrated and further solicitations of sellers or investors became futile. (NOL: Ex. C, Forlizzo Dep. at 32:1-19; 33:13-19.)

The testimony of one agent, Forlizzo, about his knowledge of Tampa's business activity after Weaver dishonored the LOI is immaterial. Furthermore, Forlizzo twice testified that McCabe and Bivona would know whether other agents of Tampa made efforts to solicit more sellers of Twitter stock and additional investors to fund such prospective purchases. (SSUMF ¶ 20, 21, 22, 23, 24.)

### III. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).) If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, summary judgment is not proper. (*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 (1968). "All that is required is that sufficient evidence supporting the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." (*Id.* at 288-89.) If reasonable minds could differ as to the import of the evidence, summary judgment is not proper. (*Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1949). The judge's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter but only to determine whether there is a genuine issue for trial. (*Anderson, supra*, 477 U.S. at 249.)

  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).) Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. (Id.) Once the moving party meets its initial burden, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' [and] designate 'specific facts showing that there is a genuine issue for trial.'" (Id., 324 (quoting Fed. R. Civ. P. 56(e)).) The non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading." (Fed. R. Civ. P. 56(e); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989).) However, any inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. (*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).)

  Weaver failed to meet his initial burden because he mischaracterizes the record and his motion should be denied. In any event, as set forth in this opposition, genuine issues of material fact exist; therefore, Weaver's motion seeking summary judgment should be denied in its entirety.

//
//
//
//

## IV. ARGUMENT

### A. Plaintiff's MSJ Fails to Address the Elements of Each Claim.

#### 1. Intentional Misrepresentation.

To recover for fraud based on an intentional misrepresentation, Tampa must prove: (1) that Weaver represented to Tampa that an important fact was true; (2) that Weaver's representation was false; (3) that Weaver knew that the representation was false when he made it, or that he made the representation recklessly and without regard for its truth; (4) that Weaver intended that Tampa rely on the representation; (5) that Tampa reasonably relied on Weaver's representation; (6) that Tampa was harmed; and (7) that Tampa's reliance on Weaver's representation was a substantial factor in causing its harm. (California Civil Jury Instruction No. 1900; *Gonsalves v. Hodgson* (1951) 38 Cal.2d 91, 100-101; *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412; *Anderson v. Deloitte & Touche* (1997) 56 Cal.App.4th 1468, 1474.)

"The general rule is that unless a party's reliance is irrational or "preposterous," he or she is entitled to rely on the representations of the other party and on the representations of the other party's agent without making an independent investigation to discover the falsity of the representation. (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 488-489.) Punitive damages may be recovered for intentional fraud." (*Tri-Delta Engineering, Inc. Insurance Co. of North America* (1978) 80 Cal.App.3d 752.)

In this case, Weaver represented to Tampa his agreement to enter a non-binding LOI (via email, to someone Weaver understood to be Tampa's broker, and through his execution of the LOI.) (SSUMF ¶13.) In fact, Weaver did not intend to honor these representations if Twitter did not exercise or assign its ROFR, and he knew this when he expressed his intent to Tampa. Weaver intended for Tampa to rely upon his misrepresentation, which was reasonable based upon his deliberation and decision, and to execute the LOI with a "too good to be true price." Tampa incurred costs as a result, lost profits on other Twitter stock transactions, and ultimately became a defunct entity foreclosed from its sole business purpose.

Further, if Tampa had not relied upon Weaver's representations it would have avoided the out-of-pocket costs and opportunity costs it lost on Weaver's LOI and "lived to fight another

day" in the pre-IPO market for Twitter stock. By attaining Twitter's approval to purchase its stock, Twitter was a valuable enterprise. Due to Weaver's deception, Tampa became worthless.

### 2. Negligent Misrepresentation.

The prevail on its claim for negligent misrepresentation, Tampa must prove: (1) that Weaver represented to Tampa that an important fact was true; (2) that Weaver's representation was not true; (3) that Weaver had no reasonable grounds for believing the representation was true when he made it; (4) that Weaver intended that Tampa rely on this representation; (5) that Tampa reasonably relied on Weaver's representation; (6) that Tampa was harmed; and (7) that Tampa's reliance on Weaver's representation was a substantial factor in causing its harm. (CACI 1903; *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 402.)

Here, Weaver represented to Tampa his agreement to enter a non-binding LOI without intent to honor these representations if Twitter did not exercise or assign its ROFR, knowing his true intent, and seeking to induce Tampa to execute the LOI for a "too good to be true price." Tampa's reliance was reasonable and it suffered a range of damages set forth above as a direct result of Weaver's concealment.

### 3. Concealment.

To prevail on its claim for fraudulent concealment, Tampa must prove: (1) that Weaver intentionally failed to disclose an important fact that was known only to him and that Tampa could not have discovered; (2) that Tampa did not know of the concealed fact; (3) that Weaver intended to deceive Tampa by concealing the fact; (4) that Tampa reasonably relied on Weaver's deception; (5) that Tampa was harmed; and (6) that Weaver's concealment was a substantial factor in causing Tampa's harm. (CACI 1901; *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248.)[5]

---

5 The circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (2) when the defendant actively conceals a material fact from the plaintiff; and (3) when the defendant makes partial representations but also suppresses some material facts… Each of the [three non-fiduciary] circumstances in which nondisclosure may be actionable presupposes the

-10-
Defendant Tampa Investment Group, LLC's Opposition to Plaintiff's Motion for Summary Judgment
Case No.: CV-12-01117EJD

Here, Weaver concealed from Tampa his intent to dishonor the non-binding terms of the LOI, and Tampa had no way of knowing the deception which Weaver intended. Tampa suffered harm, as set forth above, which was the direct result of Weaver's concealment.

**4. False Promise.**

"Promissory fraud" is a subspecies of fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [¶] An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract.' " *Engalla v. Permanente Medical Group, Inc.* 15 Cal.4th 951, 973—974 (1997, internal citations omitted.)

"A promise of future conduct is actionable as fraud only if made without a present intent to perform. 'A declaration of intention, although in the nature of a promise, made in good faith, without intention to deceive, and in the honest expectation that it will be fulfilled, even though it is not carried out, does not constitute a fraud.' Moreover, ' "something more than nonperformance is required to prove the defendant's intent not to perform his promise." . . . [I]f plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury.' " (*Magpali v. Farmers Group, Inc.* 48 Cal.App.4th 471, 481 (1996, internal citations omitted; *see also* CACI 1902.)

Here, the "performance" Weaver promised, but never intended to deliver, was to acknowledge Tampa's right to terminate the proposed sale, for any reason or none at all, without consequences, just as Tampa was obligated to honor Weaver's right to do the same. Weaver and his transactional attorney's (i) actions to draft material—but surreptitious—modifications to the

---

existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise . . . [S]uch a relationship can only come into being as a result of some sort of transaction between the parties… Thus, a duty to disclose may arise from the relationship between seller and buyer…or parties entering into any kind of contractual agreement.' All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances." (*Limandri v. Judkins* (1997) 52 Cal.App.4th 326, 336—337 (internal citations, italics, and footnote omitted).)

non-binding nature of the LOI, which were never delivered to Tampa or its agents, followed by (ii) the final addition of a superfluous sentence—to feign confusion, show that Weaver had no intent to perform as he represented.

### B. Agency

Under the doctrine of imputed knowledge a principal is chargeable with the knowledge or notice received by his or her agent while the agent is acting within the scope of his or her authority. *Columbia Pictures Corp. v. DeToth*, 87 Cal. App. 2d 620, 630 (1948). The law imputes the knowledge to the principal, regardless of whether the agent actually communicates the knowledge to the principal. (Id).

"As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." *Columbia Pictures Corp.*, 87 Cal.App.2d at 630; *Cal. Civ. Code, § 2332*. The agent acting within the scope of his authority, is, as to the matters existing therein during the course of the agency, the principal himself. *Wittenbrock v. Parker*, 102 Cal. 93, 101, 102 (1894). "The fact that the knowledge acquired by the agent was not actually communicated to the principal . . . does not prevent operation of the rule." *Columbia Pictures Corp.*, 87 Cal.App.2d, at 630; *O'Riordan v. Federal Kemper Life Assurance Co.*, 36 Cal.4th 281, 288 (2005). "This rule of law is not a rebuttable presumption. It is not a presumption at all. It is a rule which charges the principal with the knowledge possessed by his agent." *Columbia Pictures Corp.*, 87 Cal.App.2d at 631.

Here, all of Tampa's agents represented a limited liability company. Tampa, the entity, is imputed with the knowledge of all its agents whether or not all of the agents shared the same knowledge.

//
//
//
//
//

-12-
Defendant Tampa Investment Group, LLC's Opposition to Plaintiff's Motion for Summary Judgment
Case No.: CV-12-01117EJD

## V. CONCLUSION

Weaver's Motion for Summary Judgment to Tampa's Counter-claim should be denied in its entirety.

Respectfully submitted,

Dated: March 2, 2015

THE KING LAW GROUP

By: _____
David A. King, Esq.
Attorney for Defendant Tampa Investment Group, LLC

-13-
Defendant Tampa Investment Group, LLC's Opposition to Plaintiff's Motion for Summary Judgment
Case No.: CV-12-01117EJD